AND THE

## CORRECTION OF ERRORS,

OF THE

## STATE OF NEW-YORK,

FEBRUARY AND MARCH, 1810.

---

JOHN V. N. YATES, Plaintiff in Error,
> *against*

The PEOPLE of the STATE of NEWYORK, } Defendants in Error.(*a*)

YATES
*v.*
THE PEOPLE.

---

THIS cause came before this court, on a writ of error directed to the supreme court.

On the 5th of *February*, 1810, the following order was moved:

" On reading and filing the affidavit of Mr. *Rodman*, of counsel for the plaintiff in error, ordered, that the justices of the supreme court of judicature forthwith make return to the writ of error allowed and filed in this case, according to the exigency of the writ."

The consideration of the motion was postponed; and on the 13th of *February*, the Court took into considera-

*The court of chancery has no right to refuse a writ of error, or to supersede it, after it has issued, in any civil case, or in a not capital.*

*A writ of error will lie on a judgment of the supreme court on a habeas corpus.*

*Where A. B. a master in chancery, was committed by the court of chancery, and the order of commitment.*

(*a*) This case is so entitled in the record returned by the supreme court, though the proceedings before that court were *ex parte Yates*.

*IN ERROR.*

ALBANY,
Feb. & March,
1810.

YATES
v.
THE PEOPLE.

tion the order as moved for by Mr. *Rodman*, on the 5th instant; and having heard the chancellor assign his reasons for issuing a *supersedeas* to the writ of error issued in the said matter, it was ordered that the said rule be affirmed as of this day.(*a*)

On the 15th *February*, the writ of error was returned by the supreme court. The writ and return were as follows:

"The People of the State of *New-York*, by the grace of GOD free and independent, to our justices of our supreme court of judicature, greeting: Because in the record and proceedings, and also in the rendering of judgment of and upon a certain *habeas corpus*, returnable before you, whereby *John V. N. Yates*, in the said writ named, was brought before you, and was afterwards remanded by you to the custody of the sheriff of the city and county of *Albany*, for a certain contempt alleged to have been committed by him in our court of chancery, manifest error, as it is said, hath happened, to the great

*Marginal headnote:* stated, that A. B. while he was master, filed a bill to which he subscribed the name of C. D. one of the solicitors of the court, without his knowledge or consent, and prosecuted the suit in his name, "contrary to the statute in such case made and provided, in wilful violation of his duty, as master, and in contempt of the court;" and "for the said malpractice and contempt," the said A. B. was ordered to be "committed to gaol, there to remain until the further order of the court;" it was held, that the commitment was illegal and void, being for an offence against the statute, of which the court of chancery had no jurisdiction.

(*a*) The supreme court was sitting from the 5th to the 17th *February*, during which time the judges did not attend in the court of errors.

A copy of the above order was served on the chief justice, by the clerk of the senate, on the 13th *February*.

The court of chancery cannot commit for a contempt, on the affidavits of witnesses only, without first putting the party to answer to interrogatories.

*It seems*, that courts of justice cannot commit for contempts, for an indefinite time; or until the further order of the court.

A judge of the supreme court, in vacation, has the same power, under the *habeas corpus* act, which the court itself possesses at common law, except in cases of treason or felony.

If a judge, in vacation, discharges a prisoner brought before him on *habeas corpus*, such discharge, whether erroneous or not, is final and conclusive, and the party cannot be again imprisoned for the same cause; unless by order of the court in which he is recognised to appear, or other court having jurisdiction of the cause.

Where a judge in vacation discharged a master in chancery, committed by order of the court of chancery for malpractice and contempt, it was held, that the chancellor could not recommit the party for the same cause.

A person, out of court, cannot be committed for a contempt by an *order* of the court, without a *writ* or *warrant*.

A person who has been regularly committed, and afterwards set at large, cannot be recommitted, by an order grounded upon and reciting the original writ or attachment.

Where the court of chancery commits a person for an offence against the statute relative to solicitors and others, and also for a contempt, a judge in vacation, or the supreme court in term time, may discharge the prisoner, on *habeas corpus*; and *it seems*, that a judge of the supreme court, or the court, may discharge, on *habeas corpus*, a prisoner committed by the court of chancery for a contempt only.

A prisoner may be discharged on *habeas corpus*, though the conviction or judgment on which he has been committed remains in full force.

damage of the said *John V. N. Yates*, as by his complaint
we have understood: We, therefore, being willing that
the error, if any hath been, should be duly corrected, and
full and speedy justice done to the said *John V. N.*
*Yates* in this behalf, command you, that if judgment
thereof be given, then the record and proceedings afore-
said, with all things touching the same, to the president
of the senate, and the senators and chancellor of our
said state, under your seal, you distinctly and openly
send, so that you may have the same before our said
president, senators and chancellor, at the next meeting
of the senate, together with this writ, wheresoever the
same shall then be, without delay, that the record and
proceedings aforesaid being inspected, we may further
do or cause to be done, for amending the said error, what
of right, and according to the laws and customs of our
said state, ought to be done. Witness *John Lansing*,
junior, esquire, chancellor of our said state, at the city
of *New-York*, the first day of *September*, in the thirty-
fourth year of our independence, and in the year of our
Lord one thousand eight hundred and nine.

" *Champlin*, attorney.

" *Edmund Elmendorf*, Clerk.

" To our justices of our supreme court of judicature
of the state of *New-York*, in the case of *John V. N. Yates*
on *habeas corpus*. Tested the first day of *September*,
A. D. 1809, and returnable before the president of the
senate, the senators and chancellor, at the next meeting
of the senate.

" *Edm. Elmendorf*, Clerk.

" *Champlin*, att'y."

" The justices of the supreme court humbly certify
and return to the president of the senate, the senators
and chancellor, in the court for the trial of impeach-
ments and the correction of errors, that the writ of error
hereunto annexed was filed in the clerk's office of this
court, on the 12th day of *September* last, by which it was

*IN ERROR.*
......
ALBANY,
Feb. & March,
1810.

YATES
v.
THE PEOPLE.

commanded to the said justices to return to your honourable court the proceedings in the supreme court upon the writ of *habeas corpus* awarded in the case of *John V. N. Yates:* And the said justices do further certify and return, that the writ of *supersedeas* also hereunto annexed, was filed in the said clerk's office, on the 28th day of *September* last, by which it is declared, that the said writ of error improvidently and irregularly issued, and by which the said justices are commanded to desist from making any return to the said writ of error. The said justices are accordingly unadvised what of right ought to be done in the premises, as they humbly apprehend that it appertains to your honourable court, and not to them, to determine whether the said writ of error be valid and operative, notwithstanding the said writ of *supersedeas,* or whether it be null and void by reason of the said *supersedeas.*

" If your honourable court should adjudge it inoperative, no farther return will be required; but if your honourable court should adjudge it valid and operative, the said justices are ready to obey the said writ of error, by making a return according to the requisition thereof. All which is humbly submitted.

" *James Kent,* Ch. Justice."

" The people of the state of *New-York,* by the grace of GOD free and independent, to our justices of our supreme court of judicature, greeting: Whereas, by our certain writ of error, tested on the first day of this present month of *September,* issued from and out of our court of chancery, under the seal thereof, we lately commanded you, because, in the record and proceedings, and also in the rendering of judgment of and upon a certain writ of *habeas corpus* returnable before you, whereby *John V. N. Yates,* in the said writ named, was brought before you, and was afterwards remanded by you to the custody of the sheriff of the city and county of *Albany,* for a certain contempt alleged to have been committed

by him in our court of chancery, manifest error, as it was said, had happened, to the great damage of the said *John* *V. N. Yates*, as by his complaint we had understood, and therefore being willing that the error, if any had been, should be duly corrected, and full and speedy jus- tice done to the said *John V. N. Yates*, that if judgment thereof had been given, that the record and proceedings aforesaid, with all things touching the same, to the pre- sident of the senate, the senators and chancellor of our state, at the next meeting of the senate, together with the said writ you distinctly and openly should send, so that you might have the same before the president, se- nators and chancellor, at the next meeting of the senate, together with the said writ, wheresoever the same should then be, without delay, so that we might further do, or cause to be done, for amending the said error, what of right, and according to the laws and customs of our said state, ought to be done. Nevertheless, because that writ, out of our said court of chancery, improvidently and irregularly issued, therefore we command you, that from sending the records, proceedings and writ of error aforesaid, before our said president, senators and chan- cellor, or from making any return to the said writ of er- ror, you entirely desist and supersede. Witness the honourable *John Lansing*, junior, esquire, chancellor of our said state, at the city of *Albany*, the twenty-seventh day of *September*, in the thirty-fourth year of our inde- pendence.

" *Van Ingen*, Clerk in Chancery."

This return having been read, the court directed the *attorney-general*, on the one side, and the counsel of Mr. *Yates*, on the other, to argue the preliminary question, as to the sufficiency of the return, whether the chancellor had a right to issue the *supersedeas*, and whether the same was not null and void; and *Thursday*, the 22d of *February*, was assigned for hearing the argument.

*IN ERROR.*

ALBANY,
Feb. & March,
1810.

YATES
v.
THE PEOPLE.

*Rodman*, for the plaintiff in error. It was out of the jurisdiction of the chancellor to issue a *supersedeas*. If this was a case in which no writ of error would lie, it belonged to this court, alone, to decide on that point. A writ of error is a matter of right, and the chancellor is bound to issue it, when demanded. He can only have a right to supersede, where he has a discretion to grant the writ or not. By the first section of the act, (sess. 24. c. 25.) " writs of error, in all civil cases, and in criminal cases, not capital, are considered as writs of right, and issue, of course, subject to the regulations prescribed by law." By the *fourth* section of the same act, it is provided, that " no writ of error issue, to remove a judgment, out of the supreme court, unless the party applying for it, shall deliver to the officer, whose duty it is to issue it, a certificate of a counsellor of the supreme court, that he has examined the record, and that, in his opinion, there is error in substance therein." The language of the act is imperative; and on presenting the requisite certificate, the clerk in chancery, has no discretion, but must grant the writ to the party applying.

* 3 *Wils.* 188.
193.

In the case of *Crosby*, mayor of *London*,* Lord Chief Justice *De Grey* said, that, " in all cases, except treason and felony, a writ of error is grantable of right." So,

† 2 *Salk.* 503,
504.

in the case of *The Queen* v. *Paty and others*,† ten of the judges held, that the queen could not deny a writ of error; but it was grantable *ex debito justitiæ*, except only

‡ 2 *Com. Dig.*
*Chancery,*(4 E.)

in treason or felony. Baron *Comyns*‡ states all the cases on the subject; but there are none to support the *super-sedeas* in the present case. The court of chancery will not supersede a writ of replevin, issued out of chancery, unless

§ 2 *Atk.* 237.

a fraudulent use is made of it;§ nor can it supersede or

¶ 3 *Atk.* 479.

quash a writ after its return;¶ nor will it supersede a special original, because it has been altered by the plaintiff's attorney, with leave of the cursitor, and resealed;

** 3 *Atk.* 595.

for that is the course of the office.** In the case of

†† 3 *Johns. Rep.*
554. 556.

*Hartshorne* v. *Sleght*,†† the chancellor was of opinion,

that a writ of error was a writ of right, and issued of course, subject to the statutory restraint, as to a certificate of counsel; and, in that case, *this court* quashed the writ of error, because it had improvidently issued.

The case of *The King* v. *The Dean and Chapter of Dublin,** shows that the court of appellate jurisdiction is the only court to decide on its jurisdiction; and the writ of error must be returned, in order that it may decide whether to quash the writ or not. A contrary doctrine would subject the jurisdiction of this court to the will of the court of chancery.

In the case of *Lloyd* v. *Skutt,*† it was held that a writ of error, from the court of king's bench to the court of exchequer, could not be quashed in the K. B., but that application should be made either to the court from whence it issued, or the court to which it was returnable : and on application to the court of chancery, it refused to entertain the question.

The circumstances of the case of *The Lessee of Lawler* v. *Murray,*‡ are peculiar. A writ grounded on the statute of *Westm.* 2. c. 31. commanding the justices of the K. B. to affix their seal to bills of exceptions, was made out and issued by the *cursitor*, and which was obeyed by the judges. Afterwards, and before the return of the writ, the lord chancellor, being informed of the proceedings, was of opinion that the writ issued improvidently, and ought to be superseded; that it was a case, in which special application must be made to the person holding the great seal, and that it was not to be issued by the *cursitor*, as a writ of course. It came, therefore, within the distinction I have laid down, between writs of error which are grantable of common right, and of course, and such as are to be obtained only by special application.

The statute of *Westminster* 2. c. 13. *Edw.* I. c. 24. provided, that where a case arose, requiring a remedy, and no precedent of a writ could be found, the clerks, in

*In margin right:*

IN ERROR.
......
ALBANY,
Feb. & March,
1810.

YATES
v.
THE PEOPLE.

* 1 *Str.* 536.

†*Doug.* 351. and note 353.

‡ 1 *Schoales &* *Lefroy*, 75.

*IN ERROR.*
......
ALBANY,
Feb & March,
1810.

YATES
v.
THE PEOPLE.

\* 1 *Harr. Ch.*
*Pr.* p. 7. 9.

chancery should agree in forming new one; and if they could not agree, it should be adjourned to the next parliament. It was not the duty or business of the chancellor to frame writs.

It was the opinion of Lord Keeper *North*, that where a writ of error was issued improvidently, the proper remedy was by injunction, not a *supersedeas*.\*

It is a general rule, that exceptions to writs must be made in the court to which they are returnable.

*Van Vechten*, Attorney-General, contra. I shall endeavour to show: 1. That, in strictness, no writ can issue, without an order for that purpose; 2. That if a writ is improperly or surreptitiously obtained, or has issued improvidently, it is in the power of the chancellor to supersede it. This doctrine does not, in the least, impair the rights of the citizen; but is essential to the maintenance of order in the administration of justice.

1. Every court has necessarily a control over its own process. It prescribes the forms of process; and if no form is already established, to afford the proper remedy, then a new writ must be devised, and cannot issue, without the sanction of the court. It is the court out of. which the process is to issue, that must decide on the form of the writ, and whether it is proper to be issued. A clerk is a mere ministerial officer of the court, appointed by the chancellor himself, and subject to his direction in all cases.

It is reasonable and fit that the court should have the power to prevent and to correct any abuse of its process. Is a clerk, then, to be the sole judge, when it is proper that a writ should issue, or to decide whether the prerequisites of the statute have been complied with, by the party who applies for the writ?

The original business of the court of chancery, was to devise writs, and to afford specific relief in cases not provided for.† It is true, some of the duties originally performed by the chancellor have been delegated to clerks;

† 2 *Inst.* 255.
3 *Bl. Comm.* 48,
49. 51.

but this does not take away the right of the chancellor, whenever he sees fit, to perform these duties in person, and to decide on the propriety of granting writs. The chancellor, in *England*, was constituted by the delivery of the great seal into his custody; and to him belonged the right of affixing the seal to all patents, writs, &c.* It is the implication of law, that all writs are devised and issued by the chancellor. Who was to frame these writs, or settle the form of them? Not the parties who applied for them. The *register* shows that certain forms had been provided and established, by which the clerks were to be governed. Who is to decide whether a writ is conformable to the *register* or not? Not the party; but the chancellor.

Whenever application is made for a writ of error, three things are to be decided: 1. Whether the application is well founded; 2. Whether a writ ought to issue; 3. What shall be the form of the writ. These questions, by implication of law, are to be decided by the chancellor, before the writ can issue. It is true, that in ordinary cases these questions are not made, because the opinion of the court is well known and understood. The case of *Lawler* v. *Murray* shows that new writs cannot be made out by the *cursitor*. In particular cases, where there is no prescribed form of a writ, it cannot be issued, until it is settled and approved by the chancellor. When it is once framed, it is entered in the *register*, and serves for a precedent. But the chancellor cannot decide on the form of the writ to be issued, in a new case, if a clerk may, without his knowledge, or against his will, put the seal of the court to any writ that is presented to him. It seems, then, that where a writ has been irregularly and improvidently issued by the clerk, it is in the power of the chancellor, and it is his duty, to quash it, if it has not been actually delivered out, or, if it has not been actually returned to the court into which it is made returnable, to supersede it.

IN ERROR.
......
ALBANY,
Feb. & March,
1810.

YATES
v.
THE PEOPLE.

* 1 *Harr. Ch. Pr.* 3—15. 4 *Inst.* 87, 88.

*IN ERROR.*

ALBANY,
Feb. & March,
1810.

YATES
v.
THE PEOPLE.

It is said, that a writ of error is a writ of right in civil cases, and in criminal cases not capital. True, it is a writ of right in every case in which a writ of error lies ; or in which it is right and proper to issue, by law. But is the clerk to be allowed to put the seal of the court to every writ which a party may present to him? Suppose the writ presented is directed to a justice's court, or to a court of common pleas, and made returnable to this court. Are writs of error, in such and similar cases, to be issued of course, by the clerk? Is he bound by the statute to grant them? The doctrine contended for by the other side may lead to great abuse, and produce serious inconveniences. Writs of error may be issued in every case in which the parties may demand them, and all proceedings must be stayed, until this court decides, on the return, whether they ought to have issued.

The act declares, that writs of error, in all civil cases, and in criminal cases, not capital, shall be considered as writs of right, and issue, of course, subject to the regulations prescribed by law. Now what are the regulations to which the statute refers? Not those contained in the subsequent part of the act; but the regulations established by long existing usage, and the practice of courts on the subject, as has been stated.

Again, by the act of the 23d of *February*, 1802, (sess. 25. c. 15.) it is declared, that all process to be issued out of the court of chancery shall be under the seal thereof, " and shall be in such form as the said court shall from time to time establish, expressive of the design or end for which the same shall issue." It seems to follow, by necessary implication, that no writ can issue, but in the form devised by the chancellor. Unless then it is shown, that the chancellor had prescribed or adopted a form, in this case, he had a right to stop the writ before it reached this court.

IN ERROR.
........
ALBANY,
Feb. & March,
1810.

YATES
v.
THE PEOPLE.

Anciently, the governor of the state, who was, *ex officio*, chancellor, had the custody of the seals ; but by the act of the 6th of *April*, 1790, re-enacted the 3d of *April*, 1801, (sess. 24. c. 133.) the seals of the court of chancery are placed under the direction of the chancellor, who is to cause them to be deposited in such places as he shall deem most convenient for the administration of justice.

We are told that, if the doctrine for which we contend is to prevail, it will be placing the court of chancery above this court; it will enable the chancellor to abridge and control the jurisdiction of this court. But if he abuses his power, in this respect, he is responsible, and amenable to punishment. It does not follow, that because the chancellor may possibly refuse a writ, that no application is to be made to him for it. Because this court has power, by the constitution, to correct the errors of the court of chancery, and of the supreme court, it does not follow, that it is to exercise that power in every case which may be brought before them, in any manner the party pleases. It should appear that the case comes before the court regularly, according to the established rules and course of proceeding, and on a writ regularly and duly obtained.

The cases which have been cited go no further than to show that writs of error, in civil cases, are writs of right, and grantable *ex debito justitiæ*, not *ex gratia.* But the question again recurs, in what case is it a writ of right? Is it a proper case for a writ of error to issue?

The doctrine I contend for is this; that before the process is returned into the court to which it is made returnable, the court from which it issued may quash it, or stop it by a *supersedeas*, or an injunction. After it is returned, application must be made to the court to which it is returned, to quash it.

*IN ERROR.*

ALBANY,
Feb. & March,
1810.

YATES
v.
THE PEOPLE.

Though a *supersedeas* cannot issue to the court to which the writ of error is returnable, it does not follow that it may not be directed to the court to which the writ was directed, and who are required to obey it. The power that can command obedience, may dispense with that obedience, and revoke its command, before it has been executed.

*T. A. Emmett*, in reply.   This is a question of great importance, though not of difficult solution.   It is a contest between the powers of a branch of the judiciary, and the rights of the citizen ; and if there be any doubt, the latter ought to prevail.   Much of the argument of the attorney-general turns on the point, whether this was a *formed* writ.   He supposes there was something for the chancellor to devise and form.   But the writ is in the common and ordinary form of a writ of error, as the same is used every day.   It is, then, to be found in the *register*, and requires no judicial power to mould or frame it. It is in the power and is the duty of the chancellor to devise new writs for the benefit of suitors.   If a suitor, through ignorance, asks for a writ which does not suit his case, it is not, therefore to be denied him ; but it must be left to the court to which it is returned to decide on its fitness.   The writ is, then, *ex debito justitiæ*, due to the suitor, and issues as matter of course.

That a writ of right, issuing by law, as matter of course, should be under the control of the court of chancery, who may abridge or deny this right, cannot be law. What is due of course, must issue of course.   The statute makes a distinction between writs of *right* and writs of *grace ;* the latter are to be obtained by a petition or application to the chancellor ; thereby necessarily implying that the former are to be granted, without any such application.   The course and practice of the court of chancery in *England*, though not binding here, is to be regarded.   Not a case can be found, nor even an intima-

IN ERROR.
......
ALBANY,
Feb. & March,
1810.

YATES
v.
THE PEOPLE.

tion that the court of chancery in *England*, ever refused, or required a special application for a writ, which issues of course.

In the absence of all precedent, we must resort to principle. It is said, every court must have control over its own process. True ; but is a writ of error, returnable into this court, the process of the court of chancery or of this court? I contend that a writ of error, directed to the supreme court, and made returnable here, is the process of this court, and no other court or power can control or stop it.

Again, as to the issuing this writ, the court of chancery has been considered by the attorney-general, as a *court*. But in regard to the issuing of writs of error, it is a mere *officina brevium ;* a mere ministerial office of this court. Though I admit, that in regard to writs which do not issue of course, but on petition, the chancery must be considered as a court having jurisdiction.

Some writers have considered the *officina brevium*, as a part of the common law jurisdiction of the court of chancery in *England.* But in this state, the court of chancery is a mere court of equity, without any common law jurisdiction whatever. It is true that the *officina brevium* has been left, by statute, to the court of chancery ; but, in this respect, the court has no power but what is conferred by statute. It has no discretion whatever, in regard to issuing writs of right.

In the case of *Hartshorne* v. *Sleght*,* the chancellor said, " a writ of error is a writ of right, and issues of course, at the instance of the party conforming to the statutory restraint, which requires the certificate of counsel, as a prerequisite to its issuing.". There is nothing that can restrain the issuing of a writ of error, but the statutory prerequisite. If the right be abused, or wrested, for the purposes of vexation, or oppression, it is this court, possessing jurisdiction of the cause, which is to quash the writ. If any person should be so foolish

* 3 *Johns. Rep.* 554. 556.

*IN ERROR.* as to take out a bad writ, he must pay the costs. It will
ALBANY, be found in the *Year Books,* that an objection was fre-
Feb. & March, quently made in the courts to which writs were returna-
1810. ble, that were not conformable to the *register.*

YATES          Even if the writ had been obtained without a certifi-
v.
THE PEOPLE. cate of counsel, it could not be stopped by the court of
chancery; but it belongs to this court to quash it, with
costs. The statute which requires the certificate of
counsel, does not give to the court of chancery the
power to stop or quash the writ, issued without such pre-
requisite, but inflicts a penalty on the officer issuing it.

As to the act of 1802, (sess. 25. c. 15.) the 8th sec-
tion speaks of the process of the court of chancery.
Is a writ of error the process of that court? If it is,
then it must, according to the same section of the act,
be directed to the sheriff of the county, where it is to be
executed. But a writ of error being directed to the su-
preme court and returnable here, must be deemed the
process of this court. By the constitution, the court of
chancery is a court of equity only, and can have juris-
diction for no other purpose.

As to the supposed applications for writs of error,
in cases where, by law, they do not lie; such writs
are to be treated, by every person, as perfect nullities, and
wholly disregarded.

No inconvenience can result from the doctrine for
which we contend, that this court shall decide, whether the
writs returnable here are erroneous or not; but much
inconvenience and injury may result from a contrary
doctrine. It would place the court of chancery above
this court; for if it can refuse, or quash, or supersede
writs of error, it can prevent this court from exercising
its constitutional jurisdiction, and will itself become, in
effect, the court of errors.

A court which has no right to refuse a writ, when
demanded, has no right to supersede it. A writ of right,
after it has once issued, cannot be controlled in any man-

ner, except by the court to which it is made returnable.
Not a case is to be found, in the *English* books, in which
the chancellor, in *England*, has superseded a writ of
error returnable into another or higher court. The case
of *The King* v. *The Dean and Chapter of Dublin*,* was
on a writ of error from the K. B. in *Ireland*, and it was
decided that a writ of error would not lie, on the award *\* 1 Str. 536.*
of a peremptory *mandamus*. In the case of *The King* v.
*Hearle*,† which was also a case of *mandamus*, it was de- †1 *Str.* 625. 628.<br>3 *Bro. P. C.* 178.
cided on error, in parliament, that a writ of error would 2*Bro. P. C.* 554.
not lie, and the writ was quashed. Had the court, from
which the writ of *mandamus* issued, thought they had
the power to supersede it, they would certainly have ex-
ercised the right, and have stopped the writ.

In the case of *Lloyd* v. *Skutt*,† Lord *Mansfield* gave ‡ *Doug.* 351.
no opinion on this question : he intimated that applica-
tion to quash the writ must be made either to the court
of chancery, from whence it issued, or to the court of
exchequer, where it was returnable. It appears, from a
*note* of the reporter, that application was, afterwards,
made to the court of chancery, who refused to entertain
the question, thereby expressing very strongly the opi-
nion that the court of chancery had no jurisdiction in
the case. Yet the *English* chancellor has higher powers
and prerogatives than the chancellor of this state.

The case of *The Queen* v. *Paty and others*,§ arose on § 2 *Salk.* 503.
a *habeas corpus*, and is analogous to the present. If the 2 *Ld. Raym.*<br>1105. S. C.
court of chancery had jurisdiction in that case, how came
it to be referred to the decision of the twelve judges.
Supposing the chancellor to have had jurisdiction, such
a proceeding would have been a flagrant violation of his
powers ; and the high and noble lord who presided in
that court, had he supposed his rights to have been in-
vaded, would never have submitted to the violation, in
silence. Ten of the judges were of opinion that the
queen could not deny the writ of error, but that it was
grantable, *ex debito justitiæ*, except only in treason or fe-

IN ERROR.
‾‾‾‾‾‾
ALBANY,
Feb. & March,
1810.
‾‾‾‾‾‾‾
YATES
v.
THE PEOPLE.

* 3 *Wils.* 188.
188.

†*Dig.* tit. *Chan-cery,* 4. (Q.)

lony; and Lord Chief Justice *De Grey* was of the same opinion in *Brass Crosby's* case.*

The case of the *Lessee of Lawler* v. *Murray*, has been cited, as an authority to support the power of the chancellor to grant a *supersedeas*, on the ground that he has power to frame new writs, and must, therefore, decide on the form of them. But to make that case applicable, it must appear that the writ issued out in the present case was a new writ. In the one cited it was a formed writ, issuing at the discretion of the king, or his representative, and not of course; for it was a *mandatory* writ, which the king, in his prerogative, may grant or not; and it is to be observed, that the writ was returnable back to the court of chancery, from whence it issued; so that there is no analogy in the two cases. Lord *Redesdale* merely says it was not issued by the proper officer; for being a mandatory or prerogative writ, it should have been issued by the clerk of the crown, and not by the cursitor. I challenge the learned counsel to produce a case in which the chancellor in *England* has superseded a writ of error returnable to the house of lords, or the exchequer. *Comyns*† has been cited to this point. The authority referred to by *Comyns* is *Fitzherbert's Nat. Brev.* 239. a. but the writ in *Fitzherbert* is a *supersedeas* to an execution, and directed to an inferior court. It is true there are old cases to be found in *Brooke's Abridgment*, (tit. *Supersed.* pl. 5.) of writs of *supersedeas* to executions, issued by the chancellor to the court of king's bench, but they were considered, at the time, as improper.

A court not superior to another court, cannot command that other court not to proceed; for suppose the supreme court had returned the writ of error, notwithstanding the *supersedeas*, could the chancellor have punished the judges for disobedience to his writ? A power to command, implies a power to enforce obedience. Lord Keeper *North* felt this difficulty when he said he

would enjoin the *parties;* for he might bring his power
to bear on them, though not on the judges of the court
of K. B.

The present question is new and extraordinary, and
if decided against us, it can never be again inquired
into; and the supreme court will be bound to obey a *su-*
*persedeas* of the court of chancery. No writ of error
can ever be obtained, but at the pleasure of the chancel-
lor. This court cannot interfere; for it can decide only
on cases brought before it, on a return to a writ of error.
It cannot decide on the question of *improvidence* al-
leged as to the issuing of the writ. And it cannot now
look beyond the writ and return to any extraneous facts,
relative to the issuing of the writ of error. It follows,
then, that the chancellor must remain in the uncontrolled
exercise of his discretion, without any remedy against
him, except that high and awful remedy to courts of jus-
tice, provided by the constitution. He must become al-
together impregnable; and there will be no means of
approaching the court of chancery, or questioning its ad-
judications.

As to the irregularity supposed, of the name of a so-
licitor used to a writ of error, without his consent, it
may be answered, that a solicitor's name is not essential,
and may be rejected, as surplusage; for the party may ob-
tain the writ in proper person. Having once obtained
a writ returnable here, he has a right to be heard in this
court, and no other power can stop him. The only pre-
requisite is a certificate of counsel; and if that is
wanting, this court, on affidavit of the fact, may quash
the writ.

*February* 27. THE CHANCELLOR. I have, on a
former occasion, remarked, that this case comes before
the court under a very peculiar aspect. In its form,
it is presented as intended to correct an error of the
supreme court. In substance, it is calculated to correct

IN ERROR.

ALBANY,
Feb. & March,
1810.

YATES
v.
THE PEOPLE.

an error of the court of chancery. The writ of error which presents the point on which the decision of this court is required, adds another unusual feature, as associated with its professed and real object; for it is returnable before the president of the senate, the senators and chancellor.

The constitution, in its 32d article, prescribes the mode to be observed, in correcting the errors of the court of chancery and of the supreme court; it is, as detached from the sentences preceding it, in this same section, which have no connection with this subject, expressed in the following words: " when an appeal from a decree in equity shall be heard, the chancellor shall inform the court of the reasons of his decree, but shall not have a voice in the final sentence; and if the cause be brought up by a writ of error, on a question of law, on a judgment in the supreme court, the judges of the court shall assign the reasons of such their judgment, but shall not have a voice for its affirmance or reversal."

As this case is not brought up by a writ of error on a question of law, on a judgment in the supreme court, I think neither the letter or spirit of the constitution preclude the judges of that court from being considered as members of this; and I much regret that any considerations of delicacy have prevented them from mingling their opinions on an occasion, which, from its attendant circumstances only, is become important to the due administration of justice, and which, from its technical nature, renders the aid of professional and official information highly desirable.

These remarks apply with greater force to the court of chancery, as to this case; for as to that court, the power of revision in this is, by the constitution, limited to an appeal from a decree in equity; so that the constitutional provision applies to the judicial officers of another court; and without the explanation contained in the act instituting this court, which in the 8th section (1 *Laws of*

IN ERROR.
......
ALBANY,
Feb. & March,
1810.

YATES
v.
THE PEOPLE.

*N. Y.* sess. 24. c. 10. p. 185.) extends the power of revision to " any sentence, judgment, decree, or order," it might involve a doubt, whether any proceedings of the court of chancery could be reviewed here, but on a final decree ; for this word *decree* is used as a correlative of judgment, and, in technical language, without any adjunct exclusively applied to designate a final decree ; so in its 7th section (1 *Laws of N. Y.* p. 184.) the act directs that the party against whom any judgment hath been, or may hereafter be given in the supreme court, may sue a writ of error out of chancery, returnable in this court. In this there is no amplification of this constitutional provision, and it is simply confined to a judgment. In the present case, there is no judgment, but merely an award of the supreme court of a recommitment on a *habeas corpus ;* this will appear from the record now deposited with the clerk of this court, to be received or rejected, as the point may be determined. As it is here, and brought here by the act of this court, though in so questionable a shape, I confess, and, with much concern, I say, I know not whether I am to treat it as here or not ; that is, however, for the consideration of the court.

As the course of these proceedings have constituted me a judge of this court, I mean to avail myself of that character to consider this case, as such, and to place such points before this court, as appear to me to arise out of a just view of the subject.

In doing this, I shall, in the first place, request the attention of the court to the case, which I had the honour to read at the opening of the argument. I shall read it as the report of a case adjudged in the court of chancery. I shall read it, because it contains my reasons for granting the *supersedeas.* I shall read it to give the court the information the constitution intended it should possess ; and, last of all, I mean to be distinctly understood, that I shall read it, because it has been said, that I have no right to read it. I state it in this manner, be-

IN ERROR.
......
ALBANY,
Feb. & March,
1810.

YATES
v.
THE PEOPLE.

cause I intend it as a deliberate assertion of my right to read it; and that if it is still doubted, that it may receive a previous discussion, and not perplex the decision of the case now before the court.

[Here the chancellor read a printed report of the case *ex parte Yates*, which contained the proceedings and opinion delivered in the court of chancery.]

If these reasons are to be attended to; if they form part of the matter on which this court are to pronounce judicially, the cause of the irregularity upon which the court of chancery acted, fully and fairly appears from the report; for it contains not only its opinion, but the state of the case, embracing all the evidence, from which it inferred that the writ of error had issued irregularly, and if this court deem it proper, not only to examine the correctness of the principles which have governed the opinion of the court of chancery, but the evidence on which it acted, both are placed before the court in their whole extent.

The attorney-general, and the counsel for Mr. *Yates*, in discussing this subject, have confined themselves, in argument, to the consideration of the powers of the court generally, as to granting a *supersedeas* to a writ of error, and not to the reasons which influenced the court, in this particular case.

The question, therefore, devested of all the irrelevant matter, with which it has been enveloped, is narrowed to a very simple point.

Whether the court of chancery can, in any case, supersede a writ of error?

In this point of view, it is not an inquiry whether the authority of the court of chancery to issue a *supersedeas* has been properly exerted in this case, but whether a writ touched by the chancery seal, obtained by force or fraud, under any possible circumstances, or in any event, is capable of being superseded by that court; whether the court of chancery cannot say, what it is not denied that every

other court, from the supreme court to that of justices of the peace, may say, this writ has been unfairly obtained ; (1 *Stra.* 6. 1 *Salk.* 492. 1 *Hawk.* 664. s. 61. *Dyer*, 187. *H. P. C.* 140. *Cro. Eliz.* 915.) it has been issued fraudulently, contrary to the rules or orders of the court, or, supposing an extreme case, the seal has been forcibly wrested from the officer to whose custody it was committed, and applied to the writ, and therefore we annul it.

IN ERROR.
......
ALBANY,
Feb. & March,
1810.
YATES
v.
THE PEOPLE.

Are this court prepared to sanction the contrary doctrine ? Will it be imputed to me that I officiously interfere in this case, if I contribute my aid, as a judge of this court, to examine its solidity, which, if correct, would expose the court of chancery to the responsibility of administering justice, without the power of protecting its process from the most flagrant abuse ? I trust not ; and I shall, in a very brief manner, examine the reasons why the authority for granting a *supersedeas* for irregularity or improvidence, possessed by all other courts, is to be denied to the court of chancery :

1. That, by issuing a writ of *supersedeas*, the free flow of justice may be impeded :

2. That the *supersedeas* imports a command to a court of coördinate jurisdiction, and obedience to which cannot be enforced by the court of chancery ; and,

3. That the court of chancery can issue no mandatory writ to this court.

The last point I put entirely out of the case. No mandatory writ lies to this court ; and if the writ of error had been returned to it, the justices of the supreme court had nothing to do with it ; and it was completely, and without any doubt, beyond the reach of the court of chancery.

The first objection is, that the power of issuing a *supersedeas* may stop the free flow of justice.

An authority has been adverted to, by the counsel of Mr. *Yates*, showing that an injunction might have been

IN ERROR.
......
ALBANY,
Feb. & March,
1810.

YATES
v.
THE PEOPLE.

issued by the court of chancery, by which that court might effect the object of the *supersedeas;* if so, the interesting associations attempted to be attached to this question, are completely annihilated; it would reduce it to a mere question of form, for both in superseding and enjoining a writ of error, the flow of justice must be equally interrupted, both equally delaying its progress, and neither preventing an ulterior remedy, if it could be found.

The second point is, that the court of chancery by issuing a *supersedeas* to a writ of error, gave a command to a court of coördinate jurisdiction, an obedience to which cannot be enforced.

It required no act of the supreme court to give the *supersedeas* effect; it notified that court, that in consequence of the writ of error having been issued irregularly and improvidently, it had been annulled, and that a compliance with its command was dispensed with.

It is not pretended that the justices of the supreme court can carry a cause to this court, in error, without a writ of error having been issued out of chancery to authorize them to do so. The writ of error commanded them to return the record here; the *supersedeas* retracted the command, and destroyed the legal capacity of those justices to return the record to this court.

Whence, then, the positive necessity of coercion? The authority under which the supreme court were required to return the record having been annulled, they could not legally return it. That it is here at all, is in consequence of an expedient, I rather think, without precedent, or legal principle, hastily adopted to retain it in the power of the court, for the purpose of determining, by the settlement of the question arising in this case, whether it is now legally here or not.

There are, however, cases which show that this objection is not well taken; and those of great antiquity, for in the case from *Bro.* tit. *Supersedeas,* pl. 5. a *supersedeas* was awarded by the court of chancery, (15 *Edw.* III.

1

IN ERROR.

ALBANY,
Feb. & March,
1810.

YATES
v.
THE PEOPLE.

*c.* 19.) commanding the justices of king's bench to sur-
cease a *capias ad satisfaciendum*, a writ issued from the
same court of K. B. and *Finch*, because it was out of a
higher court, did surcease, and no farther proceedings
were had thereon.

So a *supersedeas*, after the court of K. B. had granted
surety of the peace, was issued from chancery. The power
of the K. B. was at an end, according to *Bro.* tit. *Peace*,
&c. pl. 17. 21 *Ed.* IV. 40. (1 *Salk.* 106. 1 *P. Wms.* 351.)

This objection is fully met by those cases; for of the
three superior *English* courts of common law, the king's
bench, common pleas, and exchequer, the first is the
highest in rank and importance, and so approaches the
most to a coördinate court with the *English* court of
chancery; and yet it seems, from these cases, a *superse-
deas* was granted by chancery, in the first case to super-
sede a writ issuing from the king's bench; and in the se-
cond, it superseded the granting of surety for the peace,
which, however, might have been on its own writ of *sup-
plicavit.* (*Collect. Juridica. Treatise of the Court of Star-
Chamber*, 93. 4 *Bac.* 498. 4 *Mod.* 52. *Carth.* 217. 2
*Keb.* 243. 1 *Stra.* 578. 8 *Mod.* 209. S. C. 1 *Raym.* 545.)

But it has been said, that this is, by statute, a writ of
course. The term, *of course*, has not so limited a signi-
fication, as has been contended for. It means *according
to the course and practice of the court* from which it
issues; and it is competent for the court to prescribe the
precise course in which it shall issue. This distinction
it was necessary to advert to, considering the case of
*Hartshorne* v. *Sleght*, (3 *Johns. Rep.* 356.) from which
my opinion has been cited, in argument, as laying down,
*that a writ of error is a writ of right, and issues of
course, at the instance of the party.*

Thus the course of chancery is not, for a party to
make out his own writs. He must apply to a clerk, who
in that court executes the duty of the cursitor in the
*English* court of chancery, and who makes out the writs

*IN ERROR.*

ALBANY,
Feb. & March,
1810.

YATES
*v.*
THE PEOPLE.

from the precedents which are found in the register; but if there are none, and there is any peculiarity of form required to adapt it to the case, he applies to the court for direction.

In this case, no precedent has been produced. The mere inspection of the writ of error in the present case, by any person conversant with the forms of writs, must convince him that it is not conformable to any of the usual forms. It is not conformable to any precedent I have ever seen; and none has been produced. If it is a special writ, and, according to the course of the court, it required a resort to the court to form it, the course of the court would be as inviolably preserved in the one case, as the other. In either case, the writ would issue of course. The right is acknowledged, if it exists; but if not, it can neither be of right, nor of course.

The writ being formed, it requires the seal of the court to give it legal effect. The seal, till within a few years past, could only be procured by application to the chancellor personally; and the acts subsequently passed to authorize him to devise additional seals, leaves the placing them completely and uncontrollably at his disposal, as to their locality, as he shall deem the purposes of justice to require. He might, by law, repossess himself of all the seals; and if he did so, could there be a greater hardship in compelling a party, who had occasion of access, to apply to him rather than to a clerk? In both instances, the use of the seal must be requested; and this request, unless there was some legal impediment, must unavoidably be complied with. If the chancellor held the seal, the application for its use by a clerk would always presuppose, that the writ offered for sealing was according to the established forms. If no such form existed, application, both on common law principles, and the statute of this state respecting it, must be made to the court to form a writ, and both would emphatically be according to the course of the court.

The doctrine, that the issuing *a writ of course*, according to the construction it has been contended that phraseology will admit of, exempts it from the control of the court, by quashing or issuing a *supersedeas*, is not supported by any authority; and I rather think it is not possible to find one. In principle, it appears to me totally untenable; for it cannot be a good reason to support that doctrine, that while a writ judicially and deliberately awarded, on a formal application, and due consideration, (and it has been admitted that such there are,) may be either quashed or superseded, another description of writs, issuing without the intervention of the court, by one of its ministerial officers, should be exempt from that control. If the doctrine is true in the extent contended for, it must equally protect, not only original writs out of chancery, but every species of process so issued by all the courts of common law from the commencement of the suit, through all its intermediate stages, to its final consummation.

Seeing nothing in this cause but an abstract question, the decision of which may materially affect the practice of the court of chancery, which can have no possible bearing on private interests, beyond what the exertion of the right claimed on this occasion, may involve, believing myself, to all constitutional and legal purposes, a judge of this court, in this case, I have thus far exerted my right, as such, to clear the point to be decided from the foreign matter with which it has been surcharged; to present it in the simplicity of which it is susceptible, and to submit my reasoning on the subject to this court, and must now beg leave to withdraw myself from giving a vote on its final decision.

CLINTON, Senator. A writ of error was issued, in this cause, to the supreme court; and the judges of that court have returned that the chancellor has superseded it, on the ground, that it issued irregularly and im-

*IN ERROR.*

ALBANY,
Feb. & March,
1810.

YATES
v.
THE PEOPLE.

IN ERROR.
ALBANY,
Feb & March,
1810.

YATES
v.
THE PEOPLE.

providently. The question now to be decided is, upon the sufficiency of this return, or, in other words, whether the chancellor has a right to supersede a writ of error?

That the chancellor has no right to refuse, to arrest, or control writs of error, in civil suits, or in any case not excepted by statute, appears to me to be a proposition which cannot be justly controverted. And that the claim set up on this occasion, is subversive of the jurisdiction of this court, hostile to the due dispensation of justice, illegal and unwarrantable, is to me equally evident and palpable.

*William* the Conqueror established a court, composed of the great officers of state, and certain persons, learned in the law, which was denominated the *aula regia*, and which followed the king wherever he went. One of the most distinguished members of this court was an officer called the chancellor, who had the custody of the great seal, and part of whose duty it was, to make out and seal writs and patents. The course of application to the court was of this nature ; the party suing paid to the king a fine, to have *justitiam et rectum* in his court, and thereupon he obtained a writ, or precept, by means of which he commenced his suit, and the justices were authorized to hear and determine his claim. These writs were made out in the name and under the seal of the king, but with the *teste* of the grand justiciary, and the chancellor kept clerks for the purpose. When the *aula regia* was broken up, and cantoned out into the four great courts which now exist in *England,* the court of chancery assumed, of course, a separate existence, and it was, in process of time, divided into distinct tribunals; the one ordinary, being a court of law; the other extraordinary, being a court of equity. The ordinary legal court is much more ancient than the court of equity. Formerly, it took cognisance of a variety of matters, but now little or nothing is done on that side of the court. In the ordinary or legal court, the *officina*

*justitiæ* is kept, out of which issue all original writs that pass under the great seal. Those writs that related to the subject were originally kept in a hamper, and those that related to the interests of the crown, were kept in a little bag; and hence arose the distinction between the *hanaper* office, and the *petty-bag* office. Those offices are at all times open to the subject, who may, at any time, demand and have, *ex debito justitiæ*, any writ that he may call for. The denomination *officina justitiæ* was adopted to signify that all justice, between man and man, proceeded from that source; it being, as it is styled in the books, the shop, mint, or manufactory of justice.

*IN ERROR.*

ALBANY,
Feb. & March,
1810.

YATES
*v.*
THE PEOPLE.

Under the colonial government, the office of chancellor was vested in the governor, and the court only exercised equity powers. The common law powers of the court were not exercised then, nor are they considered as now existing. And the only remnant left is the *officina justitiæ;* the constitution having placed the court of chancery of the state, except as to the officer, on the same footing as it was in colonial times. Although, in the origin of the court of chancery, forms and precedents of writs were prescribed by the chancellor; yet after they had been practised upon, and *formulas* established for the variety of cases which occurred, the issuing of the writs was intrusted to the clerks of the court, as a matter of course. And we are told by *Reeves*, in his *History of the English Law*, that " a strict observance of the old forms had rendered them so sacred, that at length an alteration of them was esteemed an alteration of law, and, therefore, could not be made but by the great council. It became not unusual, in those times, for a plaintiff, when no writ could be found in chancery that suited his case, to apply to parliament for a new one." Our courts being modelled, in a considerable degree, on the plan of those of *England*, the *officina justitiæ* is still attached to the court of chancery. The practice has existed, after the reason

*IN ERROR.*
......
ALBANY,
Feb & March,
1810.

YATES
v.
THE PEOPLE.

has ceased. And it is, indeed, immaterial, whether this manufactory of justice exists in an independent shape, or whether it is attached to any of the great courts. The chancellor, in his character of a judge, has nothing to do with it, only in the cases expressly committed to him by statute; for the only badge of his common law jurisdic-. tion, that is now claimed by him, is this remnant of the prerogatives of the *English* chancellor; and this is as much a ministerial act, and as truly a matter of course, as the writs that are issued by the clerks of the supreme court and common pleas. It would, indeed, be considered a very singular case, if the chancellor should undertake to control the issuing of original writs, which are requisite in certain actions, and which issue of course.

Our law considers it an essential right of a suitor to have his cause examined in tribunals superior to those in which he considers himself aggrieved. In *England*, a writ of error is defined, (*Bac. Abr.*) a commission to judges of a superior court, by which they are authorized to examine the record upon which a judgment was given in an inferior court, and, on such examination, to affirm or reverse the same, according to law. In the case of the *Lord Mayor of London*, (3 *Wils.* 193.) Lord Chief Justice *De Grey* said, " in all cases, except treason and felony, I think, a writ of error is grantable of right." In the case of *The Queen* v. *Paty et al.* (2 *Salk.* 504.) it is stated, " that a new question was started and referred to the judges, whether the queen ought to allow a writ of error in that case, or any other case, *ex debito justitiæ*, or *ex mera gratia?* And ten of the judges were of opinion, that the queen could not deny the writ of error, but it was grantable *ex debito justitiæ*, except only in treason and felony. The other two judges held, that the subject could not of right demand them in any criminal case." This is the settled law of *England*. In this state, it is enacted by statute, (1 *Rev. Laws*, 200.) " that writs of error, in all civil cases, and in criminal cases,

not capital, shall be considered as writs of right, and issue *IN ERROR.* of course, subject to the regulations prescribed by law; *Feb. & March,* and in all capital cases, writs of error shall be considered *1810.* as writs of grace, and shall not issue but upon order of *YATES* the chancellor made upon motion or petition, notice *THE PEOPLE.* whereof shall be given to the attorney-general, or prose- cutor of the people." By a subsequent provision in this statute, a certificate of counsel is made necessary to re- move a judgment out of the supreme court, by writ of error. The act concerning the rights of the citizens of this state, (1 *Rev. Laws*, 48.) which is principally a tran- script of the *English* bill of rights, declares " that neither justice nor right shall be sold to any person, nor denied, nor deferred; and that writs and process shall be grant- ed freely and without delay, to all persons requiring the same." The phraseology of the first statute pre- cludes all idea of a right to deny a writ of error. The words are highly imperative. *Writs of error shall issue of course*, under the regulations prescribed by law. Every citizen of the state, on application to the *officina justitiæ*, is entitled to his writ of error, as a matter of course, on filing a certificate of counsel. Neither the chancellor, nor officer giving the writ, is authorized to make any investigation respecting it. On making the demand, the applicant has a right to the writ, in the same manner that any other person has, on a similar applica- tion to any other court or office. The judicial power given to the chancellor over writs of error, in capital cases, is an affirmative pregnant, negating his authority over them in all other cases. An inhibition of a writ of error, except in capital cases, is a violation of our bill of rights, and an attack upon the privileges of the citizens of this state. A writ of error, like the present, is an authority given by the people of this state, to the court of errors, to examine a cause decided in the supreme court. It issues out of the *officina justitiæ*, deriving its authority from the people, not from the chancellor. It is directed

*IN ERROR.*
......
ALBANY,
Feb. & March,
1810.

YATES
v.
THE PEOPLE.

to the supreme court, and it is returnable to, and cognisable in, this court. Can it for a moment be believed, that chancery, which is an inferior court to this tribunal, has the power of granting or withholding, *ad libitum*, the exercise of its appellate jurisdiction? Can it be pretended that the chancellor, who is only a member of this court, can, in the plenitude of his power, exercise a greater authority than the whole court combined? Can it be supposed that our laws, when they imitated the *English* system, in the establishment of a mint of justice, intended to erect an authority, which may ride with impunity over the privileges of the citizen, and the high prerogatives of this court, of dernier resort? For the moment it is conceded that a writ of error is a matter of toleration with the chancellor, and subject to his will and pleasure, you place him beyond the reach of *amenability*. A judge is not answerable for an error of the understanding. And may the time be distant, when the rights of our citizens shall depend not upon the laws of the land, but upon the volition of a judge, or the conscience of a chancellor.

I, therefore, consider the writ of error as a writ of right, except in capital cases. The precedents for writs of error are not now to be moulded or formed; they have been settled for ages. The right claimed on the part of the chancellor, under the statute, authorizing him to prescribe the form of process in his court, applies to process in causes cognisable in chancery, and not to causes cognisable in this court; and the mere ministerial act of writing out a writ, and affixing a seal, can never imply the right of granting or refusing the writ. If the writ is directed to an improper tribunal, as, for instance, to a justice's court, it is a nullity, and the party will take nothing by it. If it is taken out in a case in which error will not lie, this court will quash it, with costs. If it has been irregularly or improvidently issued, it is our exclusive right and our duty so to pronounce.

If the chancellor has no power to refuse a writ of error, he has no power to supersede it. The right to super-

sede involves the right to refuse, and the right to refuse
involves the right to supersede. They are correlative
powers, necessarily blended together.

In this case, as it appears from the return of the su-
preme court, the chancellor issued a *supersedeas*, direct-
ing that tribunal not to make a return to the writ of
error, he having superseded it, on account of its having
*irregularly and improvidently issued;* and without spe-
cifying wherein the irregularity or improvidence con-
sists.   Here, it is evident, the chancellor has not only
set up a claim to intercept and destroy the transit
of a cause from the supreme court to this court, but that
he has also attempted to exercise a controlling power over
that high tribunal.   Before his plenipotentiary assump-
tions, the judges of the supreme court are to bow with
abject humility, and this court is to surrender its high
and supervisional authorities.

The supreme court is the highest court of law of ori-
ginal jurisdiction; and the court of chancery, the highest
court of equity.   The one is supreme, in questions of
law; the other, in questions of equity.   They are pos-
sessed of coördinate authority, in their respective spheres,
and are equal in rank.   The chancellor has no more
right to command and to coerce the supreme court, than
that court has to command and to coerce the court of
chancery.   Their common superior, for correcting their
erroneous decisions, is this court.

Injunctions and mandates from chancery operate not
upon the supreme court, but upon the suitors, their
agents, attorneys, and counsellors; and they are enforced,
by attachment, against the offending persons.   If a writ
of error is not obeyed, the power of enforcing obedience,
resides in the court of errors; but if a writ of *superse-
deas* is not complied with, the authority to compel must
be vested in the chancellor, or no where.   If vested in
him, what becomes of the equality, the dignity, the inde-
pendence and the coördinate authority of the supreme

IN ERROR.
......
ALBANY,
Feb. & March,
1810.

YATES
v.
THE PEOPLE.

*IN ERROR.*

ALBANY,
Feb. & March,
1810.

YATES
v.
THE PEOPLE.

court. If not deposited with him, then the law has committed the monstrous absurdity of clothing a court with an authority to command, without an authority to carry that command into execution.

But the evil does not rest here. If upon the vague and general surmise of *improvidence*, or any other pretence, the chancellor has a right to shut out a writ of error from entering into this court, it is. obvious that its appellate functions, so far as they respect the supreme court, are dependent on his volition. He will, in effect, be an intermediate tribunal between this court and the supreme court, and will have it in his power to oust us completely of our jurisdiction.

In *Lloyd* v. *Skutt,* (*Doug.* 339.) a motion was made, in the king's bench, to quash a writ of error, because *improvide emanavit,* the court refused to sustain the application, and said that it ought to be made either to the court of chancery, from whence it issued, or to the exchequer-chamber, where it was returnable. The chancellor refused to entertain the question; and it was brought before the exchequer-chamber, where it was determined. The case before us is a much stronger one. Indeed, no instance can be found in the books to justify or countenance a course of proceeding like the present.

The *officina justitiæ*, attached to the law part of chancery, is, in respect to writs directed and returnable to other courts, the mere channel of conveyance, or vehicle of correspondence. The chancellor has power over process in causes in chancery, not over process bringing suits into this tribunal. It is a matter of indifference from what office writs of error issue, independently of legislative provision. A writ of error to the supreme court might as well emanate from our clerk, as from a clerk in chancery, if the legislature thought fit so to direct; and whether the writ is sealed in this place, or elsewhere, it is a command of the people to invest us with

the cognisance of a cause, of which the chancellor has no right to deprive us, nor to deprive a suitor of his dernier resort. A writ of error, instead of being a writ of right, would then be a writ of grace; instead of issuing of course, it must issue on motion. The appellate rights of parties would depend on the pleasure of the chancellor; and the appellate authorities of this court would be rendered subservient to a tribunal over which it possesses paramount authority, and from which it has a right to exact obedience.

I am, therefore, of opinion, that the first return of the supreme court is insufficient, on the ground that the *supersedeas* is a nullity; and that the supreme court ought, without noticing it, to have obeyed the writ of error.

PLATT, Senator. Two facts only are, judicially, before this court:

1. That a writ, styled a writ of error, was issued, under the seal of the court of chancery, signed by one of the clerks of that court, directed to the justices of the supreme court, alleging, on the face of it, that in the record and proceedings, and also in giving judgment of and upon a certain writ of *habeas corpus*, in the case of *John V. N. Yates*, manifest error had intervened; and commanding a return to this court.

2. That a writ of *supersedeas* was, soon afterwards, and before the writ of error was returned, issued from the court of chancery, and directed to the justices of the supreme court, alleging that the writ of error in the case of *John V. N. Yates* had been *improvidently* and *irregularly issued;* and therefore commanding them to make no return to said writ of error, and to do nothing thereon.

And the question now submitted, on the special return of the justices of the supreme court, is, whether the writ of error is annulled by the writ of *supersedeas;* or whether the *supersedeas* is itself unauthorized and void?

*(margin)* IN ERROR.
ALBANY,
Feb. & March,
1810.

YATES
v.
THE PEOPLE.

IN ERROR.
......
ALBANY,
Feb. & March,
1810.

YATES
v.
THE PEOPLE.

It is contended, on the part of Mr. *Yates*, that, as applicable to the present case, no discretion is allowed to his honour the chancellor to refuse the writ of error; that his office, in regard to issuing writs of error, except in capital cases, is merely ministerial; and having no right to refuse such a writ, he is unauthorized to control or supersede it.

From a careful attention to the argument, and the best consideration which I have been able to bestow on the case, my mind has been led to a different result.

Our court of chancery, as recognised by the constitution, and statute law of the state, is a court of high original jurisdiction, emanating from, and bearing strong analogy to the court of chancery in *England*, as that court was organized and established at the era of our independence.

From the history of that court, to be found in *Harrison's Chancery Practice*, *Mitford's Pleader* and *Blackstone's Commentaries*, it appears that, as *officina brevium*, it is not constituted by statute; but that that branch of its powers is of common law origin. Several statutes in *England*, and in this state, have regulated the exercise of those powers: but those statutes evidently presuppose the existence of the *officina brevium* as a branch of chancery jurisdiction.

In the reign of *Edward* I, the chief judicial employment of the chancellor is said to have been, " in devising new writs, directed to the courts of common law, to give remedy in cases where none was before administered:" and " to quicken the diligence of the clerks in chancery, who were too much attached to ancient precedents," the stat. *Westm.* 2. 13 *Edw.* I. c. 24. directs, " that whenever from henceforth in one case a writ shall be found in chancery, and in a like case falling under the same right, and requiring like remedy, no precedent of a writ can be produced, the clerks in chancery shall agree in forming a new one; and if they can-

not agree, it shall be adjourned to the next parliament,
when a writ shall be framed by consent of the learned
in the law; lest it happen. that the court be deficient in
doing justice to the suitors."

The counsel for Mr. *Yates* cited this old *English* sta-
tute to show, that the duty of forming writs had, for a
long course of years, devolved upon the clerks in chan-
cery; and that by modern usage, founded on this statute,
the chancellor did not interfere in the business of the
*officina brevium;* and although that *English* statute no
longer existed here; yet the usage under it still conti-
nued.

I find, however, that in this particular the counsel was
mistaken. That statute has been substantially re-enact-
ed here; but with such a marked variance in the ex-
pression, as to exclude the construction contended for
by the counsel of Mr. *Yates.*

By our statute of *March* 12, 1787, (vol. 1. p. 82.) it is
enacted, " that whenever in one case a writ is found and
used in chancery, and in a like case, falling under like
law, and requiring like remedy, there is none found, a
proper writ shall be devised, and made in such case;
and that suitors may not go without remedy, they shall
have writs according to their cases."

This statute enjoins on the *court of chancery*, what
the *English* statute had expressly directed the *clerks in
chancery* to perform.

The act of 20th *February*, 1801, (vol. 1. p. 184.) enacts,
that it shall be lawful for any party against whom *any
judgment* shall be given in the supreme court, to sue
forth, out of the court of chancery, a writ of error to be
directed to the judges of the supreme court, and return-
able in this court.

The act of 20th *March*, 1801, (vol. 1. p. 200.) pro-
vides, " that writs of error, in all civil cases, and in cri-
minal cases not capital, shall be considered as writs *of
right*, and issue *of course*, subject to the regulations pre-

IN ERROR.
......
ALBANY,
Feb. & March,
1810.

YATES
v.
THE PEOPLE.

scribed by law ; and, in all capital cases, writs of error shall be considered as writs *of grace*, and shall not issue' but by order of the chancellor, made upon motion or petition, notice whereof shall be given to the attorney-general, or prosecutor for the people."

In order to a just exposition of the statute last cited, it is proper to consider it in connexion with all the preceding statutes on that subject, and in relation to the common law powers of the court of chancery, as *officina brevium*. And in this view, the true construction of the act of 20th *March*, 1801, appears to me to be, that in all cases civil and criminal, it is the province and duty of the chancellor to judge, whether the writ claimed is *a writ of error*, according to the legal and appropriate sense of the words ; and if he decide it to be so, then it becomes his duty to devise and adapt the form of the writ for the case presented to him. If a question arise, whether a certificate of error in substance be filed according to the statute ; or whether the person signing such certificate be in fact of the degree of counsellor in the supreme court, the chancellor is to decide.

Suppose a suitor demands a writ to remove the judgment of a justice of the peace, or the sentence of a court-martial, or the award of arbitrators, or an order for the discharge of an insolvent debtor, to be reviewed in this court ; I conceive the chancellor has a right, and it would be his duty to decide, that the writ applied for was *not a writ of error*, and, of course, that he ought to refuse it. For although it be a writ *of right*, and to issue *of course*, yet, by the express terms of the statute, it is " *subject to the regulations prescribed by law ;*" and if, by the existing law of this state, a writ of error would not lie to remove an order on *habeas corpus*, the chancellor was bound by his duty and his oath to refuse it.

Besides, the general powers incident to every court of record, of regulating its own practice, and prescribing rules in regard to the form of conducting its proceed-

ings, are as applicable to the court of chancery in issu-
ing writs of error, as in performing any other of its functio*n*s : and, although by the express or implied per-
mission and sanction of the chancellor, his clerks usually perform that office, yet, of his right to direct and con-
trol those officers in the discharge of their functions, I cannot entertain a doubt.

In directing that in all civil cases, and in all criminal cases not capital, writs of error shall be considered as writs *of right*, and issue *of course*, I understand the legislature to mean that, in such cases, the chancellor shall not examine whether there is probable cause for reversing the judgment complained of. If it be a case in which such judgment would be reversible in this court, if erroneous, then the writ of error is a writ *of right*, and must issue *of course*, according to the form prescribed, and pursuant to the regular practice of the court of chancery.

In capital criminal cases, a writ of error is a writ *of grace*, and can issue only on special motion, or petition, of which the public prosecutor is to have notice. This implies a right to examine the merits of the case, so far as to judge, whether there be probable cause for reversing the judgment; and a discretion is given to the chancellor to issue or to refuse the writ.

I cannot believe that the statute, which directs that writs of error returnable in this court shall issue from chancery, intended to constitute the chancellor a mere clerk of this court. If he was to have no discretion in such cases; if he was intended to be the mere instrument, or conduit, to bring the suitors into this court, why did not the legislature adopt the obvious course of simplifying the system, by directing such writs of error to be issued by the clerk of this court?

The true reason, I apprehend, for directing writs of error to be issued from chancery was, that judicial discretion is frequently necessary in performing that duty; and as this court sits but a small portion of the year;

IN ERROR.
......
ALBANY,
Feb. & March,
1810.

YATES
v.
THE PEOPLE.

and could advise and direct its clerk only while in session, it was deemed expedient to vest that power in the chancellor, whose court is always open.

The counsel for Mr. *Yates* have insisted, that as a writ *of right*, and *of course*, he was entitled to this writ of error, merely because he demanded it; that it was a *formed* writ, and needed no discretion in framing it to suit the case; that it differs from other writs of error in no particular, except the title of the cause. These assertions, however, are incorrect. This writ differs materially from ordinary writs of error, inasmuch as it alleges, on the face of it, that the error complained of was in rendering judgment on a *habeas corpus*. In this particular case, it is *special* and *extraordinary*. No such writ is to be found in the *registrum brevium;* and if it be a writ *of right* in such a case, (of which we are not now to consider,) then it was the office and duty of the chancellor to devise and adapt the form of this *new writ.*

It has been said, that no evil can result from the practice of allowing the seal to any writ of error, in whatever form it may be applied for; that if it be in a case where error will not lie; or if it be absurd and nugatory, this court will eventually protect the opposite party from all injurious consequences, and the plaintiff in error will lose his time, his money, and his suit.

This does not satisfy me that there ought to be an *unlicensed* use of the seals. A defendant in error would be exposed to great vexation and expense; his eventual indemnity would be contingent and uncertain; and the insolvency of a plaintiff in error would leave the defendant remediless.

That any person who demands it, has a right to have the chancery seal affixed to what he may choose to call a writ of error, is a position which I deem utterly inconsistent with the orderly administration of justice, and which would lead to the prostitution and abuse of the process of that court, to the most vexatious and oppressive purposes.

*IN ERROR.*
......
ALBANY,
Feb. & March,
1810.

YATES
v.
THE PEOPLE.

If the legislature intended that the seal should be thus common, why was it committed to the custody of the chancellor, a high judicial officer? It would have accorded better with such a design, to have hung it up in the market place, accessible to all, to be used by any body, and in any case.

By the 6th section of the " act concerning the rights of the citizens of this state," it is declared, " that neither justice nor right shall be denied or deferred;" and, " that writs and process shall be granted freely, and without delay, to all persons requiring the same."

This act is as explicit and imperative, as the act relative to the issuing the writs of error; and yet the unanimous construction of all the courts in the state, has invariably been, that this statute does not abridge their right of regulating the practice of the courts; of judging of and controlling their process; of requiring security for costs, and imposing such other restrictions as the ends of justice shall require, in regard to the order and form of proceedings.

I am of opinion, that the right of the chancellor to judge of the form and regularity of a writ of error, and to decide whether his rules of practice in relation to it have been violated, is as ample and discretionary as it is in the case of any other process of his court; and if this writ of error was obtained by stealth, by fraud, or in violation of the rules of practice in that court, the chancellor had a right to quash the writ, if it had not passed beyond the verge of his court; or to supersede it, at any time before it was executed by the justices of the supreme court.

This court of errors is not a common law court; it has no original jurisdiction of causes; and although a writ of error be returnable here; yet, until it is returned, this court has no jurisdiction.

A writ of error is not the process of this court, in such a sense that this court can make any interlocutory order in relation to it previous to its return; and as writs

*IN ERROR.*
......

ALBANY,
Feb. & March,
1810.

YATES
*v.*
THE PEOPLE.

of error, like other process from chancery, may issue improvidently, vexatiously and irregularly, I deem it a power inherent in the chancellor to judge of and control such writ, whenever such cause for interference shall exist; provided he exercises such power before this court acquires jurisdiction of the cause on which the writ of error is founded.

In the case of *Lloyd* v. *Skutt,* (*Doug.* 350.) there was a motion in the king's bench to quash a writ of error; and Lord *Mansfield* and the whole court decided that it could not be quashed there; but that the application ought to be made either to the court of chancery, from whence it issued, or to the exchequer-chamber, where it was returnable.

A marginal note of the reporter states, that application was, afterwards, made to the court of chancery, which refused to entertain the question; and then to the court of exchequer-chamber, where it was determined that the writ of error was properly brought.

This note is a very loose authority, and does not specify whether the application to chancery to quash the writ was before or after the return; nor is there any reason stated why the court of chancery would not entertain the question. I can, however, imagine this reason; that as the writ of error had completely passed out of the court of chancery, and was then on file in the king's bench, the motion to quash was irregular; and the inference by no means follows, that an application for a *supersedeas* would not have been successful.

In the case of *The Dean and Chapter of Dublin* v. *Dowgatt,* (1 *P. Wms.* 149. 151.) Ch. J. *Parker* (who assisted Lord Chancellor *Cowper*) declared, that "the court of chancery might supersede the writ of error, *quia improvide emanavit.*"

In the case of the *Lessee of Lawlor* v. *Murray,* (1 *Sch. & Lef.* 75.) the court of king's bench amended a record in ejectment, which was objected to, and a bill of exceptions was tendered, which the judges refused to seal;

A writ grounded on the statute of *Westminster*, corres- IN ERROR.
ponding with our statute concerning bills of exceptions, ALBANY,
was issued by the *cursitor* in chancery; in obedience to Feb. & March, 1810.
which, the judges of K. B. affixed their seals to the bill of
exceptions. After the writ had issued, and before it was YATES v. THE PEOPLE.
returned, the lord chancellor was informed of the pro-
ceedings; and, upon argument, and due deliberation,
he decided, that the writ had issued improvidently, and
ordered it to be superseded. His lordship observed,
as the reasons of his decision, that he could find no trace
of such a writ having been issued; and he was clearly
of opinion that it had been issued improvidently. If it
had been returned, or it had not gone out of the custo-
dy of the officer of his court, it ought to have been quash-
ed; but as it had been delivered to the party, it could
not properly be quashed; and the only proper remedy
was by *supersedeas.*

I think that case is analogous to the one now before
this court; and is a strong authority in support of the
chancellor's proceedings.

The *supersedeas*, in this case, alleges that the writ of
error issued improvidently and irregularly; and as cases
may exist, wherein the chancellor has a right to deny
what the party may choose to call a writ of error, and
as he has a right to control the forms and practice of his
court, in relation to all writs of error, we are bound to
presume that the allegations set forth in the *supersedeas*
are true, and that malpractice has been committed in ob-
taining this writ of error; and if the writ did issue irre-
gularly and improvidently, I think it was properly arrest-
ed by the *supersedeas.*

An appeal has been made, which is calculated to alarm
the pride, and to rouse *l'esprit de corps* of the members
of this court. Such addresses always come in a flattering
form; they are too apt to be heard with complacency,
and should, on that account, be listened, to with a jea-
lous caution.

We are told, that the jurisdiction and independence

IN ERROR.
......
ALBANY,
Feb. & March,
1810.

YATES
v.
THE PEOPLE.

of this court have been invaded; that the chancellor has usurped powers, which belong exclusively to us, and that this dangerous encroachment should be sternly resisted.

I feel it to be my indispensable duty to maintain the constitutional authority of this court, so far as my voice will avail; but I consider it to be equally my duty, to acknowledge and respect the legitimate powers and jurisdiction of every other tribunal of justice.

If, however, the question before us be doubtful, and we permit ourselves to listen to the suggestions of expediency and sound policy, in order to solve it; the argument resulting from these considerations, is, in my judgment, decidedly opposed to the pretensions of an arbitrary superintending control by this court, in such cases. It is true the chancellor may abuse his discretion; and deny a writ of error, where he ought to grant it. He has, indeed, the physical power to prevent regular suitors from coming into this court; but, I ask, if every officer intrusted with a seal, has not a like power of stopping the courts of justice, by refusing process? The supreme court may obstruct suitors in their progress to this court. Suppose the justices of the supreme court should refuse to render judgment, or to perfect a record; I presume it will not be contended, that this court has a right to issue a *mandamus*, to compel a performance of their duty.

These are extreme *possible* cases, and as they have never occurred in past experience, the anticipation of future dangers, arising from such improbable acts, is to my mind chimerical. But, if such cases should occur, ample remedies exist. Civil and criminal prosecutions, impeachment and removal from office await the corrupt offenders; and if these are insufficient, the legislature are competent, and I trust will always be disposed, to provide further checks and penalties for such abuses.

I will not impeach the wisdom of the constitution, in regard to the establishment of this court; but, when I consider how it is constituted, how numerous its members, how slow and imperfect their accountability, and

IN ERROR.
......
ALBANY,
Feb. & March,
1810.

YATES
v.
THE PEOPLE.

how transcendent their powers, I feel no apprehension that this court will ever sustain any diminution of its authority by its collisions with the other state judicatures. This is, perhaps, the only body of men to be found in all the republican institutions of our country, in which such high and extensive judicial powers are united with legislative functions. We have an independent voice in passing all laws; we expound and enforce those laws, as a court of dernier resort; we not only revise and control the decrees in chancery, and the judgments of the supreme court; but it is our office to try the chancellor and justices of the supreme court, on impeachment, and to remove them from their seats.

As well might the lion say to the kid, "you have invaded my forest, and if I do not exert my authority in avenging the insult, there is danger that my dominion will be usurped."

I am bound to presume, that no member of this court is influenced, on this occasion, by motives of party spirit, or personal resentment; but I will not conceal my fears that, hereafter, some unprincipled demagogue, of furious passions and vindictive temper, may obtain a place here; who, being not only the leader, but the tyrant of his party, and regardless of property, except as it ministers to his ambition, may here erect his fortress, for assailing and prostrating the subordinate courts of justice, which afford the only security for private rights, and the only sanctuary for civil liberty. I confess I am jealous of any man, who habitually inculcates sentiments of disrespect for those courts; of any man, who dares, directly or indirectly, to beguile and allure the people, by the fallacious hope, that justice can be attained through any other channels, than the established courts of law and equity. If a *Cæsar* or a *Cromwell* shall hereafter arise, I fear that this court is destined to be the theatre, on which he will proclaim himself dictator.

My opinion is, that the writ of error is annulled by the writ of *supersedeas*, and that the justices of the

*IN ERROR.*

.....

ALBANY,
Feb. & March,
1810.

YATES
v.
THE PEOPLE.

supreme court be advised, that no further return to the writ of error is required.

PARIS, Senator, declared himself to be of the same opinion.

But a majority of the court(*a*) being of opinion, that the return was insufficient ; it was, therefore, *ordered,* and adjudged that the *supersedeas* issued in this cause be deemed a nullity, and that the first return of the supreme court is insufficient.

A further return was then made to the writ of error, by the supreme court, as follows : " The answer of *James Kent,* Chief Justice of the supreme court of judicature of the state of *New-York,* within named. The record and proceedings on the writ of *habeas corpus,* whereof mention is within made, with all things concerning the same ; To the president of the senate, and the senators and chancellor, within specified, at the day and place within contained, I certify, in a certain schedule to this writ annexed, as I am within commanded.

" *James Kent.*"

" *New-York* supreme court,

     *February* term, in the year of our Lord, 1810.

The people of the state of *New-York* have sent to the sheriff of the city and county of *Albany,* their writ of *habeas corpus,* in these words, to wit : (here the writ was set forth :) " *J. V. N. Yates* in person, allowed in open court, *February* 6th, 1809.

" And now here at this day, to wit, on the 9th *February,* in this present *February* term, before the justices aforesaid, at the city-hall of the city of *Albany,* comes the said *John V. N. Yates,* in his proper person, under the custody of *Solomon Southwick,* Esq. sheriff of the city and county of *Albany,* and the said *Solomon Southwick,* Esq, sheriff as aforesaid, now here returns the

(*a*) There were 19 in the affirmative, and 9 in the negative.

aforesaid writ of *habeas corpus*, together with the day
and cause of the caption and detention of the said *John
V. N. Yates*, in the words and figures following, that is
to say : [here the whole return was set forth, *verbatim*,
for which, see the case of *J. V. N. Yates*, 4 *Johns.
Rep.* p. 318. 321.] Which said return, together with
the said writ of *habeas corpus*, to which the same is an-
nexed, being now here read, and the said *John V. N.
Yates* prays may be received and filed. It is therefore
ordered, that the same be, and is, hereby received and
filed, which being received and filed, the said *John V.
N. Yates*, now here, prays, that pending the argument
of and upon the premises, he may be let to bail by the
justices now here, and it is granted to him, &c. And
hereupon the said *John V. N. Yates*, before the justices
aforesaid, now here, together with his bail, *Sebastian
Visscher*, of the city and county of *Albany*, Esq. before
the justices aforesaid, now here, acknowledged them-
selves indebted to the people of the state of *New-York*,
to wit, the said *John V. N. Yates*, in the sum of five
hundred dollars ; and the said *Sebastian Visscher*, in the
sum of two hundred and fifty dollars, to be levied of
their respective goods and chattels, lands and tenements,
to the use of the said people, if default be made in
the condition following, to wit : which condition is, that
if the said *John V. N. Yates* shall personally appear,
from day to day, before the justices aforesaid, during
the present term of *February*, and stand to abide by the
order and judgment of the said justices, of and upon
the premises aforesaid, then the said recognisance is to
be void, else to be and remain in full force and virtue.
And because the said justices, now here, are not yet ad-
vised of and upon the premises, day is therefore given
to the said *John V. N. Yates*, that he be before the jus-
tices aforesaid, on the first *Monday* of *May* next, at the
city-hall of the city of *New-York*, to hear judgment of

*IN ERROR.*

......

ALBANY,
Feb. & March,
1810.

YATES
v.
THE PEOPLE.

*IN ERROR.*

ALBANY,
Feb. & March,
1810.

YATES
v.
THE PEOPLE.

and upon the premises, because the said justices would advise thereupon, &c. And hereupon the said *John V. N. Yates* prays to be further let to bail, of and upon the premises, until the said first day of *May* next; and it is granted, &c. And hereupon the said *John V. N. Yates*, together with *Isaac Hansen*, of the city of *Albany*, in the county of *Albany*, Esq. before the justices aforesaid, now here, acknowledged themselves indebted to the people of the state of *New-York*, to wit, the said *John V. N. Yates*, in the sum of five hundred dollars, and the said *Isaac Hansen*, in the sum of two hundred and fifty dollars, to be levied of their respective goods, chattels, lands and tenements, to the use of the said people, if default be made in the condition following, to wit: that if the said *John V. N. Yates* shall personally appear before the justices aforesaid, at the city-hall of the city of *New-York*, on the first *Monday* of *May* next, and from day to day, during the said term of *May*, and then and there to stand to, and abide by, the order and judgment of the said justices, of and upon the premises aforesaid, then the said recognisance to be void, else to remain in full force and virtue. At which said time and place, before the justices aforesaid, at the city-hall of the city of *New-York*, the said *John V. N. Yates* did not appear, but made default; and upon the prayer of *Thomas Addis Emmet*, his counsel, a further day is given to the said *John V. N. Yates*, that he be before the justices aforesaid, in his proper person, at the capitol in the city of *Albany*, on the first *Monday* of *August* next, to hear judgment of and upon the premises, &c. And hereupon the said *John V. N. Yates*, by the said *Thomas Addis Emmet*, his counsel, prays that the recognisances of the said *John V. N. Yates*, and of his bail, the said *Isaac Hansen*, be respited until the first *Monday* of *August* next; and it is granted, &c. At which said day and place, before the justices aforesaid, at the

2

capitol, in the city of *Albany*, the said *John V. N. Yates*, although solemnly demanded, cometh not, but maketh default.

Therefore let the recognisances of himself, and of the aforesaid *Isaac Hansen*, his bail, be estreated into the court of exchequer of the state of *New-York*, for the default of the said *John V. N. Yates;* and the same are estreated accordingly, &c.

Whereupon, all and singular the premises aforesaid being seen, and fully examined and understood, by the justices aforesaid, now here, it seemeth to the justices aforesaid, here, that the aforesaid cause of commitment of the said *John V. N. Yates*, to the custody of the sheriff of the city and county of *Albany*, in the return of the sheriff above specified, is good, and sufficient in law, to detain the said *John V. N. Yates* in custody aforesaid.

Therefore the said *John John V. N. Yates* is, by the justices aforesaid, here, remitted to the custody of the sheriff of the city and county of *Albany*, there to remain in the same state in which he was at the time of the issuing of the aforesaid writ of *habeas corpus*," &c.

After reading this return, a motion was made, that the writ of error in this case be quashed; and the court directed the *attorney-general*, on the part of the people, and the counsel for Mr. *Yates*, to argue the question, whether a writ of error would lie in this case.

[The subject is so fully considered, and the authorities so critically examined, in the opinions delivered by the members of the court, that the arguments of counsel are stated as briefly as possible.]

*Van Vechten*, attorney-general. 1. I shall contend, that a writ of error will not lie in any case, on a *habeas corpus;* and, 2. If it will lie, that the present is not one of the cases in which it may be brought.

1. A writ of error lies only where there has been an issue of law or fact joined, on which a *judgment* has

IN ERROR.
.....
ALBANY,
Feb. & March,
1810.

YATES
v.
THE PEOPLE.

IN ERROR.
·····
ALBANY,
Feb. & March,
1810.

YATES
v.
THE PEOPLE.

* 8 Co. 253.
† 8 Mod. 27. 29.
S. C. Str. 653.

‡ 3 Bro. P. C.
596.

§ Fortesc. Rep.
329.

¶ 10 Co. 38.
Metcalf's case.

** 1 Ld. Raym.
454. S. C. 1
Salk. 144. Com.
76.

†† 24 Sess. c. 65.
s. 5. Laws, vol.
1. p. 286.

been given. In the case of the *City of London*,* the court of common pleas decided, that upon the return to a writ of *habeas corpus*, no issue could be joined, or a demurrer taken; and that no writ of error would lie on the award of the court made on the return. So in the case of *The King* v. *The Dean and Chapter of Trinity Chapel, in Dublin*,† the court said, it was against the nature of a writ of error to lie on any judgment, but in cases where an issue may be joined and tried, or where judgment may be had on a demurrer, and therefore it would not lie on a judgment for a *procedendo*, nor on the return of a *habeas corpus*. And it was held, in that case, that a writ of error would not lie on the award of a *peremptory mandamus*, though it might lie, if the facts of the return were traversed, and the other side took issue, or demurred. The same principle was also decided in *Pender* v. *Herle*,‡ in the house of lords.

In the cases of *procedendo*, *habeas corpus*, and *mandamus*, the judgment establishes no right, nor concludes on the merits; and no writ of error lies, except on a judgment on the merits.§ A writ of error will not lie on a judgment *quod computet*, and before a final judgment.¶

A writ of error lies only where there is a judgment; and the decision of the court on a return to a *habeas corpus*, is not a formal judgment.

In the case of *Groenvelt* v. *Burwell*,** the same principle was admitted by lord *Holt*. A writ of *habeas corpus* is a mere writ of privilege, and a judgment given on the return is not that kind of judgment on which error lies.

The 5th section of the *habeas corpus* act,†† countenances this doctrine. It declares, " that no person who shall be set at large upon any *habeas corpus*, shall be again imprisoned for the same offence, unless by the legal order or process of the court wherein he is bound, by recognisance, to appear, or other court having jurisdiction of the cause," &c. The exception shows that

the legislature did not consider a decision on a *habeas*
*corpus* as final, since the merits of the case are referred
to the court having jurisdiction of the cause ; and thus
marks the distinction between a decison on a *habeas cor-*
*pus*, and a final judgment on the merits of the case.
The third section also recognises the same distinction.

The question, arising on the return to this writ of
error, relates to an order of the supreme court, remand-
ing the party to the custody of the officer, under the
commitment of the chancellor. The supreme court sup-
posed that they had no jurisdiction in the case, as it
was a conviction of a contempt of the court of chancery,
and peculiarly and exclusively belonged to that court.
How can this court decide as to the legality or justice of
that conviction, or of an order for an attachment to enforce
the conviction, or on an order of the supreme court, re-
manding the prisoner ?

2. But admitting that there may be cases, arising on
a *habeas corpus* or *mandamus*, in which a writ of error
will lie, the present case is not one of them. A writ of
error will not lie on a conviction for a fine, or a con-
tempt ;* those are summary proceedings, not judgments, * 3 *Mod.* 23. 1
or matters of record.  *Salk.* 263. 2  *Mod.* 218.

Again, there is a serious objection to a writ of error
in this case, arising from the doctrine of contempts.
The power of committing for contempts is essential to
the existence of every court ; and every court must be
the sole and exclusive judge of its own contempts.† † 3 *Wils.* 199,
Where it appears on a return to a *habeas corpus*, that 201. 2 Ld. *Rayn.* 1115,
there has been a conviction, by a court of competent
jurisdiction, it is conclusive, and cannot be reviewed in
this way.

Again, this court is merely a court of review. It has
no original jurisdiction. It can have cognisance of causes
only when brought before it by a *direct* appeal from a de-
cree of the court of chancery, or by a writ of error from

IN ERROR.
......
ALBANY,
Feb. & March,
1810.
YATES
v.
THE PEOPLE.

the judgment of the supreme court. The constitution does not give this court power to review, in this *circuitous* way, a decision of the court of chancery. The supreme court has no power to review the decisions of the chancellor. Such a course of proceeding is not warranted by the constitution, and is inconsistent with the nature of a court of appeals.

In all appeals from the court of chancery, the chancellor is required to assign the reasons of his decree, though he can give no voice in the final decision. Is this court to proceed to decide whether Mr. *Yates* ought to be discharged? If so, it must be because he has been illegally committed. By what court? The court of chancery. But where are the reasons and grounds of the decision of that court?

Again, the chancellor is one of the judges of this court, before whom this writ of error is made returnable. The judges of the supreme court are excluded from giving any vote, on the final decision, on questions arising on writs of error, but the chancellor is not excluded; and thus, he will be called upon to decide, in review, on his own judgment.

On appeals, this court are to reverse or affirm, and are also authorized to modify the decree or judgment of the court below; but how are they to modify a decision on an order or attachment?

Again, this court are to give such judgment as the supreme court ought to have given, and the record must be remitted. What *judgment* of the supreme court is to be reversed? It is a mere remitting of the prisoner to the custody of the officer, under the attachment, to remain in the same state he was in at the time of issuing the *habeas corpus.* What is to be done by the supreme court, when the record is remitted? Mr. *Yates* is not in the custody of an officer of that court; he is no longer subject to its order or control. Can this court make an

order, by which he is to be sent back into the custody of the supreme court? Must that court issue a new *habeas corpus* to bring him again before them? That is in their discretion. The necessity of a new *habeas corpus* shows the absurdity of entertaining a writ of error in such a case. The great inconvenience, and the numerous difficulties, which such a doctrine must produce, afford sufficient ground for this court to quash the writ.

*IN ERROR.*
......
ALBANY,
Feb. & March,
1810.
~~~~
YATES
v.
THE PEOPLE.

</div>

*Rodman* and *T. A. Emmet*, contra. The question now brought into discussion has never been decided in *England*, or in this state. Unshackled by precedent, this court must decide it on principle.

This court differs from the house of lords, as a court of errors, in *England*. That court grew up by the common law; by practice, usage and precedent. This court derives its origin from the constitution and the statutes. The powers of the two courts are different. The 7th section of the statute,* organizing this court, says, that " all errors happening in the court of chancery, the supreme court, or court of probate, shall be redressed and corrected, by the court for the trial of impeachments and the correction of errors." These are the largest and most comprehensive words which could be used. It was intended, that this court should have power to correct every error of the court of chancery, or the supreme court. This court, then, possesses powers more extensive, as a court of review, than the house of lords; and, therefore, though it should be shown that no writ of error lies on a *habeas corpus* in *England*, the attorney-general must go further, and show that the supreme court could commit no error, on a *habeas corpus;* for if an error is committed by that court, it is to be corrected here.

<div style="text-align: right">

* 24 sess. c. 10.
*Laws*, vol. 1. p. 184.

</div>

In the case of *The Queen* v. *Paty*,† Lord *Holt*, in one of those decisions which have rendered his name im-

<div style="text-align: right">

† 2 Ld. *Raym.* 1106. 1115.

</div>

*IN ERROR.*

ALBANY,
Feb. & March,
1810.

YATES
v.
THE PEOPLE.

mortal, was of opinion, that the action which *Paty* brought against the constables of *Aylesbury*, and for which he was committed by the house of commons for a contempt, well lay, and the bringing of it no breach of the privilege of the house, and that a writ of error would lie. (Here was given a history of that case.) The commons addressed the queen, to prorogue the parliament,(*a*) in order to prevent a decision of the very question, whether a writ of error would lie on a *habeas corpus.* Now, if it were a point so very clear, that no writ of error would lie, it is hardly to be supposed, that the commons would have been prorogued, to prevent a decision. It must have been apprehended, that the house of lords would have decided, conformably to the opinion of Lord *Holt*, that a writ of error would lie.

The cases which have been cited, to support a contrary doctrine, contain only the *dicta* of lawyers. The case of *The City of London*, reported by *Coke*, was decided before the *habeas corpus* act, and when a writ of *habeas corpus* was considered as a mere writ of privilege; but since the statute, it is a writ of right, demandable of right, and is not subject to the rule, as to writs of privilege.

˅ 3 *Mod.* 27.

The principle decided in the case of the *Dean and Chapter of Trinity Chapel, in Dublin*,* is true, as a general proposition; but there are cases in which a writ of error will lie, though there has been no judgment on the merits. As, where a statute-merchant has been duly acknowledged, and the execution is erroneous, a writ of

† *Cro. Eliz.* 233.
*Ascue* v. *Ful-
jambe.*

‡ 2 *Inst.* 513.

error may be brought.† In the acknowledgment of a statute-merchant, there is no declaration, plea, issue or judgment; but the bare acknowledgment of a debt on record. So a writ of error lies to reverse a *fine*,‡ in which there is no issue of law or fact, nor a judgment. In the case of a *procedendo*, there is no judgment, nor

(*a*) See *Smollett's Continuation of the History of England.* (1704.)

any ingredient of a judgment; it merely sends the cause
to the inferior court.

All proceedings of inferior courts, which conclusively affect the rights or property of persons, ought to be subject to the revision or correction of a higher tribunal. In *Ashby* v. *White*, cited in 1 *Stra.* 536. it was held, that a writ of error would lie on the award of the court to remand a person, where the court refused to bail.

When the court in which the proceedings originate have done all in their power to do, and have recorded their acts, there ought to be a power in a higher court to reverse their proceedings. A *habeas corpus* is a writ of right; and in a case affecting the liberty of a citizen, what good reason can be assigned, why a writ of error should not lie? It is said, there is no judgment. In *Salkeld* and Ld. *Raymond*, the decision of the court is called a judgment. In the present case, the prisoner was let to bail, and entered into a recognisance to appear and abide the order and judgment of the supreme court. What is a judgment? *Blackstone** says, a judgment is the sentence of the law, pronounced by the court, on the matter contained in the record. Did not the supreme court pronounce the sentence of the law, in the matter before them, and contained in the record? *Coke†* says, a writ of error does not lie, without a judgment, or an award in nature of a judgment. Is not the sentence of the supreme court, in this matter, an award in nature of a judgment? It is not a technical and formal judgment, it is true; but it comes within the description of *Coke.* It was final, as it respected the supreme court; for they did all that it was in their power to do in the case. The position that the words "*ideo consideratum est*" are essential to a judgment, is not to be found in any of the books, except 8 *Mod.* and that is the worst authority. In *The King* v. *Hearle, Reynolds,* J. says, " I know of

* 3 *Bl. Comm.* 395, 396.

† *Co. Litt.* 288, b.

*IN ERROR.*
......
ALBANY,
Feb. & March,
1810.

YATES
v.
THE PEOPLE.

no certain form of words in judgments, but every judg-ment may and ought to vary, according to the circum-stances of the case."

But if the words "therefore *it is considered*" are essential, then there is error in the record for the omis-sion of them. If those words are not necessary, then this is a judgment on which a writ of error will lie. In *Groenwelt* v. *Burwell*, the court held that error would not lie, because it was the judgment of an inferior court, and its proceedings were removable by *certiorari.*

It is objected, that if the writ of error lies in this case, this court will decide, in a collateral way, on the power of the court of chancery to commit for a contempt. Though that court has extensive powers of commitment, they must be exercised according to law; and it must be shown, that its discretion has been exercised according to the established principles of law. This court has power to decide whether the court of chancery has pro-ceeded according to law, in the exercise of its discre-tion; whether the conviction was only legal evidence, or not.

It is asked, if this writ of error should be sustained, what judgment can this court pronounce? We answer, that this court must give the same judgment which ought to have been given by the supreme court. The record must be remitted; and Mr. *Yates* may be recog-nised to appear at the next term, when the supreme court will pronounce the judgment which this court shall say ought to have been given, and the prisoner be set at large.

No inconvenience can result from a writ of error in this case. The proceedings of the court below are inter-fered with no further than to oblige that court to con-form to the principles of law, in the exercise of its powers. Unless a writ of error can be sustained, Mr. *Yates* will be without remedy. That no exact precedent

6

can be found, is no reason why this court may not re- *IN ERROR.*
view the proceedings of the supreme court. A record ALBANY,
is sent here, which is complete and final. *Est boni ju-* Feb. & March,
*dicis ampliare jurisdictionem*, is a maxim of our law. 1810.
This maxim, if not applicable to inferior courts, is emi- YATES
nently so, in regard to a court of the highest jurisdiction, THE PEOPLE.
and of *dernier resort.*

*The Attorney-General*, in reply. The words " all
errors," &c. in the act organizing this court, are not to
be construed to mean every error, but only such errors
as may happen in pronouncing a final judgment on the
merits. This is evidently the meaning of the act, if the
whole section is read together.

I repeat it, this court has no jurisdiction but in cases
regularly brought before it, by appeal or writ of error.
How is this court to decide whether the court of chan-
cery, in committing Mr. *Yates*, exercised its discretion
according to law, or not? Is this court possessed of the
reasons or grounds of the chancellor's decision? Or
can they in any way appear on the record? The proper
course was to have appealed from the decision of the
court of chancery, and then the reasons of its proceed-
ing would have been stated to this court. Now this is
a writ of error which merely brings up an attachment and
order of the court. It is like a writ of error brought
on an execution, which leaves the judgment in full force.

It is said, that by ordering the supreme court to enter
a judgment for the discharge of Mr. *Yates*, and thereby
reversing the former judgment of that court, the convic-
tion in the court of chancery will also be reversed.
This is, in effect, to allow the supreme court to review
the proceedings of the court of chancery; and this court,
indirectly, without any appeal, and without the facts and
reasons of the decision before them, will reverse the or-
der of the chancellor. Why should this court break

*IN ERROR.*
•••••
ALBANY,
Feb. & March,
1810.
YATES
v.
THE PEOPLE.

down the barriers which have been raised by the constitution, between the court of chancery and the supreme court, for their mutual protection? This court cannot depart from the course of proceeding pointed out by the constitution.

There cannot be two modes of bringing the case of Mr. *Yates* before this court. That prescribed by the constitution is by an appeal. If an appeal would lie, and that was the proper remedy, it ought to have been pursued. A writ of error cannot be proper. It is said, Mr. *Yates* not having entered his appeal within the fifteen days, prescribed by the statute, will be remediless, if this writ of error is not sustained. But that is no reason why this court should interfere. Mr. *Yates* should have exercised his right of appeal, within the time required by law. If he has lost his remedy, it is by his own neglect, and this court cannot help him. The legislature only can interfere for his relief, if that body should think it a fit case for its interposition.

Granting, for the sake of argument, that this question has never been decided in *England;* it is strange that, in this state, where the rights of the citizens are so often brought into discussion, and so well defended, that this point should never have been raised or decided. But the question, in principle, has been decided in *England.* The general rule has been expressly laid down, and certain exceptions are stated; but the present case does not come within any of the exceptions.

A *statute-merchant*, being an acknowledgment of the debt of record, there is no occasion for any pleadings or issue; but the judgment of the court is given, and execution issues to enforce it.

Again, this court are called upon to reverse an order, or attachment, of the court of chancery, as erroneous; yet the conviction for the contempt will remain legal and in full force, and another attachment may be issued. The supreme court decided only, that on the face of the

order or attachment, Mr. *Yates* was legally in custody, and that they had no jurisdiction in the case of a conviction for a contempt by the court of chancery. What order is this court to make? It is said, that Mr. *Yates* is to be brought before the supreme court, upon a recognisance, for that purpose. Who is to take this recognisance? Will this court direct the chief justice, or one of the judges, to go to the prison to take a recognisance? Would the judges be bound to obey such an order?

Again, suppose that Mr. Justice *Spencer*, when Mr. *Yates* was brought before him, in vacation, had remanded him, in the same manner as was afterwards done by the supreme court, would a writ of error lie from the decision of the judge? Could a record be made up in such a case, and be brought here?

The decision of the supreme court is, it is true, a sort of judgment; but it is not that kind of judgment on which a writ of error will lie. It will hardly be pretended, that a writ of error will lie on every order or decision of that court.

If there is any error in the proceedings against Mr. *Yates*, it originated in the court of chancery; yet the chancellor is to sit in judgment here, and the judges are excluded from giving any opinion on the final decision of the case.

Again, the chancellor cannot be called upon to give his reasons, because this is not a case arising on an appeal from his court; nor can the judges of the supreme court assign any reasons. They did not decide on the merits of the case; they merely said, that they had no power to review the proceedings of the chancellor, or to discharge a person committed by him for a contempt; that it was a case in which they had no right to interfere.

If this court is to grant relief, merely because the party is remediless, it will go beyond the constitutional

IN ERROR.
······
ALBANY,
Feb. & March,
1810.

YATES
v.
THE PEOPLE.

*IN ERROR.*
····
ALBANY,
Feb. & March,
1810.

YATES
v.
THE PEOPLE.

limits of its jurisdiction. Why is Mr. *Yates* remediless? Because he neglected to enter his appeal; not because he has been guilty of an offence, from the punishment of which no remedy is to be obtained in this way. But he has a more complete remedy. He may be pardoned by the executive. The judgment of this court, reversing the decision of the supreme court, will amount to no more than a discharge of Mr. *Yates* from custody; and while the conviction remains in force, he may again be committed.

*Cur. ad. vult.*

*Tuesday, March* 13. The court now proceeded to decide the question arising on the motion to quash the writ of error in this case; and the judges of the supreme court being requested to give their opinions,(a) they delivered them, *seriatim*, as follows:

YATES, J. The question for the determination of this court is, whether a writ of error will lie on the proceedings had before the supreme court, on the *habeas corpus*, allowed by that court.

The writ of *habeas corpus* is the most usual and proper remedy to be relieved against a wrongful imprisonment; and in order to prevent vexatious delay, it is, by statute, made the duty of the chancellor, or justice of the supreme court, to whom application shall be made, to allow it, and examine into the cause of commitment.

In this case, Mr. *Yates*, after having been twice discharged by a justice of the supreme court, was taken a third time, by an order out of the court of chancery, and, on application, was, by *habeas corpus*, brought before the supreme court, who adjudged the commitment good

(a) A doubt having been suggested by some member of the court, on a former day, whether the judges of the supreme court had a right to take any part in the questions arising in this cause, or to express any opinion concerning them, a vote was taken on the subject, which passed in favour of the right of the judges to deliver their opinions.

and sufficient in law, and remitted him to prison in ·the same state in which he was at the time of issuing the writ of *habeas corpus*.

It has been urged, that this is not a judgment, and therefore error will not lie; that the *habeas corpus* is a writ of privilege, merely for the enlargement of the prisoner, without touching his case; that as in a *procedendo*, it does not touch the merits; and that the same reasoning applies here as in the case of a *mandamus*.

I do not think the words *ideo consideratum est*, are indispensable, to constitute the only judgment subject to error; it is not used in a fine, nor is it necessary in outlawry.

Lord *Coke* says, without a judgment, or award in nature of a judgment, error will not lie. I believe it is only necessary to examine these proceedings, to determine whether it is an award in the nature of a judgment. It is sufficiently extensive and final; he is remitted in the same state in which he was when the *habeas corpus* issued; and, in my view, it partakes so much of the nature of a judgment, that it may well be called so, and deemed subject to error.

The nature of a *procedendo*, and the province of a *mandamus*, differ materially from the writ of *habeas corpus*; nor do I think the same reasoning applicable on a question of property or interest, which substantial justice would legally enforce, as on a question of personal liberty, and which ought, at all times, to be extended to the citizen, more especially by a court of the last resort, if it can be done without violating established principles of law.

The supreme court proceeded to examine into the cause of commitment, and by its adjudication has confirmed the proceedings in the court of chancery; and the party, conceiving himself aggrieved, now seeks his remedy in this court, grounded on the proceedings laid before the court below; and unless sufficient appears on

IN ERROR.
......
ALBANY,
Feb. & March,
1810.

YATES
v.
THE PEOPLE.

*IN ERROR.*
ALBANY,
Feb. & March,
1810.

YATES

THE PEOPLE.

the face of those proceedings to entitle the party to re-lief, he must of course be remanded; but if it should appear manifest, on an examination of these proceedings by this court, that the court of chancery has exceeded its authority, and that Mr. *Yates* is illegally imprisoned, I would ask, whence is the necessity of any further in-vestigation into what has been called the merits of the present case? But it is said, that the party might have appealed within a limited time, and having neglected to do so, he is now without remedy, and must continue in confinement, or seek relief from the executive, by pardon. Whenever such arguments are urged, there ought to be no remaining doubt of the guilt of the pri-soner, established by a full and constitutional inves-tigation; but while the party supposing himself ag-grieved, is engaged in the very act of seeking a revision of what, by him, is deemed unlawful proceedings against him, in the way pointed out by the constitution, those arguments ought not to be regarded.

The peculiar situation in which these proceedings have placed the chancellor, and the justices of the su-preme court, as members of this court, has been urged as evidence of the impropriety of sustaining the writ. I cannot discover the force of this argument, or how the existence of such a difficulty can possibly affect the remedy now sought for, against an act of a court, whose adjudication is subject to the revision of this court.

It is also said, supposing Mr. Justice *Spencer* had refused to bail, or discharge the party, who would then have returned the proceedings to this court? Such re-turn, certainly, could not be enforced, nor would it be necessary, another remedy being open to the party. If dissatisfied with the opinion of the judge in vacation, he might renew his application, in term time; and if he supposed himself aggrieved by the subsequent adjudica-tion of the court, he might, as in this instance, claim

his writ of error, and ask a revision of its proceedings *IN ERROR.* on the *habeas corpus* so allowed. To quash this writ, ALBANY, can only be justified, on the ground that it is the avowed Feb. & March, 1810. and known law of the land, that error will not lie on a *habeas corpus.* This doctrine the *English* books will not YATES uphold to such an extent, as to make it the duty of this THE PEOPLE. court to set it aside. In all the cases adduced, it is stated incidentally; there is not one case I have been able to find, where the point has been absolutely determined.

In the case of *The Queen* v. *Paty et al.* ten of the judges were of opinion, that the *queen* could not refuse to allow a writ of error, but that it was grantable, *ex debito justitiæ.* Two of the judges held, that the subject could not, of right, demand it in any criminal case, then it was a doubt, whether any writ of error lay upon a *habeas corpus.* The agitation of the house of lords, occasioned by the extensive claim of privilege on the part of the commons in this case, and the subsequent conduct of the queen to prevent a decision, is, I think, strong presumptive evidence of the favourable opinion of the house of lords, as to entertaining this writ.

In short, it has never been so determined, as to remove the doubt which then existed on the subject; and it now remains for this court to settle the law; and in a case like the present, where it is admitted, that the prisoner is without remedy, if error cannot be sustained, I have no hesitation in giving it as my opinion, that the writ ought not to be quashed, in order to give full effect to the revising power vested in this court by the constitution, which, in this instance, will of course be confined to the record of the proceedings sent here by the supreme court.

VAN NESS, J. declared, in substance, that upon a full and deliberate examination of the question, he was clearly of opinion, that the writ of error would not lie in this case, and that the writ ought, therefore, to be quashed.

*IN ERROR.*

ALBANY,
Feb. & March,
1810.

YATES
v.
THE PEOPLE.

SPENCER, J. The question now under consideration is of high importance. It has been correctly said, in the progress of the argument, that there never has been a decision in *England* upon the point; there are *dicta* to be found, but they proceed from judges who had not cognisance of the question, and are merely thrown out by way of illustration, on discussions of other points of law. Such *dicta* have never been considered as authoritative; and when quoted by counsel, to subserve their purposes, have ever been treated as inconclusive. Having premised thus much, I proceed to show, that whenever it has been said by the judges, that a writ of error will not lie upon a *habeas corpus*, these have been *obiter dicta.*

The case of *The City of London*, (8 *Coke*, 7 *Jac. I.*) was thus; one *Wagoner* was imprisoned, upon a conviction, for a breach of one of the by-laws of the city. He sued out his *habeas corpus;* a special and very long return was made in justification of the imprisonment; and upon the objection, by the prisoner's counsel, that the return consisted much in recital, it was answered and resolved, that this was not a demurrer in law, but a return to a writ of privilege, upon which no issue can be taken or demurrer joined; and that, upon the award of the court, no writ of error would lie, the return being to inform the court of the truth of the matter. Upon this case, it is observable, that it was before the *habeas corpus* act, which passed in 31 *Car.* II. The question was not, and could not be under the judgment of the court, whether a writ of error lay or not. The next case is that of *The King* v. *The Dean and Chapter of Trinity Chapel, in Dublin.* (8 *Mod.* 28. *Hil.* 8 *Geo.* I.) That case is to be found in several other books. As reported in *Mod.* it is this: A writ of error was brought from the king's bench in *Ireland*, to the king's bench in *England*, on the awarding of a peremptory *mandamus*, and the chief point was, whether a writ of error would lie upon a peremptory

*mandamus*, and it was adjudged that it would not lie, and in giving judgment, the court say, " it is against the nature of a writ of error, to lie, on any judgment, but in causes where an issue may be joined and tried, or where judgment may be had on demurrer, and therefore it will not lie on a judgment for a *procedendo*, or on the return of a *habeas corpus*." Whatever is said by the court, in this case, beyond the point in question, which was, whether a writ of error lay, on the award of a peremptory *mandamus*, cannot be considered as authoritative. This case is also reported in *Strange*, 536. but not a word escapes the court respecting a writ of error on a *habeas corpus*, excepting, that *Eyre*, J. infers, from the entry made in the case of the *Aylesbury* men, without an *ideo consideratum est*, that the judges thought that not to be a case relievable by writ of error. With professional gentlemen there can be little hesitation in yielding the palm of accuracy to Sir *John Strange*, in a competition with 8 *Mod.* and I think myself warranted in doubting the fact, that the court used the *dicta* attributed to them in *Mod.* The case of *Dr. Groenvelt* v. *Dr. Burwell and others*, (1 Ld. *Raym.* 454.) has no bearing on the question. One of the many points decided in that case, and to which our attention has been called, is, that to a court, newly erected, with power to proceed in a manner unknown to the common law, a writ of error does not lie; but their errors are to be corrected, on *certiorari*, in the king's bench. The same case is to be found also in *Salk.* 144. 263. where the same point is ruled. The case of *Hammond* v. *Howell* (2 *Mod.* 218.) is not perceived to have the remotest bearing on the question. These are all the cases cited by the attorney-general, and are supposed to have decided the present question. I repeat it, that the points decided in these cases were different, and that this question really comes before this court as a new one. In the case of *The Queen* v. *Paty and others*, (2 *Salk.* 504.) it is stated to be a doubt, whether any writ of error lay upon a judgment

IN ERROR.
.....
ALBANY,
Feb. & March,
1810.

YATES
v.
THE PEOPLE.

IN ERROR.
·····
ALBANY,
Feb. & March,
1810.

YATES
v.
THE PEOPLE.

given on a *habeas corpus.* The history of the *Aylesbury* cases, in my view, demonstrates that it was not the opinion of the house of lords, or of the lawyers of that period, that a writ of error would not lie in such case.; the contrary, in my judgment, is the most natural inference.

This case, then, comes back, to be considered on principle, without the aid of any adjudged case. The objections urged against a writ of error are several :

1. That no definitive judgment has been given, and the form of the entry is such, as shows that the matter has not been adjudged, there being no *ideo consideratum est.*

2. That a *habeas corpus* is a mere writ of privilege, for the enlargement of the prisoner, and does not touch the merits of his case.

3. That this court cannot, if it takes cognisance of the case, afford any remedy to the prisoner.

4. That the writ of error, in this case, has not brought before the court the whole case ; and that as the conviction took place in the court of chancery, the only remedy would have been by appeal; and that the grievance complained of, having originated from chancery, the provisions of the constitution are defeated in permitting a writ of error to lie, by which the judges of the supreme court will be precluded from sitting as judges.

As to the last point, it will be recollected, that on this motion, the merits of the case can be no further considered, than are necessary to raise the question. It is, therefore, not now to be examined, whether *Yates* was committed for a contempt of the court of chancery, or for a criminal act in violating a public statute, for which he was alone amenable in courts having criminal jurisdiction, nor whether he was liable to be reimprisoned, after his enlargement on *habeas corpus.* It is as little to the purpose, to examine into the constitutional organization of this court, by reasoning against its jurisdiction, in consequence of provisions in the constitution, which exclude the justices of the supreme court, from voting in

cases of writs of error.  Such observations may detect <span style="float:right">*IN ERROR.*</span>
errors in the constitution, but do nothing in deciding the
question.    If the record  now before the court, on exa-
mination, does not present a case in which there can be
relief, provided the  court has jurisdiction, then it will be
the prisoner's misfortune.

IN ERROR.
.....
ALBANY,
Feb. & March,
1810.

YATES
v.
THE PEOPLE.

The form of the judgment, in this case, is, " whereupon,
all and singular the premises aforesaid, being seen and fully
examined and  understood, by the  justices  aforesaid, it
seemeth to the justices aforesaid here, that the aforesaid
cause of commitment of the said *John V. N. Yates*, to the
custody of the sheriff of the city and county of *Albany*, in
the return of the said sheriff above specified, is good and
sufficient in law,  to detain the said *John V. N. Yates* in
the  custody aforesaid."    There is no *ideo consideratum*,
and a reversal of the decision of the supreme court, would
not entitle the prisoner to any thing in the personalty.

That the record  presents a determination of the ques-
tions of law arising from the sheriff's return, will hardly
be denied by any one.   The language of the  record im-
ports an ultimate and final decision by the supreme court
against the prisoner.  It  is a decision too of the highest
importance to him, because  it subjects him to imprison-
ment under the order of  the court of chancery, which
has no  other limitation in point of  time than the  mere
pleasure of that court.   In a case thus circumstanced,
to abridge the citizen of his right  to  appeal  to  a court
superior to  the one which has virtually sentenced him
to  imprisonment,  by  declaring  that  the cause of his
commitment by  the  court of  chancery is good and
sufficient in law, to detain him, and by  remanding him
to  the custody  of  the sheriff,  there  to remain in the
same state in which he was at the  time of issuing the
aforesaid writ of *habeas  corpus*, would, in my view, re-
quire very strong and cogent reasons.

The 7th section of the  act organizing this court,
(1 *Rev. Laws*, 184.) declares, that all errors happening

*IN ERROR.*

ALBANY,
Feb. & March,
1810.

YATES
v.
THE PEOPLE.

in the court of chancery, the supreme court, or court of probates, shall be redressed and corrected by the court for the trial of impeachments and the correction of errors. These expressions are broad, and I agree are not to be extended to give this court cognisance of cases, in judgments or proceedings merely interlocutory; but I do insist, that whenever a decision takes place in the supreme court, which is final, and of which a record can be made, and which shall decide the rights of property, or personal liberty, in such cases, the statute gives jurisdiction to this court. And, permit me to observe, that it would be a singular defect in our judicial system, to provide and institute this high court to decide, in the last resort, on the properties of the citizens, and to leave their dearer rights, their personal liberties, unprotected and unprovided for.

In the present case, a record has been made under the directions of the justices of the supreme court, agreeably, in most respects, to the form settled in the king's bench, in the case of *The Queen* v. *Paty and others*, except that the entry in that case is, that the cognisance of the cause of the caption and detention of *Paty*, did not belong to the court of the said lady the queen, &c. whilst in the record here, it is, that the cause of the commitment is good and sufficient in law, &c. In the case of *Paty*, the court denied itself jurisdiction; but in this case, the supreme court assumed a jurisdiction to judge, and did adjudge the commitment good and legal.

In the case of *The Queen* v. *Paty*, Lord *Holt* says, and he is not contradicted by the other judges, when considering the return of the *habeas corpus*, " And we may as well determine it upon the return of the *habeas corpus*, (the privileges of the commons,) for the defendants are here in a proper course of law, and the matter appears to us upon record, as well this way as if it were pleaded to an action."

The question recurs, is it essential that the record should

contain *ideo consideratum est*, as the test to determine whe-
ther a writ of error will lie ? I am persuaded that these
words are not the test. In the case of a *procedendo*, the
entry is with an *ideo consideratum*, and yet error will
not lie. The reason in that case is, that the court which
awards it, directs another court to proceed in the case ;
and *Coke*, in his *Commentary* on *Littleton*, p. 288. b.
says, that " a writ of error lieth when a man is grieved
by an error in the foundation, proceeding, judgment or
execution ; but without a judgment, or an award in na-
ture of a judgment, no writ of error doth lie, for the
words of the writ are *si judicium redditum sit*, and that
judgment must regularly be given by judges of record.'
He proceeds to state the judgment in outlawry, after the
defendant is *quintus exactus*, which is *ideo utlagatur
per judicium coronatorum*, and in *London per judicium
recordatoris*. But before the forfeiture of goods, the she-
riffs must return the *exigent*, whereby the outlawry ap-
pears of record, or the outlawry must be removed by
*certiorari ;* " for before" he adds " that time, that the out-
lawry appears of record, the defendant doth not forfeit his
goods, nor the plaintiff can be disabled, nor any writ of
error doth lie in that case." *Coke* then proceeds to
state a diversity, when by the writ of error he shall
recover, or be restored to any personal thing, as debt,
damage, or the like, then a release of all actions per-
sonal is a good plea. But where, by a writ of error, the
plaintiff shall not be restored to any personal or real thing,
a release is no bar ; and *Littleton* puts the case of a writ
of error upon an outlawry, where it happens by process
on the original, in which the writ of error does not re-
store him to any thing in the personalty, but only to his
law, and his ability to sue, &c. *Tidd*, a writer of the
greatest accuracy, and of high celebrity, states the rule
in the words of *Coke*, that there must be a judgment, or
an award in nature of a judgment, or else a writ of er-
ror will not lie. (2 *Tidd*, 1062.)

*IN ERROR.*
.....
ALBANY,
Feb. & March,
1810.

YATES
v.
THE PEOPLE.

It will not be denied that writs of error lie to reverse outlawries. We have a statute regulating the proceedings in error on outlawries ; not giving, but recognising the writ : and I state, without the possibility of contradiction, that the form of the judgment is *ideo ultagatur per judicium coronatorum,* or *recordatoris.* Here then is one instance in which writs of error lie, without the *ideo consideratum est.*

In the case of *Ascue* v. *Fitzjambe,* (*Cro. Eliz.* 233. 349. *Fitz. N. B.* 304.) upon a statute-merchant, the court held clearly that error lay where the statute was good, but the execution is erroneously sued out upon it. A statute-merchant is where a man is bound before a mayor or bailiff of a corporate town, who has power to take such bonds or recognisances, to pay a certain sum of money, at a fixed day ; if there be default in payment, then the person, in whose favour it is made, comes before the officer, taking the statute, and prays him to certify it under his seal, upon which there issues a writ to execute the statute. I have given this succinct history of the proceedings on a statute-merchant, for the purpose of showing, that there is no judgment of any court upon it ; and yet we see that a writ of error lies on it. It is very certain also, that a writ of error lies on a fine, on which no judgment is pronounced, the whole process depending on the acts of the parties, it being a more solemn form of conveying real estates. Our statute relative to fines limits the time within which writs of error shall be brought to reverse them ; and declares, that for certain defects therein they shall not be reversed : and in the case of fines the statute does not give, but only recognises, the law, that writs of error lie on them.

In *Metcalfe's* case (11 *Coke,* 38.) it was decided that a writ of error would not lie on a judgment *quod computet,* because it was not a final decision ; but in the same case, the reporter, Lord *Coke,* instructs the reader, that there are exceptions to the rule, that no writ of error lies until

the whole matter in the original is determined, and he
cites a case in *Trinity* term, 18 *Hen.* VII. in the king's
bench, of one *Eaton*, who was indicted of the death of
*J. M.*, upon which a *capias* was awarded, and upon that
an *exigent;* after which *Eaton* died before an attainder;
upon which award of the *exigent*, his administrators
brought a writ of error, and it was adjudged, that the
writ of error lay; and the reason was because, by the
award of the *exigent*, his goods and chattels were for-
feited; and of such awards, *Coke* adds, which tend *ad
tale grave damnum* of the party, a writ of error lies, though
the principal judgment was never given.

These cases, and it is believed others could be added
to them, evince that there is no such rule existing, as that
a writ of error will lie in cases only where the judgment
is technically, *ideo consideratum est.*

As to the second point. It is incorrect, at this day, to
say, that a *habeas corpus* is a writ of privilege. Since the
31 *Car.* II. it has been considered a writ of right, de-
mandable, *ex debito justitiæ*, in the cases provided; and
this right is secured by various penalties on those autho-
rized to allow, and on those required to execute, the writ.
It is, in truth, the birth-right of the citizen; and it appears
to me extraordinary, to have it contended, that the de-
cision of the supreme court does not touch the merits of
the prisoner's case. If he cannot obtain the benefit of this
writ from that court, he can get it no where; for though
there be the physical power on the part of a judge of that
court, in vacation, to allow the writ and liberate the pri-
soner even now; yet such a procedure would be incorrect
and censurable. The decision of the supreme court has
settled the law of that case; and if this court cannot
review the question, it must remain the law of every si-
milar case.

But it has been insisted, that there is an analogy be-
tween the adjudication on a writ of *habeas corpus*, and
the issuing a peremptory *mandamus;* and it having been
settled in the house of lords, in *England*, in the case of

*IN ERROR.*

*ALBANY,*
*Feb. & March,*
*1810.*

YATES
v.
THE PEOPLE.

IN ERROR.
.....
ALBANY,
Feb. & March,
1810.

YATES
v.
THE PEOPLE.

*Pender* v. *Herle*, (3 *Bro. P. C.* 178.) and the case of the *Dean and Chapter of Trinity Church, in Dublin*, (2 *Bro. P. C.* 555, 556.) that a writ of error will not lie on a peremptory *mandamus*, it follows, it is said, that it will not, upon the adjudication on a *habeas corpus*. It appears to me that the reason for the judgment of the house of lords, on the *mandamus*, is altogether inapplicable to a *habeas corpus*. In 8 *Mod.* 29. the case before quoted, the court of king's bench in *England*, in giving their reasons why a writ of error would not lie on a *mandamus*, say, " that the right of any person was not to be determined on a *mandamus ;* it gives a remedy where there is a seeming probability for it, and it settles people in their possessions, so that they may be able to defend their rights, or by virtue thereof, to bring an action for things incident to the possession ; and if a writ of error should lie in such cases, it would entangle all the public acts of annual officers in most corporations and parishes." But they admit that it does lie in case of traversing the return, under the statute of 9th *Anne*, c. 20. In what respects the analogy exists between a *mandamus*, which does not settle the rights of parties, and the final adjudication on a *habeas corpus*, which I trust I have shown does affect, in the most essential manner, the rights of the prisoner, if he be illegally imprisoned, I cannot discover.

The statute to which I have referred is very broad and extensive. This court have a revisionary power over all errors happening in the supreme court.

In this case, there is a record of a proceeding in that court ; and there is, substantially, a judgment on that record, or, in the language of *Coke*, an award in nature of a judgment.

The *ideo consideratum est*, on a record, is not the test by which to determine whether error lies or not, as must be manifest from the cases which have been cited. The question is altogether unshackled by decisions in the *English* courts. Not one has been quoted, and none

exists; and, finally, it appears to me to involve the highest absurdity to conceive that the framers of our constitution and our laws meant to erect this high tribunal to correct the errors of our highest courts of judicature, in civil cases, and to leave the still greater and more invaluable rights of personal liberty unprovided for and unprotected, by appeal to this high court, in a case where, in fact, a judgment has been given.

IN ERROR.

.....

ALBANY,
Feb. & March,
1810.

YATES
v.
THE PEOPLE.

Should this court take cognisance of the question, by entertaining a writ of error, there can be no difficulty in the subsequent stage of the cause. Should they reverse the judgment of the supreme court, by reversing that judgment, they will declare the law of the case; and the prisoner will be in the situation of a person whose outlawry is reversed, when the forfeiture of goods has not taken place; he will be restored to his right under the *habeas corpus* act, as the outlaw is to his law, and his ability to sue. On remitting this record back to the supreme court, with a reversal of their judgment, that court will have an undoubted right, and it will become their indispensable duty, to order the prisoner to be brought before them, and to discharge him. The prisoner is now in custody, under the sentence of the supreme court, remitting him to his former imprisonment. By reversing that judgment, the prisoner is put in the same situation he was in before he was remitted. The court, also, are to begin again from that point. A judgment of reversal would, necessarily, therefore, operate effectually, by virtually giving to the supreme court directions and authority to proceed again under the *habeas corpus* to be remitted. But, at all events, by reversing the judgment, the law of the case becomes settled, and no judge of the supreme court would hesitate in discharging the prisoner.

It has been said, and it may again be urged, that the want of a precedent of a writ of error on a *habeas corpus*, is evidence that error will not lie. I cannot subscribe to this doctrine. In an action at common law, it can be no

IN ERROR.
·····
ALBANY,
Feb. & March,
1810.

YATES
v.
THE PEOPLE.

objection to its maintenance, that there never has been the like action. *Blackstone* (vol. 3. p. 123.) lays it down, as an elementary principle, " that wherever the common law gives a right or prohibits an injury, it also gives a remedy by action ; and therefore, wherever a new injury is done, a new method of remedy must be pursued." There are reasons for our not meeting with decisions on this question, in the *English* reports, which do not apply to us. The statute of 31 *Car.* II. c. 2. gives a power to the lord chancellor, the lord keeper, or any justice of either bench, or baron of the exchequer, of the degree of the coif, to grant writs of *habeas corpus ;* and, independently of the statute, the courts of king's bench and common pleas, as courts, award and take cognisance of cases on *habeas corpus.* There being in *England* so many persons, and such a choice of courts, to whom application can be made, it is with me no argument against a writ of error, that, under such circumstances, we find no adjudication on the present question.

My opinion is, that this court ought to take cognisance of the cause by upholding the writ of error; and that a refusal to do so would be a denial of right to the individual, and a surrender of the clear, just, and necessary prerogatives of this high tribunal.

THOMPSON, J. The prisoner having been committed by the court of chancery, to the custody of the sheriff of *Albany*, for *mal-practice and contempt*, was brought into the supreme court, upon a *habeas corpus ;* and after due examination there, of the cause of commitment, he was ordered to be remitted to the custody of the sheriff, there to remain, in the same state in which he was at the time of issuing the writ of *habeas corpus.* Upon this a writ of error is brought, returnable in this court ; and the specific and only question now under consideration is, whether a writ of error will lie in this case.

It at once strikes the mind, that this, although in the form of a writ of error, is, in substance, to bring under review, proceedings in the court of chancery. The ques- tion now to be decided, never has been under the consi- deration, or received the judgment of the supreme court, which, in my opinion, renders it fit and proper, if not the duty of the judges of that court, to afford their aid and assistance, in elucidating the question.

By the constitution, (article 32.) this court is to consist of the president of the senate, for the time being, and the senators, chancellor, and judges of the supreme court; and it is declared, that if the cause to be determined shall be brought up by writ of error, on a question of law, on a judgment in the supreme court, the judges of the court shall assign the reasons of such their judgment, but shall not have a voice for its *affirmance or reversal.* Thus it will be seen that the judges are made constituent members of this court, and thereby necessarily acquire a right to vote in all cases, and upon all questions, except on the affirmance or reversal of their judgment. The particular question now before this court, never having been, in any shape, before the supreme court, it is impossible that the judgment of that court is to be affirmed or reversed, by the present decision. But it appears to me, that one of the rules of this court excludes the judges of the supreme court from a voice in the decision. It declares, that when a cause shall be brought into this court, by a writ of error, on the question of law in a judgment of the supreme court, the judges of such court may severally state their opinions, upon *every matter, that may arise on such hearing,* but shall not have a voice, in the decision of the court, *on any question* whatever, arising on the cause so brought into this court. Although the validity of this rule may well be questioned, as it abridges a constitutional right of the

*IN ERROR.*

ALBANY,
Feb. & March,
1810.

YATES
v.
THE PEOPLE.

judges of the supreme court; yet I do not feel disposed, at present, to assert my right to vote on the question. These preliminary observations are made for the purpose of showing, that in pronouncing the opinion I am about to submit to this court, I am strictly within the letter of the rule referred to ; and, of course, exercising a right, conferred both by the constitution and rule of this court.

It may, I believe, be assumed as an undeniable fact, that this is the first instance, in the history of our own, or *English* jurisprudence, in which a writ of error has been brought, upon the judgment or order of a court, upon a *habeas corpus.* This, although not conclusive, affords a very strong argument, that no such writ will lie. No such writ ever having been brought, it follows, as matter of course, that no direct adjudication on the subject is to be found. We have, however, the opinion of able and learned judges, in *England;* men who have been considered sages in the law, that a writ of error will not lie in such case, and I cannot find a contrary *dictum,* by any judge or elementary writer.

The case of *The City of London,* was upon a *return to a habeas corpus,* and one objection was, that the matter of the return consisted much in recital, which ought to have been directly and certainly alleged. But the court overruled the objection; and the reason assigned why it was not tenable, was, that the return is but to inform the court of the truth of the matter, and, therefore, such precise certainty is not required, as in pleading; it is matter upon which no issue or demurrer can be taken; *nor can any writ of error be brought, upon the award of the court thereon.* (8 *Coke,* 253.) The opinion here expressed, is entitled to more respectful attention than a mere extrajudicial *dictum* of a single judge. It was the solemn resolution of the whole court. Because a writ of error would not lie, was

considered one of the essential reasons, why less preci- *IN ERROR.*
.....
sion and certainty was required in the return, than in     ALBANY,
matters of pleading, in cases where a writ of error Feb. & March,
                                                        1810.
would lie.

The case of *The King* v. *The Dean and Chapter of Trinity Chapel*, was on a writ of error from the king's bench in *England*, to the king's bench in *Ireland:* and the question was, whether a writ of error would lie on the award of a peremptory *mandamus;* and it was held that it would not, and the writ was accordingly quashed. The court, in giving judgment, say, it is against the nature of a writ of error, to lie on any judgment, but in cases where an issue may be joined and tried, or where judgment may be had upon a demurrer, and therefore it will not lie on a judgment for a *procedendo, nor on the return of a habeas corpus.* A writ of error was, afterwards, brought, in the house of lords, and all the judges of *England* were of opinion, that a writ of error would not lie ; (8 *Mod.* 29. 1 *Stra.* 543. S. C.) and affirmed the judgment of the king's bench. As it is not pretended that any case is to be found, where a writ of error has been sustained upon any order made on the return of a *habeas corpus*, or even a *dictum*, in any shape countenancing such a proceeding, it is unnecessary further to examine, or refer to the opinions of *English* judges. The cases already noticed are amply sufficient to show, that not even a doubt is entertained in *England* on the subject. I say, not a doubt; because, had there been, our law books would have furnished some traces of a judicial decision on the very point. But it has been said, that this question is not to be tested by the powers, or proceedings of the house of peers in *England*, but by the constitution and statute of this state, constituting this court. It ought to be constantly kept in view, that the proceedings complained of, by the prisoner, origina-

IN ERROR.
.....
ALBANY,
Feb. & March,
1810.

YATES
v.
THE PEOPLE.

ted in the court of chancery, and not in the supreme court; and that it is not now a question, whether these proceedings can be reviewed by this court, but whether it can be done in the mode now attempted. The statute (1 *Rev. Laws*, 184.) declares, that all errors happening in the court of chancery, the supreme court, or court of probates, shall be redressed and corrected by the court for the trial of impeachments and the correction of errors. The statute then goes on to point out the mode by which the party conceiving himself aggrieved, may have the proceeding brought up into this court. Where the error complained of is in the judgment of the supreme court, it must be by writ of error. Where it is in any sentence, judgment, decree, or order in the court of chancery, it must be by *appeal*. Although the words of the statute are broad, that *all errors* happening in the supreme court are to be redressed by this court; yet it is obvious, these words must be construed in reference to cases, where writs of error may be brought, according to the subsequent provision in the same section of the act, and the constitution of this state, to wit, upon final judgments. A contrary doctrine would be novel and unprecedented. If these words are to be taken in the latitude contended for, they will embrace every interlocutory order, made in the progress of a cause, where a party may conceive himself aggrieved. And although it was warmly pressed upon this court, by the prisoner's counsel, that they ought to construe their powers, so as to enlarge their supervising jurisdiction, I have the fullest confidence, they will not feel disposed to push it to such an extent.

Admitting, for the present, that errors have happened in these proceedings, which this court can, and ought, to review, the question is, in *what court* did they occur. That the conviction for the contempt, and the attachment upon which the prisoner was committed, were proceed-

ings of the court of chancery, cannot be denied. If in these are to be found the errors complained of, the remedy which the statute points out is by appeal. What is the error complained of in the supreme court? To put it on the broadest possible ground, it is, that the court ought to have discharged the prisoner, when brought up on *habeas corpus*. But here again the statute interposes insuperable difficulties. The supreme court, it is said, should have discharged the prisoner. Why? Because there was error in the proceedings of the court of chancery. But the statute is positive, that all errors happening in the court of chancery shall be redressed and corrected by this court. Have the supreme court, then, committed an error, in not assuming a right to review proceedings in the court of chancery, directly repugnant to the positive words of the statute? Suppose all the matter now appearing on the return to the writ of error, had been presented to the supreme court, by affidavit, upon the application for the allowance of the *habeas corpus*, and an allowance had been refused, would a writ of error have been brought thereupon? This, I presume, will not be pretended; and yet such proceedings would have been on file in the clerk's office, and might have been put into a shape, as much resembling the record of a judgment, as the one now before the court and the denial of the allowance; would have been as much a judgment of the court as the order for remanding the prisoner. The allowance of the *habeas corpus* is rather a matter of form, to bring before the court the cause of commitment, that they may examine whether the prisoner ought not to be liberated from his imprisonment, and not for the purpose of determining whether he is to be altogether discharged from the complaint against him. The court may discharge the prisoner from confinement, upon bail, or without bail, according to circumstances. He is still,

*IN ERROR.*
.....
ALBANY,
Feb. & March,
1810.

YATES
v.
THE PEOPLE.

*IN ERROR.*
.....
ALBANY,
Feb. & March,
1810.

YATES
v.
THE PEOPLE.

however, liable to trial and punishment for the offence alleged against him. The court, upon the return to the *habeas corpus,* has no power to try the prisoner, and acquit, or convict him. The order, therefore, upon such return, is no judgment upon the merits of his case; it only reaches his present confinement. The object sought after by a writ of error, is to restore to the party somewhat that is lost. (1 *Stra.* 543.) It is therefore a fit and proper subject of inquiry, whether this end would be attained by a reversal of the order of the supreme court. The statute directs, that this court shall reverse or affirm the judgment, and give such other judgment therein, as the law shall require; and shall then cause the transcript of the record, with their judgment thereon, and all things touching the same, to be remitted into the supreme court, where such further proceedings shall be thereupon had, as well *for execution,* as otherwise, as may be agreeable to law and justice. According to the course of proceeding pointed out by the statute, it is obvious, that no order can be made by this court, upon the sheriff to discharge the prisoner; whatever is to be done, must be through the supreme court. Reversing the order of the supreme court restores the prisoner to nothing; and he is not in confinement under any process from that court, over which they have any control. He is in custody of the court of chancery; and how is he to be taken out of that court? Can this court compel the supreme court to issue a *habeas corpus,* and bring up the prisoner again? And supposing this court to have such power, would this insure effectual relief to the prisoner? To what would a judgment of reversal, pronounced here, extend? Certainly, to nothing more than the attachment. The conviction in the court of chancery, for the contempt, remains in full force. And if the attachment issued thereupon be defective, has not the chancellor a right to issue another? And if the she-

riff, upon another *habeas corpus* sent to him, should re-
turn, that the prisoner was in his custody, upon an at-
tachment, in which no defect or illegality whatever ap-
peared, would the supreme court be bound to discharge
him, at all events? Or, supposing he should be dis-
charged, might not the chancellor issue another attach-
ment? The judgment in his court remains in full force ;
and why then, it may be emphatically asked, should a
course be adopted by this court, which is admitted, on
all hands, to be unprecedented, and which, at all events,
cannot afford effectual relief, when, if the proceedings
in the court of chancery in this case, can be reviewed
at all by this court, the mode plainly and distinctly
pointed out by the statute is by appeal; when the whole
merits of the case will be brought before this court, and
finally and effectually determined. It has been said, that
unless the prisoner can obtain redress in this way, he is
without remedy, as the time limited by the statute,
within which an appeal must be brought, has already
expired. Without stopping to examine the correctness
of this suggestion, it appears to me, that, admitting it
to be true, it is a very extraordinary and unfit argu-
ment to be addressed to a court of justice. Because
the prisoner has neglected to pursue the only remedy
given to him by law, is he entitled to relief, in violation
of law? Suppose he had neglected to bring a writ of
error within the time limited by law for that purpose,
with equal force and propriety, might it be urged upon
this court, that unless they would sustain the writ, in de-
fiance of the statute, the party would be without remedy.
Such arguments can never influence a tribunal who are
not to make law, but who are to be governed and regu-
lated by the law, as they shall find it already made. If
this be a case which imperiously demands the extraordi-
nary interposition of power, let it be legislative or ex-
ecutive power, which will not draw after it the baneful

*IN ERROR.*
.....
ALBANY,
Feb. & March,
1810.

YATES
v.
THE PEOPLE.

effects of a judicial precedent. From a very careful and attentive examination of the question, I am fully persuaded, that to sustain the writ of error in this case, would be without precedent, and against law: that if the prisoner has any judicial relief, it must be by appeal.

I am, accordingly, of opinion, that the writ of error ought to be quashed.

KENT, Ch. J. Before I enter upon the consideration of the case, it will be proper to submit a few observations relative to the title under which I now claim the privilege of addressing the court. Doubts seem to have been entertained, by some of the members, whether the judges had authority to take any, and if any, what share in the important questions which have arisen in the course of this cause. Indeed it has been thought necessary, that a formal vote should be taken, allowing us to give an opinion, on the present occasion.

The 32d article of the constitution declares, that this court shall consist of the president of the senate, for the time being, and the senators, chancellor, and the judges of the supreme court, or the major part of them. These are the officers who are to constitute the court. This is its general description ; its permanent and component organization. The remainder of the article qualifies and restricts the exercise of this judicial power by the chancellor and judges, in certain specified cases. In case of impeachment, the chancellor, or judge impeached, is suspended from exercising his office, until his acquittal. In this instance, the disqualification for the time being, becomes complete and absolute, and the officer cannot sit as a member. But in cases of appeals and writs of error, the language of the constitution is materially different. It imposes no other restriction upon the rights of the chancellor and judges, as full and perfect members of the court, than simply this : that on appeals, the chan-

IN ERROR.
.....
ALBANY,
Feb. & March,
1810.

YATES
v.
THE PEOPLE.

·ellor shall not have a voice in the final sentence, and on writs of error, the judges shall not have a voice for the affirmance or reversal of the judgment. In every other respect, their rights, as members, remain in full force. Every exception to the general delegation of constitutional power is to be taken strictly. This is a settled rule of interpretation. The general grant is to them, as members; the exception is, that they shall not vote in the given case. The chancellor and judges are then regular constitutional members of this court, with powers and immunities equal to those of other members; and with an equal and perfect right to speak, act, and vote in all cases, and on all questions arising upon appeals and writs of error, subject only to the express and definite limitation which I have mentioned. There can be no just doubt of the correctness of this construction; and the rule of this court, made some years ago, (and before I was a member of the bench,) declaring that the chancellor and judges should not have a voice in the decision of any question, arising on appeals, or writs of error, was a palpable denial of right, and is, of itself, null and void. I could wish to be informed from whence this court derived the authority to make that rule. Every court may, undoubtedly, make rules to regulate its practice; but no court can limit or explain the powers of its coördinate members. The members are all equal, and are not responsible to each other, and derive their authority from one common source, If majorities can vote down, or fritter away the rights of minorities, they might with equal facility, expel the chancellor and judges, and exercise, in this way, the most shameless tyranny. If doubts exist, as to the constitutional rights of the members, those doubts cannot be solved by any power short of the legislature, who have authority to establish regulations for this court. The act, organizing the court, was originally drawn with uncommon ability,

IN ERROR.
•••••
ALBANY,
Feb. & March,
1810.

YATES
v.
THE PEOPLE.

and has not sanctioned any such invasion of right as that contained in the rule. It declares, generally, (1 *Rev. Laws,* 182.) that this court shall consist of the president of the senate, the senators, chancellor, and judges of the supreme court, or the major part of them; and that they shall hold such court during the sitting of the legislature. The statute is even silent, as to the restriction imposed upon the chancellor and judges, when the vote is to be taken on the final question in a cause; but leaves that restriction to rest upon the constitution, as being too clear to be mistaken, and too sacred to be invaded.

Having said thus much in explanation of my rights, I shall not demand to go beyond the rule of court, on the present occasion. It reserves to the judges the right to state their opinion, upon every matter which may arise upon the hearing of a cause brought up by writ of error. Though this leaves them in a mutilated condition, with rights half retained and half destroyed, I do not think that this is the proper moment to revise the rule. I mean only to be distinctly understood, that the opinion which I am now to deliver, I give, as a matter of right, not of license; that I stand here, not as a tenant at will, but on a constitutional freehold, from which I will not be driven, without a contest.

Upon the motion now before the court, two questions present themselves; 1. Whether a writ of error will lie, in any case, upon the award of the supreme court, remanding a prisoner, upon the return to a writ of *habeas corpus.*

2. Admitting that it will lie in any case, whether it ought to be sustained in the case before us.

So much has been said upon the argument respecting the powers and authority of this court, that it will be useful to endeavour, in the first place, to ascertain the true and legal limits of its jurisdiction.

This court is as much bound by law as any other

court within the state. The idea, that it has an unde-
fined discretion, in any case, is wholly unfounded. The
members, when they enter upon the execution of their
trust, take and subscribe the same oath that is taken by
all other judicial officers. They are bound by the most
solemn sanctions, legal, moral, and religious, to seek af-
ter, and to declare the law, without prejudice or par-
tiality. Whether the law be in any case defective or un-
palatable, is not to be made a question here. It is the
business of the legislature to make, and amend the law,
and the duty of every court, and equally so of this, to pro-
nounce it, as they find it. This court cannot possibly
approve of the suggestions of counsel, " to encourage an
enlargement of its supervisory powers, to vindicate to
itself the powers, that the best court of errors ought to
have, and not to clip the rights of the subject, by *English*
rules and technical standards." How can this court vin-
dicate or assume to itself powers not given to it by law?
This would be gross usurpation upon the legislative de-
partment. If such advice were to be followed, there would
be an end of all law and security within these walls. We
should have no certain measure or standard of justice.
The citizen would never know when he was safe, or
what were his rights. An uncertain rule of law, produces
the most miserable servitude. The court would soon
become the object of intrigue, the slave of prejudice, the
organ of party, terrible to the suitor, and destructive of
the established law of the land. In my opinion, no
court should be more scrupulously cautious than this,
of overleaping its constitutional and legal limits, because
it is a court of final resort, and no other court can cor-
rect its abuses. Such an unchecked tribunal would soon
become the public terror, or, perhaps, the public scorn,
if it once dreams of discretion and usurpation. The
court ought to turn a deaf ear to such dangerous flat-
tery.

IN ERROR.
.....
ALBANY,
Feb. & March,
1810.

YATES
v.
THE PEOPLE.

Nor can I believe that this court will relish the still more reprehensible invitation not to listen to the constitutional law members of the court, except on questions respecting private property. There, indeed, it is said, they may be regarded; but in cases respecting the person or liberty of the subject, the senators are exhorted to disregard the legal opinions of those judicial characters, who have been intrusted, by their country, with the most exalted confidence, and are exclusively devoting their lives and talents to the administration of justice. And why not listen to the judges, who have equally the guardianship of the civil and the criminal code, and whose efforts to hold up the law, as a protection to the innocent, and a punishment to the guilty, are in constant activity before the public eye? Is there to be no certain rule of decision, when personal rights are involved? In what volume do we read, that the liberty of the citizen is not as much under the protection, and defined by the rules of law, as his property? Will it be safe or becoming to follow our prejudices, our sympathies, or indignation in the one case more than in the other? And if the established judges are to be distrusted, from whom is the court to receive assistance, and on whom to bestow their reverence and confidence?

Such language cannot have been used with success. The constitution early taught me to cherish better hopes of this assembly. This venerable body is chosen from large districts, for a long time, and by independent lords of the soil. It must be presumed to consist of gentlemen of intelligence, of integrity, and of extended reputation. They must feel all the pride and dignity of character, which their elevated station inspires. Whatever political divisions may agitate them in the exercise of their senatorial duties, they will lay them all aside when they assume the graver character, and high responsibility of judges. In this solemn temple, this last retreat of

justice, they will assuredly discard every prejudice, and
follow firmly the law of the land. Neither the wishes
nor the discipline of party will be discovered here. The
public, we trust, will witness and admire the unrelaxing
severity of their justice.

The powers of this court are to be known, and known
only, from the constitution, and the act organizing the
court. From them it will appear, that a writ of error
does not lie, except upon a final judgment of the supreme
court.

The constitution ordains, that this court shall be in-
stituted, under the regulations which shall be established
by the legislature. It further declares, that when a cause
shall be brought up by a writ of error, on a question of
law, on a judgment of the supreme court, the judges
shall assign their reasons for their judgment, but shall not
have a voice for its affirmance or reversal. It is, then, on
a *question of law* on a *judgment* of the supreme court,
that error lies. These are the words of the constitution ;
and the idea that it lies for any other errors, if any there
be, than those involved in a judgment, is extremely incor-
rect. The statute was designed to institute and regulate
the court ; but it could not enlarge its jurisdiction, in the
cases in which the constitution had already defined it.
It could not authorize a writ of error, but upon a judg-
ment rendered ; nor does the statute admit of any other
meaning. It is not good logic to reason from these pre-
liminary expressions in the statute, that " all errors hap-
pening in the supreme court shall be corrected here ;"
unless we, at the same time, compare them with the con-
text, and the other provisions in the act. Who ever
heard of expounding a statute by reading one line only?
The words *all errors*, mean all errors that are involved
in a final judgment ; and if we read and compare the
whole section together, this meaning will be made mani-
fest. The statute goes on and says, " that it shall be

IN ERROR.
.....
ALBANY,
Feb. & March,
1810.

YATES
v.
THE PEOPLE.

lawful, as well for the attorney-general, in behalf of the people, as for any party against whom any judgment shall be given, to sue out a writ of error, and to cause the transcript of such judgment, and all things concerning the same, to be brought into this court. The court is then to reverse or affirm such judgment, and to give such other judgment therein, as the law shall require, and to cause the transcript of the record, with the judgment thereon, to be remitted into the supreme court, where such further proceedings shall be had, as well for execution as otherwise, as may be agreeable to law and justice."

Here, then, we have, in one view, all the powers of this court, on the subject of a writ of error, as granted by the constitution, or declared by law. It is a wise and cautious provision. It gives this court no unusual appellate jurisdiction; no superintending discretion. It is a court with plain, precise, and intelligible barriers. No man could surmount them, without being conscious of committing a crime. The power of review is simply confined to a judgment and final decree; and when the constitution spoke of a judgment of the supreme court, it used a technical term, perfectly familiar to the sages and patriots, who enlightened and animated our first convention. They never intended any thing more than those ordinary writs of error, which, by the settled practice, lay to the exchequer-chamber, or the house of lords, upon the judgments of the court of king's bench in *England.*

The convention of 1777 knew nothing of the revolutionary novelties, and madness of a subsequent period. They formed our constitution with all its legal and technical definitions, upon the approved wisdom, the sober sense of the *English* common law, which they most providentially ingrafted into our system. Nothing can be plainer than the path before us. Our

*IN ERROR.*
.....
ALBANY,
Feb. & March,
1810.

YATES
v.
THE PEOPLE.

constitution meant by a judgment of the supreme court, what was well understood under the colonial government, and was well understood in *Westminster-Hall*, to be a final judgment of a court of law. It was not the design of the founders of this house, to bestow upon it a broader jurisdiction than that possessed by the house of lords. There was no motive occurring at that day which could have led to such an innovation.

The *English* system of jurisprudence, had fostered the soundest and most rational principles of civil liberty. Under it our fathers had lived and flourished, and from it they had imbibed, and, I hope I may say, transmitted to us, that lively sense of order, of decency, of moderation, and of right, which is inculcated by its generous institutions. We must, therefore, constantly recur to the *English* common law, to explain the technical language, and the sound import of our laws and constitution. If we depart from this plain standard of interpretation, we set every thing afloat, and our constitution becomes a mass of unintelligible matter.

Assuming it, then, as a solid principle, that a writ of error lies here, only when it would lie on a judgment of the K. B. I proceed to show, by decisive authority, that it will not lie in *England*, upon an award made on the return of a writ of *habeas corpus*. If I establish this point, as I most assuredly shall, the writ in the present case must be quashed; for this court will never violate the law which it is sworn to administer. ♠♠♠

The first case which I cite is that of the *City of London*, which arose in the common pleas, the 7 *Jac.* I. (8 *Co.* 121. b.) It was the case of a *habeas corpus*, issued out of that court to the mayor, aldermen and sheriffs of *London*, to bring up the body of one *Wagoner*, who was in their custody upon civil process, for breach of a by-law. A return was made to the writ, and, upon an objection to its sufficiency, the court resolved it suffi-

*IN ERROR.*
.....
ALBANY,
Feb. & March,
1810.

YATES
v.
THE PEOPLE.

cient upon this ground, that, upon the return, no issue could be taken or demurrer joined; that the return was only to inform the court of the truth of the matter, and that a writ of error would not lie upon the award of the court, to be made upon the return.

This case is taken from Lord *Coke's Reports.* The opinion is precisely in point. It was a resolution of the court, delivered by Lord *Coke* himself, who was at that time chief justice of the C. B. and who has always been regarded as an oracle of the common law. This solemn opinion, coming from such high authority, and made with the return of a *habeas corpus* before the court, has now stood the test of two centuries, as an uncontrovertible principle, without a precedent or a *dictum* to oppose it. The counsel, I observed, trod very lightly when he approached this case. To overthrow it would be tearing up the common law by the roots. If principles of such old and sturdy growth are to be subverted, what plants can hereafter endure the tempest?

This declaration of the C. B. has not only stood uncontradicted, but it has received affirmatively the strongest sanction. In the case of *The King* v. *The Dean and Chapter of Trinity Chapel, in Dublin,* (8 *Mod.* 27. 1 *Stra.* 536.) which was in the K. B. 8 *Geo.* I. the doctrine of the case in *Coke* was pointedly recognised. The case arose upon a writ of error from the K. B. in *Ireland,* to the K. B. in *England,* brought upon the award of a peremptory *mandamus.* The principal point in the case was, whether a writ of error would lie upon such an award. The K. B. unanimously resolved, that the writ would not lie, and it was quashed. The judges declared, that error would not lie on a conviction for a contempt, nor on the award of a *procedendo,* nor on the return of a rescue. They went further, and said, in the words of Lord *Coke,* that it was against the nature of a writ of error to lie on any judgment, but in causes where

Issue might be joined and tried, or where judgment might be had upon demurrer, and therefore that it would not lie on the return of a *habeas corpus*. Upon this de- cision a writ of error was brought into the house of lords; and all the judges of *England* being of opinion that the decision was correct, the judgment of the K. B. was affirmed. (2 *Bro. P. C.* 554.) And I will here add, that the like point came before the lords, the next year, in the case of *Pender* v. *Herle*, (3 *Bro. P. C.* 178.) and the like decision was made, upon the ground that to deny or to grant a *mandamus*, was a mere award of the court, and not a strict formal judgment.

This case is reported in two books of unequal authority. But there is no reason to doubt of the accuracy of the report, as I have stated it. The decision is the same, and the argument substantially the same, in both the reports. In Sir *John Strange*, the different counsel who argued against the writ of error, cited the case from *Coke*, as sound law, that on the award of a *habeas corpus*, error would not lie; and in *Mod. Rep.* the court say the same thing. There is no contradiction or repugnancy in the two reports of the case. But there is one circumstance which places the authority of the case in *Mod. Rep.* beyond a doubt. Lord Chief Baron *Comyns*, in his *Digest*, (*Pleader*, 3 B. 7.) lays down the same rule, that a writ of error will not lie upon a *habeas corpus*, and he cites for it this very case in 8 *Mod. Rep.* He must have known of the accuracy of the case, for he was an eminent counsellor at the *English* bar, at the time of the decision; and he is of himself a great authority, since, as Lord *Kenyon* has observed, he was considered by his cotemporaries as the most able lawyer in *Westminster-Hall*.

This case was near twenty years after the celebrated controversy concerning the *Aylsbury* constables, in which Lord *Holt* acted such a distinguished part. It shows,

*IN ERROR.*
•••••
ALBANY,
Feb. & March,
1810.

YATES
.v.
THE PEOPLE

then, conclusively, that there was nothing in that controversy which had affected the principle for which I contend; and this will further appear by a critical examination of the *Aylsbury* cases.

In that of *The Queen* v. *Paty and others*, (2 *Salk.* 503. 2 Ld. *Raym.* 1116.) the defendants were committed to custody, by the house of commons, during the pleasure of the house, for a high contempt of their jurisdiction, and breach of their privileges. They were brought into the K. B. upon a *habeas corpus*, and, after solemn argument in favour of their discharge, and great consideration by the court, they were remanded back to custody, by the opinion of three judges to one. The case exciting great interest, an attempt was made to bring a writ of error. Application was made to the queen for the writ; and after much difficulty, and upon the advice of the judges, that a writ of error was a writ of right, and not of grace, she agreed to allow the writ, which was prevented by the prorogation of parliament. It is remarkable, however, and deserves our particular attention, that there is not a single opinion to be found, given by any professional character of that day, that a writ of error would lie in the case. The suing out of the writ was a thing of course, and no evidence that it could be sustained, when it came judicially before the lords. The attempt was nothing but a bold experiment upon the intemperance of party zeal. In the report of the case by Serjeant *Salkeld*, there is only this dry observation of the reporter, " that it was a doubt whether any writ of error lay upon a judgment given on a *habeas corpus*." The report in Lord *Raymond* adds, by way of *memorandum*, to the decision in the case, that after the resolution of the court to remand the prisoners, they were moved that a record might be made of the case, and that the judges in vacation agreed upon the form of entry. It may possibly be thought, that, as the judges of the K. B. agreed

IN ERROR.

ALBANY,
Feb. & March.
1810.

YATES
v.
THE PEOPLE.

upon the form of an entry of their decision, in like manner as the judges of the supreme court did in the present case, that they might have supposed that a writ of error would lie. This, however, has been declared to have been otherwise, and that too by the most unquestionable authority. A few years after that decision, and while *Powys*, one of the judges who was concerned in settling that form of entry, was still upon the bench, it was observed by one of his brethren, in his presence, that the very form of the entry was an argument that the judges thought it not to be a case relievable by error. (1 *Stra.* 543.) And the principles established by Lord *Holt*, in other cases, are strong to show that *he*, also, must have been of opinion, that error would not lie, though the object was to review a decision from which he had dissented. In giving the opinion of the court in *Groenwelt* v. *Burwell*, (1 *Salk.* 144. 1 Ld. *Raym.* 454.) he held that a writ of error would not lie upon a conviction of the plaintiff of mal-practice in physic, by the censors of the college of physicians, because, as he said, the proceedings were summary, without indictment or formal judgment. He also admitted it to be good law, that no error lay upon the award of a fine and imprisonment for a contempt. And if no writ of error would lie upon a conviction and imprisonment for a contempt, surely no writ of error will lie upon the bare refusal of another court to discharge from such imprisonment. This would be too great an absurdity for any lawyer, or for any man of common sense, to support.

The proceedings in parliament, upon this *Aylsbury* case, were referred to by the counsel, who spoke against the motion; but I think I can place them in a more correct and interesting view. They are detailed at large in the 8th volume of the *State Trials.* (p. 90 to 163.) When *Paty and others* applied to the queen for a writ of error, upon the refusal of the king's bench to dis-

IN ERROR.
.....
ALBANY,
Feb. & March,
1810.

YATES
v.
THE PEOPLE.

charge them upon *habeas corpus*, the house of commons considered the very attempt to ask for a writ, as a breach of privilege; and they prayed the queen not to grant it. With the jealousies and heats that agitated the two houses of parliament, relative to their respective privileges, we have, at this time, no concern; but the house of commons entered into a number of resolutions, on the subject, which are extremely important. Though they are of no legal or binding authority; yet, as that house was the intelligent and spirited guardian of the liberties of the subject, as it was composed of a number of deeply learned lawyers and statesmen, and as it spoke the representative voice of the nation, their opinion is entitled to our special attention, in the review of that case. The true principles of law, on this subject, were laid down, as I apprehend, with great force and singular precision. The house, among other things, resolved, "That no writ of error was ever brought, and that no writ of error lay in such a case. That in many cases, a prisoner cannot, upon a writ of *habeas corpus*, obtain his liberty, as in cases of commitment in execution, or for contempt to any court of record, but the party must address himself to the court which committed him. That whether a writ of error was a writ of right or a writ of grace, was not material in that case, in which no writ of error lay, or was ever before attempted. That if it was allowed upon such a proceeding, it might as well be introduced upon all acts and proceedings of courts or magistrates, and to control the bailing and discharging of prisoners in all cases. That there is no judgment pronounced in the case of a *habeas corpus*, or in any thing relating thereto; for if a *habeas corpus* be denied, or if granted, and the person thereupon be denied to be bailed or discharged; this is no such judgment, but that the same or another court may allow another writ, and,

IN ERROR.
.....
ALBANY,
Feb. & March,
1810.

YATES
v.
THE PEOPLE.

in its discretion, bail or discharge. That it had been the uniform opinion of former times, that a writ of error did not lie, in any proceeding on a *habeas corpus*, and that this appeared in the case of *The City of London*, reported by Lord *Coke*, in which the judges grounded their resolution upon this principle."

The lords, considering the interference of the commons as an attack on their jurisdiction, made also their address to the queen, in which they declare, that they did not mean to say, whether a writ of error would or would not lie, upon the award of the king's bench upon the return of a *habeas corpus*. That they only undertook to say, that it did not lay with the commons to decide that question, and that it would be time enough to decide it when the writ of error was returned. The lords, therefore, in order to preserve their appellate jurisdiction from the control of the commons, prayed that the writ of error might be granted; and the queen, in her answer, said, that she should have granted the writ as desired, had she not been under an absolute necessity of immediately proroguing the parliament, which she accordingly did; and thus ended the controversy.

The house of lords, then, in this case, gave no more countenance to the idea that the writ of error could be sustained, than this court did, the other day, when they denied to the chancellor the right to supersede the writ. They only meant to reserve to themselves the right to determine the question; and all the weighty arguments contained in the resolutions of the commons, remained unanswered, and in undoubted force.

I now submit to the candour and judgment of this court, whether I have not sufficiently shown, that by the *English* law, a writ of error will not lie in this case. We have the unanimous opinion of the court of C. B. in the time of Lord *Coke*. We have the resolutions of

IN ERROR.
.....
ALBANY,
Feb. & March,
1810.

YATES.
v.
THE PEOPLE.

the house of commons, in the reign of Queen *Anne.* We have the unanimous opinion of the court of K. B. in the time of *Geo.* I., and, lastly, we have the sanction of Lord Ch. Baron *Comyns;* and all this, without a single case, or decision, or precedent, or opinion, to oppose to such a stream of authority. What intelligent person can then doubt of the law? " I speak as to wise men, judge ye what I say." I will not stoop to the criticism, that these were opinions of the courts, and not adjudications upon the point. The doctrine was laid down in Lord *Coke's* day, as of course, as being then the known and established law. The principle is of immemorial standing. It has become the uncontroverted maxim of ages. A great part of the magnificent structure of our jurisprudence is not built upon a sounder basis. The question is not whether the house has not a physical power to vote down this principle, but has it the legal and the moral power? * * *

If we recur to those general principles, which apply to, and govern writs of error, they will serve to confirm our conclusions.

In *Metcalfe's* case, (11 *Co.* 38.) which was upon error from the common pleas, the court of K. B. determined, that a writ of error did not lie upon an interlocutory judgment, in an action of account, because it was but an award, as that an assise should be taken, or a writ of inquiry issued, or a partition be made. It was not a final and definitive judgment in a cause; and error only lay on a judgment, in which all the matter in the original cause was determined; for if the record was to be removed, until then, only a partial view of the subject would be taken, and there would be a failure of right. This doctrine is solid, and has never been questioned. It would produce infinite vexation to the courts, and oppression to the suitors, if error lay on any other than a final determination upon the merits of the cause. And it is absurd to

1

431

IN ERROR.

ALBANY,
Feb. & March,
1810.

YATES
v.
THE PEOPLE.

pretend, that the resolution of the supreme court to bail, or discharge, or remand a prisoner, is any thing like a final determination on his case. It does not, generally, so much as touch the merits of the charge. It is a mere provisional and collateral proceeding, and any judge out of court, and even several commissioners, under our statutes, can perform the same act. If, as the house of commons said, in one of their resolutions, the court remand a prisoner, that does not prevent the same court, or any judge out of court, to allow another writ, and in many cases to bail or discharge, in their discretion. If the award of the court had any analogy to a judgment; if it was a *res judicata*, it would be final, and conclude all other persons, and the same and all other jurisdictions. We might, with equal propriety, call the award upon a *habeas corpus*, made by a judge or commissioner, out of court, a judgment, upon which a writ of error would lie. Our *habeas corpus* act sufficiently declares, that the award made upon the return of a *habeas corpus* is not a judgment or final decision; for if the prisoner be bailed, it is merely to answer in court, and if he be discharged, he may be retaken by any court having jurisdiction of the cause. The truth is, that the determination of the K. B. and of our supreme court, in the case of a prisoner brought up on *habeas corpus*, whether they will bail, discharge, or remand him, generally rests, and ought to rest, in sound discretion. The authorities to this point are infinitely numerous. It will be sufficient for me to refer to *Bethell's* case, 1 *Salk.* 348. 5 *Mod.* 33.; to that of *The King* v. *Elwell, Stra.* 794. and to the cases in the note to 3 *Bacon's Abr.* (*Gwil. edit.*) 438. And if this point be once conceded, as it must be, it is of itself decisive against the writ of error.

The counsel against the motion, admitted that error would not lie in the case of a *mandamus*, because, he said, that was a subject resting in discretion. The same

*IN ERROR.*
·····
ALBANY,
Feb. & March,
1810.

YATES
v.
THE PEOPLE.
reason, in all its force, applies to this case. It is upon this ground, that applications for new trials, for setting aside defaults and judgments, for changing the *venue,* for time to plead or hold to bail, for granting informations in the nature of a *quo warranto,* and many other cases which might be mentioned, cannot be reviewed by a writ of error. In *Preston and others* v. *Ferrand,* (2 *Bro. P. C.* 179.) the house of lords, on appeal, affirmed the chancellor's order, on the ground, that he had a discretionary power to appoint guardians in the given case. So also, this court, in 1805, in the case of *Taylor* v. *Delancey,* (2 *Caines' Cases in Error,* 143.) gave a pretty plain sanction of the rule, by affirming the act of the surrogate in *New-York,* because he had a discretion to whom to award administration.

This court, upon error brought, is not only to reverse the judgment of the supreme court, but to render such judgment as that court ought to have rendered. Let us pursue this idea to its practical consequences. Suppose the supreme court, upon *habeas corpus,* remands a prisoner, by refusing to bail him, or remands him, because the bail he offers is insufficient, and he brings a writ of error, what is this court to do in these cases? Are they to determine here, by vote, when a prisoner ought to be bailed, and in what sum, and with what sureties? Is this court created for such purposes? Have they any such discretion? Are they competent to exercise it? This would be assuming original criminal jurisdiction, without colour in law, or precedent upon record. Suppose, again, that the supreme court discharge a prisoner on bail, when he ought to have been remanded, or discharge him altogether, when he ought to have been delivered upon bail; are the people, by their attorney-general, to bring a writ of error, in order to reclaim the prisoner? If the prisoner can bring a writ of error,

IN ERROR,
....
ALBANY,
Feb. & March,
1810.

YATES
v.
THE PEOPLE.

the right ought to be mutual, and exist equally on the side of the people. But how can this court cause a person to be retaken, who should, in their opinion, have been unduly set at large? Is the court to send back the transcript, with an order to the supreme court to issue a bench warrant to retake the party, and commit him? Can warrants issue but upon a charge supported by oath or indictment? Or suppose a grand jury shall, in the mean time, have passed upon the case, and rejected a bill of indictment, ought the party then to be harassed and recommitted? If a writ of error will lie in one case, it will lie in all these cases of *habeas corpus;* and this court would soon be obliged to abandon a new jurisdiction, which it is incompetent to execute.

2. But, laying all these general considerations aside, there are special reasons arising in this case, which render it impossible to sustain the writ of error. This I will now briefly, but conclusively, demonstrate.

The record shows us, that the prisoner brought into the supreme court, was detained by process from the court of chancery, founded upon a conviction in that court, of contempt and mal-practice. The legality or illegality of that conviction, never could have been considered in the supreme court, because the constitution does not give to that court any jurisdiction, by way of review or appeal, over a proceeding in chancery. The cognisance of such proceedings belongs exclusively to this court, which cannot, upon the writ of error, do any thing, like final justice, in the case. It cannot do any thing but what the supreme court ought to have done. The conviction in chancery is not before them. They cannot touch its merits. All that the supreme court had before it, and all that this court now has, is merely the process of execution, founded on that conviction. If the court could lawfully review the conviction in

*IN ERROR.*

ALBANY,
Feb. & March,
1810.

YATES
v.
THE PEOPLE.

chancery, the review ought, at least, to come directly from that court, and bring up with it the proceedings at large. It is impossible to examine the merits of the conviction, from the very imperfect state of it which comes up circuitously, by means of the present return. If we attempt it, it would, in addition to the great injustice of the measure, be an inquiry to be governed by chance, and not by investigation. If the conviction is, in any shape, to be questioned here, the chancellor is entitled, by the constitution, to be *heard*, and to be called upon to assign his reasons for his order ; and the judges of the supreme court are to sit, and not to give opinions merely, but to *vote* with the other members of the court. But by this strange proceeding, that privilege, that valuable right, is done away.

Again, if this court, by means of some newly discovered power, could discharge the prisoner from the process of commitment, it would confer no honour, or lasting benefit, upon the prisoner, for the conviction would still remain in force. The party now complaining, would still be adjudged guilty, and might instantly be imprisoned on the same sentence. This would be an inevitable legal consequence ; for to suppose a conviction can stand good, without satisfaction or reversal, and yet be without efficacy, or power of execution, would be to suppose an absurdity. ***

There is still another difficulty before us, to be surmounted. It appears by the record, that the prisoner was bailed in the supreme court, and that, at the last *August* term, he did not appear on being called, but chose rather to forfeit his recognisance. This is all that the court can judicially know of him. He is now at large, from what appears by the record. The writ of error is then palpable nonsense. It has no object. It cannot touch the conviction, for that lies in chancery ; and it cannot deliver the party, for he has already absconded. If, how-

ever, we are to listen to reports *dehors* the record, we shall probably learn, that the party has been reimprisoned, by a new order from the court of chancery. What that order is we do not know, for it is not before us; we cannot take any cognisance of it. It may be very different, in form and substance, from the attachment and orders, appearing upon the return. How can this court give any direction to the supreme court, relative to an order and attachment, which was never seen by either court? The thing is impossible. Will the court say, that no process founded upon the conviction shall be valid, when the court have never had that conviction before them? The conviction may have been incorrectly stated in the first attachment. It may, when we come to see it, at full length, and in its genuine shape, be wholly free, even from the very objections which, the record tells us, were presumed to exist against it, when first brought before the learned judge. In short, if the court proceed in this case, they must be involved in insuperable difficulties. They will be lost in a labyrinth, without the thread of *Ariadne* to conduct them.

But it may be asked, if the writ of error will not lie, is this to be a case without redress? Can a solicitor be imprisoned, at the pleasure of the court of chancery, and no tribunal correct the abuse? While I admit, that the court of chancery is sufficiently amenable, in another way, I answer, that this is not the question before the court. It has nothing to do now with that inquiry. The court is called upon to say, whether a writ of error will lie upon a *habeas corpus?* If they find that it will not, they are bound by imperious duty to say so. I think I have sufficiently shown, that if the writ of error was to be pursued, it never could bring up the *merits* of the case. The wishes, then, of the most lively benevolence, could not be gratified by this course. The real merit of the case, as far as we can judge from the record, turns on

*IN ERROR.*
.....
ALBANY,
Feb. & March,
1810.

YATES
v.
THE PEOPLE.

IN ERROR.
. . . . .

ALBANY,
Feb. & March,
1810.

YATES
v.
THE PEOPLE.

this single point, was *Yates* justly convicted of mal-practice committed, to the great injury of one *Samuel Bacon*, who exhibited charges against him? To this question, we are not to answer, because we have not the conviction, nor the proofs and proceedings which led to it. The intendment of law is, till the contrary be legally shown, that he was justly convicted. This court is bound to adopt, and to act upon that presumption. To act upon any other, would be indecorous; would be contrary to the benign maxim of the common law; and would be the highest injustice to the tribunal in question, which is not now brought here to meet or to answer that inquiry. I, therefore, lay all such extraneous considerations aside, as unbecoming the dignity, and as casting a shade over the purity, of this court. Not even the collateral point, how far the discharge, by Mr. Justice *Spencer*, was binding, could be examined and decided upon this return. The *habeas corpus* act says, that no such discharge is binding upon any court, having jurisdiction of the cause of the commitment; and how can this court determine whether the court of chancery had or had not jurisdiction of the cause, until we know, truly, what that cause was, by looking at the conviction itself, and the proofs and documents upon which it was founded?

Finally, if the *Gordian* knot is to be cut, we ought, at least, to call for the *dignus vindice nodus*. There ought to be an object befitting so bold a precedent. In this case, there is nothing which should disturb the tranquil course of the law. The party, say his counsel, might have appealed in the ordinary way. If he omitted to do so, within the time of limitation, it was his own fault, or his folly. He has no right, now, to complain, nor to call on this court, to break in upon principle, to help him. One of his counsel said, that if he could not be relieved now, it would be tantamount to an imprisonment for life. This was a very loose assertion. If he continues in

prison, it must be imputed to his obstinacy. It is well understood, that, if an attorney be convicted of mal-practice, he can come out, upon paying costs, and making satisfaction to his injured client. Lord Chancellor *Erskine* lately ruled, (13 *Vez.* 69.) that if an attorney was guilty of misconduct, he would make him pay costs, and bind him to make satisfaction.

*IN ERROR.*

ALBANY,
Feb. & March,
1810.

YATES
v.
THE PEOPLE.

For these reasons, I am of opinion, that the writ of error ought to be quashed.

THE CHANCELLOR. The question before the court arises on a motion of the attorney-general, for quashing the writ of error issued in this case.

The points on which a decision is required, have received no judicial determination in the supreme court. They are intrinsically new, as to that court; but in the court of chancery, I have had occasion to consider, whether a writ of error would lie in this case; the opinion, however, expressed on that occasion, is not now in review.

Where a public duty is to be performed, considerations of personal delicacy are appropriately and exclusively attached to the person whom they affect. Every suggestion, that, by possibility, all the embarrassments which they may involve will not be fairly estimated, may be construed into an imputation on the discernment of the mind, but more particularly apply to an impeachment of the purity of its views. Such intimations I shall ever disregard, as unworthy to influence my conduct, as to deter me from doing, what I conceive my official situation imposes, nor will I refrain from giving my vote in a case, in which, on any possible just construction of the constitution, I have a right to do so, and in which I am perfectly indifferent, my own duty being performed, and the correctness of legal principles respected, whether it is decided for quashing, or sustaining the writ of error.

The point to be decided arises on a dry question of

YATES
v.
THE PEOPLE.

law ; if it had taken a wider range ; if some of the inti-mations, which have dropped in the course of its discus-sion, had been properly directed, or any part of the pro-ceedings had disclosed a disposition to oppress, it would have become more interesting to the community, even if the power, which had been exerted, had been undoubt-edly legitimate ; but if, instead of having been called into action for the purpose of oppression, it had been deli-berately applied in its restraint, it would, at last, bring the mind to that dispassionate state, which is ever requi-site to a due and satisfactory inquiry of what is the law on the subject? Certain, however, it is, that nei-ther the one nor the other of those conclusions are to be deduced from the record, and to that the court must be unavoidably confined, as the matter legally competent to ground their judgment.

The strong appeal which has been made, rather to the feeling than the judgment of the court, founded on the allegation, that Mr. *Yates* was doomed to imprisonment for life, from which he could only escape by taking refuge in the grave, is within the knowledge of every profes-sional man, destitute of the least foundation. Mr. *Yates* might have escaped much easier from his present situa-tion, than by an imprisonment for the time to which he has been subjected.

All that would, in the ordinary course, and for an ordinary contempt, have been required of him, would have been the usual submission ; and if the contempt was connected with the illegal exaction of money, or the impo-sition of an unwarrantable expense to the party injured, the repayment of such money to the person from whom it had been received under false pretences, and the pay-ment of costs would have been superadded. If, for some reason, which he is not bound to explain, and into which this court cannot inquire, he has chosen to withhold such submission, or make such compensation to the party in-

jured, what possible affinity is there between that conduct *IN ERROR.* and the question now to be determined? Is there any peculiar hardship attached to a case thus circumstanced? *ALBANY,* *Feb. & March,* *1810.* And is not every other citizen of the state who owes money, whether the debt originated in tort, contract, or *YATES* *v.* fraud, exposed to imprisonment till he pays it? If so, *THE PEOPLE.* for aught that appears, Mr. *Yates* has in fact had the key of his prison in his pocket from the moment he entered it.

I repel these intimations, because they ought not to have been pressed into the case. They are calculated to mislead, and have not the remotest connection with the matter now to be decided.

Having made these preliminary remarks, I proceed to examine the points on which the attorney-general has relied, in support of his motion for quashing the writ of error issued in this case.

The record states simply the issuing a *habeas corpus,* by the supreme court, its return, and an order to remit Mr. *Yates* to the custody of the sheriff of the city and county of *Albany,* to remain in the same state in which he was at the time of issuing the said writ of *habeas corpus.*

The points made by the attorney-general, are,

1. That a writ of error does not lie on a *habeas corpus;* and,

2. If it will lie in any case of *habeas corpus,* it will not lie in this.

It did not seem to be doubted in argument, that, whatever might be the form, the writ of error was intended to bring into review, indirectly, the proceedings of the court of chancery in this case.

To the constitution such a course is unknown; it is not recognised by law, for it is clearly a case neither within the express provision, or possible implication, of either. They embrace only cases of a direct review of decrees, in equity, and judgments of the supreme court.

*IN ERROR.*

ALBANY,
Feb. & March,
1810.

YATES
v.
THE PEOPLE.

The words of the 32d section of the constitution, are, " that a court shall be instituted for the trial of impeachments and the correction of errors, under the regulations which shall be established by the legislature, and to consist of the president of the senate, for the time being, and the senators, chancellor, and judges of the supreme court, or the major part of them, except, that when an impeachment shall be prosecuted against the chancellor, or either of the judges of the supreme court, the person so impeached, shall be suspended from exercising his office until his acquittal; and, in like manner, when an appeal from a decree in equity shall be heard, the chancellor shall inform the court of the reasons of his decree, but shall not have a voice in the final sentence; and if the cause to be determined, shall be brought up, by writ of error, on a question of law, on a judgment of the supreme court, the judges of the court shall assign the reasons of such their judgment, but shall not have a voice for its affirmance, or reversal."

The 7th section (*Laws N. Y.* 184.) of the act concerning this court, enacts, that all errors happening in the court of chancery, supreme court, and court of probate, shall be redressed and corrected here. That those from any *judgment* of the supreme court shall be brought up by writ of error. That this court shall have full power, and are authorized and required, to examine all such errors as shall be assigned or found in such record, or any process or proceeding concerning the same, and to call upon the judges of the supreme court to assign the reasons of such judgment, and thereupon to reverse or affirm the same, and to give such other judgment thereon, as the law shall require; and shall then cause the transcript of the record, *with their judgment thereon,* and all things touching the same, *to be remitted into the supreme court,* where such further proceedings shall be thereupon had, as well for execution as otherwise, as may be agreeable to law and justice.

I shall consider the first point made by the attorney-general, under two aspects.

1. What was the law on the subject, in *England*, at the time of the revolution?

2. What diversity arises under the constitution and laws of this state?

*IN ERROR.*

**ALBANY,**
Feb. & March,
1810.

YATES
v.
THE PEOPLE.

To determine on the first of these, it becomes necessary to examine the *English* authorities, which have a bearing on it.

The first, in order of *time*, is the case of the *City of London*, reported in 8 *Co.* 127. which arose in the king's bench, on a *habeas corpus* to bring up the body of *James Wagoner*, who had been arrested in *London*, and remained in custody, in an action for a penalty alleged to have been incurred by the breach of a by-law, made to enforce one of the *customs* of that city. To the return of the *habeas corpus*, it was objected, that it consisted much in recital of matter which ought to have been directly and certainly alleged. To which it was answered *and resolved*, that this is not a demurrer in law, but a return to a writ of privilege, upon which no issue or demurrer can be taken; neither upon an award thereon, doth a writ of error lie. This is therefore an express adjudication, not an *obiter dictum*. The word *resolved*, is a technical legal word, made use of appropriately to distinguish the opinions of the court, throughout the whole of *Coke's Reports* and several other reporters, from loose sayings of their judges, which have not the weight or authority of strict judicial decisions. It was, in this case, an expression of that opinion, on the very point submitted; and it contains the reasons why the return, in the point objected to, was sufficient.

In the case of *The Dean and Chapter of Trinity Chapel, in Dublin*, (8 *Mod.* 28.) which arose on a writ of error from the king's bench in *England*, to the king's bench in *Ireland*, on a *mandamus*, in the arguments of

IN ERROR.
.....
ALBANY,
Feb. & March,
1810.

YATES
v.
THE PEOPLE.

counsel, a position is stated, as a quotation from *Har-dres*, 401. (*Charles* II.) in these words: " A writ of error was never yet granted, where a fine was imposed, on a commitment for a contempt, or upon the award of any writ of any court of justice."

From its being indicated as a quotation, (8 *Mod.* 30.) it would seem to have been carefully extracted from some case in *Hardres;* but in the page referred to, no subject connected with it appears ; nor have I been able to discover, that it is a quotation from any part of that reporter. But the court, in giving their opinion in the principal case, lay it down, " that it is against the nature of a writ of error to lie on any judgment, but in causes where issue may be joined and tried, or where judgment may be had upon a demurrer, and joinder in demurrer; and that, therefore, it would not lie on a judgment for a *procedendo,* nor upon the return of a *habeas corpus.*"

This was brought up on a writ of error to the house of lords, and eight judges attending, the lord chief baron acquainted the lords, that all the judges of *England* were of opinion, that a writ of error would not lie ; and the judgment of the king's bench was affirmed. (*Fortesc.* 329.)

In *Paty's* case, reported in 2 Ld. *Raym.* 1105. *Holt,* 326. *Salk.* 504. it appears from the latter, that the judges of the king's bench settled the form of the entry, which would seem to have been done for the purpose of grounding some ulterior proceeding; for the court having been moved, that a record should be made up, the judges met in vacation to devise the form, and frame the report. In *Salkeld,* it appears, a question was stated and referred to them, whether the *queen* ought to allow a writ of error in this case, or in any other case, *ex debito justitiæ,* or *ex mera gratia?* And ten of the judges were of opinion, that the queen could not deny the writ of error, but that it was grantable *ex debito*

IN ERROR.
.....
ALBANY,
Feb. & March,
1810.

YATES
v.
THE PEOPLE.

*justitiæ,* except only in cases of treason and felony. Then it is added, it was a doubt whether the writ of error lay upon a *judgment* given on a *habeas corpus.* Of this doubt, it does not appear that the judges gave any solution; and as to that point, the matter was no farther stirred.

This case arose, on a commitment, by the house of commons. It caused much sensation, at the time; and the celebrated case reported by *Hargrave,* as the great case of *Ashby* v. *White,* (8 *State Trials,* 158.) from a small book, published under that name, in 1705, and sometimes referred to as the case of the *Aylsbury Constables,* details the proceedings of the lords and commons of *England,* on the subject.

In a conference between the managers of the house of commons, with the lords, the former alleged, " that, in case no writ of error lies, it cannot be said, that the denying it is an obstruction of justice, or contrary to *magna charta.*"

" That a writ of error lies not on any proceeding or *habeas corpus,* has been the uniform opinion of former times, as appears in the case of *The City of London,* (7 *Jac.* 1.) where one under arrest, for the penalty of a by-law, brought his *habeas corpus,* and the judges took it for a ground, *that no issue or demurrer could be joined upon the return, nor could any writ of error lie upon the award;* and upon that, *as a principle,* grounded their restoration; and that this never came directly in question, was, because a writ of error *was never asked, much less had,* upon the bare commitment of any court whatever, and it is hard to imagine, that there is any lawful resort or appeal for liberty left untried at this day."

In the address of the lords to the queen, on that subject, they state, that three judges remanded the prisoners, contrary to the opinion of Lord Chief Justice *Holt,* without denying the allegations of the managers; but insist that the house of commons have no right of judging, whether a writ of error is properly brought; that unless

*IN ERROR.*

ALBANY,
Feb. & March,
1810.

YATES
v.
THE PEOPLE.

the writ of error is granted, the matter cannot come to a proper decision. The queen, in answer to this address, declared that she would have granted the writ, if the absolute necessity of ending the session had not prevented it. It never was granted; and if it had been, it certainly would not have been in the exertion of judicial powers, but by virtue of prerogative.

In the case of *Groenwelt* v. *Burwell*, (1 *Salk.* 144.) it was held, by *Holt*, Chief Justice, that error would not lie upon a judgment of the censors of the college of physicians, because their proceeding is not according to the common law.

In the case of *Pender* v. *Herle*, (3 *Brown's Parl. Cas.* 178.) decided in the house of lords, which came up on a writ of error, from the king's bench, on a peremptory *mandamus*, it was insisted, that it was merely an award of the court, and not a strict formal judgment; and upon the unanimous opinion of all the judges, then present, it was adjudged, that the writ of error, being brought upon proceedings at common law only, the one in that case should be quashed.

The case of *The King* v. *The Dean and Chapter of Dublin*, (*Stra.* 541. 543.) arose on a *mandamus*, and was decided on an *ex parte* argument. *Eyre*, Justice, observed, that the entry was without an *ideo consideratum est*; in all *procedendos*, it was with it, and yet it is certain, error will not lie. (*Comb.* 76. 5 Ld. *Raym.* 213.)

The answer of the judges to the question, stated by the queen in *Paty's* case, whether a writ of error could be denied by her, in that case, *or any other*, was evidently intended, as a general response, to meet the generality of the inquiry; but the doubt expressed applied particularly to the case in question, and clearly shows, it was not intended to be embraced in the general proposition. It was no more than the expression of this opinion, to aid the crown, in the exercise of its prerogative, and not a judicial opinion; and is destitute of that weight which such an opinion carries with it.

From these authorities it appears, that the question whether a writ of error would lie on the return of a *habeas corpus*, was a point directly decided in the case of *The City of London;* that the managers of the house of commons, in a solemn and deliberate assertion of their privileges, insisted that it had been the uniform opinion of former times that it would not lie; that the uniform decisions, in analogous cases, some of which were settled by the house of lords, and by the unanimous opinion of all the judges of *England*, the uninterrupted, and undisturbed practice which has obtained from the earliest periods of the writ of *habeas corpus*, the silence which has so long prevailed on so interesting a point, continued through times of great violence and commotion, and the most animated struggles on the subject of personal liberty, and the numerous *dicta*, found in a long succession of cases, interspersed, both in the ancient and modern reporters, evincive of the undeviating sense of the *English* courts, unite in announcing it the well established law, that on the return to a writ of *habeas corpus*, no writ of error lies.

This doctrine is strongly corroborated by the cases cited, which shew, that no writ of error will lie, on the denial of a prohibition; (1 *Salk.* 136.) on a *procedendo;* (8 *Mod.* 28.) on the denial of a *mandamus;* (*Str.* 541.) on a summary conviction; (1 Ld. *Raym.* 469. 1 *Salk.* 144.) or on a *mandamus*, before it assumes the shape of an action.

To this doctrine has been opposed the position (*Co. Litt.* 188. a.) that a writ of error lies on a judgment, or an award in the nature of a judgment; and cases of fines, statutes-merchant, statutes-staple, and outlawry, have been shown, as exceptions to the rule.

These, in my opinion, are not exceptions, but satisfy the precise terms of the definition on which a reliance has been placed. They are all in the nature of a judgment; and the last of them is, in fact, a judgment.

IN ERROR.

ALBANY,
Feb. & March,
1810.

YATES
v.
THE PEOPLE.

*IN ERROR.*
.....
ALBANY,
Feb. & March,
1810.

YATES
v.
THE PEOPLE.

In the case of a fine, an action is commenced by original writ, issuing out of chancery. By the form of proceeding, the *deforciant* comes in, and acknowledges the right of the demandant, which he claims by his writ; of this a record is made, and though the record does not exhibit a regular judgment, it contains a recognition of the right, which has the full effect of, and is in the nature of a judgment. Where a *conusor* acknowledged a statute-merchant or a statute-staple, it was in the nature of a judgment, for it might be certified into chancery, and execution, as a judicial writ, might be awarded on it. In outlawry, judgment is pronounced by the coroners; and the form of the return is *per judicium coronatoris*. But none of these apply to the award of a writ, which is neither a judgment, nor in the nature of a judgment.

The case of a *procedendo* seems to me to bear a strong analogy to the present. It was admitted, in argument, that a writ of error would not lie in it. The function of a *procedendo* is to remit a cause to an inferior, from a superior court, to which it has been removed by writ, either granted on a suggestion, or of course. It directs the inferior court to proceed, either because the suggestion has not been sustained, or because the party who procured the removal has not conformed to the rules prescribed by the superior court in such cases. It is intended to restore the *statu quo*. The distinction taken, that when the court below has done every thing in its power, and dismissed the cause, it is in the nature of a judgment, is fully met by the case of a *procedendo;* for if the suggestion is examined, and held insufficient by the court, its judgment has been exercised; its opinion has had effect, and, in common legal parlance, it may well be said, it has given its judgment; but it is not that strict technical judgment which the law recognises as such.

This brings me to the inquiry, what diversity exists between the *English* laws and those of this state, on the

IN ERROR.

.....

ALBANY,
Feb. & March
1810.

YATES

THE PEOPLE.

subject under examination. But it may be well first to observe, that our *habeas corpus* act is substantially similar to the *English*. In an anonymous case, in 10 *Mod.* 429. (5 *Geo.* I.) it was resolved, that none were entitled to make the prayer, in the first week of the term, to be tried, but such as were committed by a justice of the peace, or a secretary of state, and not those committed by rule of court; for that is not, within the meaning of the act, a commitment by warrant; and, in the case of *Brass Crosby, Lord Mayor of London*, (3 *Wils.* 188.) it was laid down by the court, that a *habeas corpus* by the statute would not lie on it, which seems an affirmance of the same doctrine. And certain it is, that the sole reason assigned in the preamble of the *English habeas corpus* act, for passing it, was to prevent delays used by sheriffs and other officers, to whose custody persons had been committed for criminal or supposed criminal matter; and if, as has been repeatedly alleged here, this case is not a criminal matter, the statute does not apply to it.

Whether the present case is one under the statute or not, it will tend to elucidate the doctrine contended for, to trace its application in a variety of cases to which it may be applied.

In dissecting the doctrine, every attempt to rely on it, as a protection against oppression, will elude our grasp; for as it has been laid down as universal, the remedy, to be effectual, ought to be coextensive.

The far greater portion of the year is composed of vacations of the supreme court. The terms prior to the present session, could not, collectively, exceed eight weeks in the year. In the vacation, a *habeas corpus* may be granted by the court of chancery, which is always open; by a justice of the supreme court; or by a commissioner, in cases arising under the *habeas corpus* act. Suppose it brought before the chancellor, and he remands the prisoner, will a writ of error lie to him? That has not, and I believe will not be contended. Suppose it be before

IN ERROR.
.....
ALBANY,
Feb. & March,
1810.

YATES
v
THE PEOPLE

a justice of the supreme court, or a commissioner, there is certainly no principle of law which will constitute their decision a judgment in the supreme court. No writ of error will, therefore, lie on either. Commissioners act, *ex officio*, as justices of the supreme court; but in vacation they cannot possibly render a judgment in that court. This excludes at least five-sixths of the time, and, perhaps, nine-tenths of the cases on *habeas corpus* from redress by writ of error. But what strikingly exemplifies the incongruity, and total discordance of this doctrine, is that while it would enable any one judge or commissioner to decide definitively, it denies the same effect to the opinion of all the judges collectively, with every advantage of research, deliberation, and consultation. Besides, this court, in ordinary, sits only once in the year. Suppose a writ of error brought, returnable at its next meeting. In the mean time, the proceedings against the prisoner are continued; for certainly a writ of error on the *habeas corpus* would not supersede or impede the proceedings below, in the matter of commitment, and the prisoner must, in a great majority of cases, be either acquitted, discharged, or punished, before the case on the *habeas corpus* can be ripened for decision here. If his case has been adjudged, and he consigned, either to the state-prison, or to an imprisonment in any of the common gaols, or discharged, this writ of privilege may tend to involve the prisoner in vexatious expense and disappointment, but without any possible benefit; for if his case has been adjudged, the cause of commitment must be merged in his conviction, or rendered nugatory by his discharge.

But suppose the supreme court, the only common law court the opinions of which can be revised here, in error, should decide in favour of the enlargement of the prisoner, the attorney-general, who has the same right to issue a writ of error as the party imprisoned, might issue one; and thus, notwithstanding a decision of the whole court in favour of his liberty, retain him in custody; for

the writ of error in that case would operate as a *superse-*
*deas.* This doctrine cannot be correct. It is fraught
with so much inconsistency, inconvenience and oppres-
sion, that it cannot be sustained.

The first and most prominent diversity, is derived
from the jurisdiction and power exercised by the *British*
house of lords, which, it has been insisted, are possessed
by this court.

The *British* house of lords composes the supreme ju-
dicatory of *Great Britain* ; it incontestably holds the *resi-
duum* of power exercised by the *aula regia,* and which did
not, upon its dissolution, devolve on the courts of original
jurisdiction. The extent of their power is to be sought
in the remotest annals of the *British* nation ; and through
such an obscured and extended medium, the researches
of the learned, and the speculations of the ingenious,
have been barely able to discern, that it is illimitable as
to object, as to all matters of appeal; that it has occa-
sionally exercised a power, perhaps a right of acting, as
if possessed of original jurisdiction ; and it is well
known, that it professes to regulate its conduct by cus-
toms and precedents ; but avowedly expounding, adding
to, or adapting them, as its conception of honour and jus-
tice dictate ; and this, according to *Blackstone,* " in conse-
quence of the confidence reposed in the honour and con-
science of the noble persons who compose that impor-
tant assembly, that (if possible) they will make themselves
masters of those questions upon which they undertake
to decide, and in all cases refer themselves to the opinion
of the judges, who are summoned by writ to advise
them, since, upon their decision, all property must finally
depend."

This court is very differently constituted, in the origi-
nal nature and extent of its powers. It is limited by a
written constitution, and explained by laws enacted under
its authority. Its members are subject to impeachment, in
common with all the public officers of the state ; are bound

*IN ERROR.*

ALBANY,
Feb. & March,
1810.

YATES
v.
THE PEOPLE.

by the solemnity of an oath, not to administer justice according to their abstract opinions of what they may deem just, but to perform their duty, according to that constitution and those laws, for the maintenance of liberty, and distribution of justice, without any fear, favour, affection, or hope of reward.

It must, therefore, be obvious to a man of the least reflection, that those courts are placed on very different bases; and though the modes of doing business, and the principles which regulate their decisions, may, in many instances be similar, that this court is strictly and conscientiously bound to conform to the constitution and laws, and can have not the least pretence to exercise any other appellate jurisdiction, than that which is expressly delegated by one or the other.

In resorting to the constitution, in the section I have, already quoted, we find, that no other questions are to be brought up from the supreme court to this court, but questions of law on a judgment of that court. The statute organizing this court, provides, that where any judgment of that court shall be brought up, this court shall reverse or affirm the judgment, and give such other judgment thereon, as the law shall require, and then remit the transcript of the record, with their judgment thereon, to the supreme court.

It has been urged, in argument, that the words of the act are very comprehensive. It provides, that *all errors* happening, &c. shall be corrected in this court. But if the whole section is collectively taken, the word *all*, may and must, from its terms, be exclusively applied to those which have arisen in the cases in which the *judgment* has been brought up for review; and as it has not the words found in *Coke's* definition of the cases proper to be corrected in error, " or in the nature of a judgment," by all the rules of sound construction, it may well be doubted, whether even *fines*, or *statutes-merchant* or staple, if the latter obtained in this state, could be

considered as comprehended in the cases which can, either by the constitution or statutes, be brought up in error.

IN ERROR.
.....
ALBANY,
Feb. & March,
1810.

YATES
v.
THE PEOPLE.

These diversities between the *English* laws and those of this state, it appears to me, are of much weight, and add considerable force to the considerations deduced from the former, to show that a writ of error will not lie here on a *habeas corpus*.

2. The second point made by the attorney-general, was,

That if a writ of error will lie in any case of *habeas corpus*, it will not lie in this case.

All judicial proceedings, in this state, affect either persons or things.

To give a court cognisance of a person, he must either be actually brought into court, have been summoned, or have so eluded the process of law, as to expose himself to have his non-appearance imputed to him as a *laches* or fault. As to things claimed in specie, the like process obtains to bring in the person whose rights are to be adjudicated upon; and beyond this and the inferences legally, and unavoidably deducible from it, there is no legal competency, consistent with the existing laws, to pronounce judicially on matters relating to either the person or property.

Let the case now in review, be brought to this test:

Is the person of Mr. *Yates* either under the control of this court, or of the supreme court? Is the record of his conviction for a contempt here? Neither one nor the other can properly be considered as here. The exigency of his recognisance, into which he entered in the supreme court, was not complied with by him. The *estreat* was manifestly on the ground, that in that court he did not appear, according to his stipulation. The court ordered him to be remitted to the sheriff of *Albany*, on the attachment, and he united with the formal act of the court to place himself without its reach.

*IN ERROR.*

ALBANY,
Feb. & March,
1810.

YATES
v.
THE PEOPLE.

Suppose this court should deem the award of the *remittitur* erroneous, and consider it as a judgment. It has then three acts of duty to perform, as prescribed by the statute :

1. To reverse the judgment ;
2. To render a new judgment ;
3. To remit it to the supreme court.

To get at the second and third point, a leading step must be taken, and the judgment pronounced erroneous. This done, what is the object of the new judgment? What possible legal shape can it be made to assume, so as to affect the court of chancery? This court cannot, as on an appeal from chancery, give directions. The judgment must be determinate in its terms, and defined with absolute certainty, as to its object. Can it solemnly pronounce, that Mr. *Yates* shall be set at liberty by the supreme court? However elevated and respectable the tribunal that so pronounces, it cannot be received as the judgment of law.

Can the supreme court reclaim Mr. *Yates,* unless they issue a *habeas corpus de novo?* What legal power is there in this state to direct it to do an act, which rests solely and exclusively in its legal discretion, and which, the instant it is touched by the unhallowed hand of power without right, loses all its value. Can they say, in their excuse, if they submit to it, that they dare not execute the laws. The solemn and impressive admonition, contained in the prayer of the commons of *England,* in the perilous times of *Henry* IV. emerging from a state of society, in which the will of the powerful was too often the law of the weak, forcibly exemplifies the high responsibility and independence expected from the judiciary ; for in it they pray, that justices " be not received for their excuse to say, that they dare not do or say the law, nor their intent, for doubt of death ; or that they are not free of themselves ; because they are more bound by rea-

*IN ERROR.*
.....
ALBANY,
Feb. & March,
1810.

YATES
v.
THE PEOPLE.

son to keep their oath, than to doubt death, or any forfeiture." (14 *Vin. Abr.* 577. *Judges*, B. pl. 1.)

Will this court direct the court of chancery to discharge Mr. *Yates?* It would be repugnant to every principle of the constitution and laws. Should it discharge him by its own order, he may, in the assertion of the jurisdiction of the court of chancery, which even this pre-eminent and distinguished court cannot control but on appeal, be the next moment recommitted; and if such, upon a full and due consideration in the court of chancery, should be deemed the duty of that court, what could possibly absolve it from a performance? As I am at present advised, and giving my opinion, as a member of this court, if the chancellor so thought, it would be a gross dereliction of duty, and an indelible disgrace to the administration of justice in that court, if he refrained from it.

As to remitting the judgment of this court to the supreme court; what can be remitted? Not the person; not a transcript of the record of conviction; not a judgment, on which further proceedings can be had, as well for execution, or otherwise, as shall be agreeable to law and justice.

No law has been found to establish principles, on which farther proceedings can be founded, nor can any possibly be adapted to this case, to subserve the interests of justice.

I have thus submitted my reasoning on this subject; and shall add nothing more than that I am for quashing the writ of error.

CLINTON, Senator. A second preliminary question is presented to us for our decision: *Whether a writ of error will lie on a judgment on a habeas corpus?* And, in arriving at a determination, we ought to keep out of view the merits of the cause. Whether a commitment for a contempt ought to be considered by other tribunals, as excluding their interposition? Whether the proceedings

IN ERROR.
.....
ALBANY,
Feb. & March,
1810.

YATES
v.
THE PEOPLE.

are so imperfectly set forth, that we cannot reach the merits of the controversy? are questions, indeed, of great pith and moment, and on which I refrain from giving an opinion; but the point for us to settle, is not whether a writ of error will be sustained, in a given or specified case, but whether it will lie on judgments on *habeas corpus*, in general? If it is determined, affirmatively, the merits of the commitment will next come under review, and if it shall appear, as has been stated by the attorney-general, that our interference in favour of the prisoner, will be an infraction of the rights of all courts, to commit for contempts, a dangerous inroad upon established principles, that it will be impracticable, from the record, to have a full and distinct view of the case, whereby an enlightened judgment may be formed, then the course for us to pursue will be plain and easy. An affirmance of the judgment of the supreme court must inevitably follow. In giving my opinion, I beg, therefore, to be understood, as not touching the legality of the commitment.

As there are several kinds of *habeas corpus*, it may be proper to remark, that the *habeas corpus* which now occupies our attention, is styled a *habeas corpus ad subjiciendum*. (3 *Bl. Comm.* 130.) It is a writ directed to a person detaining another, commanding him to produce the body of the prisoner, with the day and cause of his caption and detention, *ad faciendum, subjiciendum et recipiendum*, to do, submit to, and receive, whatever the judge or court awarding such writ shall consider in that behalf. Whenever a man is restrained of his liberty, it removes his body and cause (3 *Bac. Abr.* 1.) to some jurisdiction, which hath authority to examine the legality of such imprisonment, and either to bail, discharge, or remand the prisoner. It is a writ of right, and demandable *ex debito justitiæ;* (3 *Bac.* 2.) and it is stated by a celebrated writer, to *be in the nature of a writ of error, to examine the legality of a commitment.* It is a creature

of the common law, but its provisions have been fortified, and its benefits extended by statute. So highly is it prized, that in *England* it is considered a second *magna charta.* By the constitution of the *United States*, it is provided, that " the privilege of the writ of *habeas corpus* shall not be suspended, unless, when in cases of rebellion or invasion the public safety may require it."

*IN ERROR.*
.....
ALBANY,
Feb. & March,
1810.

YATES
v.
THE PEOPLE.

Our statute, on this subject, enlarges the common law remedy, and authorizes a judge in vacation to issue a *habeas corpus.* If the prisoner is not satisfied with the decision of the judge, he may bring his case, *de novo,* before the supreme court; or, if the judge does not choose to decide, on account of the importance and difficulty of the case, he may bind the prisoner to appear in that tribunal, and wait its termination. Although, from the statute provisions, this writ may be issued by a judge, in vacation; yet, in its inception and original character, *it was an appeal to a court, and in the nature of a writ of error.* In this light it ought to be viewed; and its salutary and remedial nature, its protection against tyranny and oppression, its shield in favour of personal liberty, and the exalted light in which it is contemplated by our constitution and laws, ought also to be taken into consideration; for it is certainly our duty to give this writ its most extensive operation, to protect the citizen, in the remedies prescribed by law against unjust coercion; and to furnish him, if practicable, with the same means of redress, against an invasion of his personal rights, as now apply as a safeguard to the rights of property.

This is, certainly, a case of the first impression, and which has never been adjudicated and determined. The few scattered *dicta* which are to be found in the books, are entitled to little respect. In the celebrated case of *The Queen* v. *Paty and others,* upon which I shall presently remark, (2 *Salk.* 504.) the reporter observes, at the conclu-

IN ERROR.
.....
ALBANY,
Feb. & March,
1810.

YATES
v.
THE PEOPLE.

sion of the report; " then it was a doubt, whether any writ of error lay, upon a judgment given upon a *habeas corpus.*" And, in 2 *Bac. Abr.* 190. it is stated, as a *quære,* in a marginal note, " whether a writ of error lies on a judgment given on a *habeas corpus ?*" We are, therefore, not to rely upon the authority of former adjudications, but must elicit the truth from an investigation of the principles and character of the remedy, and from the glimmering and feeble light which analogy may furnish.

In the erection of a supreme court, invested with appellate jurisdiction, it was obviously the intention of the constitution, to give it a controlling power over the decisions of the courts of original jurisdiction, affecting the rights or the interests of individuals. It is not to be supposed, that our laws intended to afford more guards and fortresses for the protection of property, than for the protection of liberty; that in the one case, the suitor may pursue his redress into this court, and that in the other, he is to be precluded by the first decision. In order to guard against the fallibility of the human understanding, and to shield the citizen from the attacks of injustice, it may be regarded as a cardinal principle in our laws, that no single tribunal is intrusted with the sole determination of a man's property. Writs of error, bills of exceptions, demurrers to evidence, and appeals, are provided as remedies ; and shall it be said, that property is considered more sacred than freedom ; that the rights of things are prized more highly than the rights of persons ? Upon the general view of the case, we would then say, that our citizens ought to be invested with the same appellate rights, in cases relating to the person, as in those that refer to the property; that the decision of a court of original jurisdiction ought not to preclude a writ of error ; and, that the benefits of a *habeas corpus* ought to be carried to the utmost possible extent of liberality.

When a prisoner is brought before the supreme court, *IN ERROR.*
on a *habeas corpus*, and the court decide that he is legally ALBANY,
committed, and remand him to prison, why should Feb. & March,
he be deprived of the right of appeal to a superior tri- 1810.
bunal? Is there any thing in the nature of the proceeding, YATES
or in the constitution of this court, which ought to shut v
the door against a writ of error? THE PEOPLE.

It is stated in *Coke on Littleton*, (288.) that without a
judgment, or an award in nature of a judgment, no writ
of error doth lie. Assuming the truth of this position,
it remains to inquire, whether a decision on a *habeas
corpus* is a judgment, or an award in the nature of a
judgment.

I shall not condescend to inquire, whether the precise
phraseology, generally adopted in the entry of judgments,
is used in cases of *habeas corpus?* I see no magic force
in the words " *ideo consideratum est,*" and shall leave
such technical jargon to those who sacrifice substance to
form, and principle to precedent. The entry of the de-
cision in the record before us, is : " Whereupon all and
singular the premises aforesaid, being seen and fully exa-
mined and understood by the justices aforesaid, now
here, it seems to the justices aforesaid here, that the
aforesaid cause of commitment of the said *John V. N.
Yates*, to the custody of the sheriff of the city and county
of *Albany*, in the return of the said sheriff above specified,
is good and sufficient in law, to detain the said *John V.
N. Yates* in the custody aforesaid. Therefore, the said
*John V. N. Yates* is, by the justices aforesaid here, remit-
ted to the custody of the sheriff of the city and county of
*Albany*, there to remain, in the same state in which he
was, at the time of the issuing of the aforesaid writ of
*habeas corpus*," &c.

A judgment is a decision of a court upon the case
before it; and the last or final determination of a tribu-
nal is the proper subject for a writ of error. When a

*IN ERROR.*
.....
ALBANY,
Feb. & March,
1810.

YATES
v.
THE PEOPLE.

court puts an end to an action, by declaring that the plaintiff has either entitled himself, or has not, to the remedy he sues for, then it gives a final judgment. On a judgment, *quod partitio fiat, in partition,* or of *quod computet, in account,* (2 *Bac. Abr.* 192.) no writ of error will lie, because the judgment is not complete; but when the final decision takes place, then the party who thinks himself aggrieved, may have his appeal. The question brought up on a *habeas corpus* is, *is the prisoner legally imprisoned?* If the court decide in the affirmative, the deprivation of liberty continues. Is not, then, this a final decision on the case before the court, and does it not deprive the party of the remedy he solicits? The words *ideo consideratum est,* are indeed omitted, and *it seemeth* supply the place of *it is therefore considered;* and this is the great subject of difference. And is the gothic jargon of *Norman* lawyers, and the ridiculous pedantry of the schoolmen, still to pervade our temples of justice, and to prostrate principle and right at the feet of sophisticated nonsense? It is worthy of remark here, that the record before us binds the prisoner to appear, and abide by the order and judgment of the supreme court; that the decision in the case is, therefore, considered a judgment; and that *Salkeld, Raymond,* and *Bacon's Abridgment,* fortified by the authority of Lord Chief Justice *Holt,* consider a determination on a *habeas corpus,* a judgment. But, admitting that it is not a technical judgment, yet it clearly comes within the definition of *Coke :* it is an award in nature of a judgment. And as a *habeas corpus* is a writ, in the nature of a writ of error, so is the determination upon it, a decision in the nature of a judgment, upon which a writ of error will lie.

It is, however, contended, that there are cases in which a writ of error will lie, and in which no judgment is rendered, and that these cases are to be considered as exceptions from the general rule. In *Cro. Eliz.* 233. it

IN ERROR.
.....
ALBANY,
Feb. & March,
1810.

YATES
v.
THE PEOPLE.

was held, in the court of common pleas, that if a *statute-merchant* is well acknowledged, and removed to the C. B. and execution is there erroneous, error lieth thereof, and this judgment was afterwards affirmed in B. R. (*Cro. Eliz.* 319.) This is well known to be a recognisance or acknowledgment of a debt, before the chief magistrate of some trading town, pursuant to the statute 13 *Edw.* I. *de mercatoribus*, and thence called a *statute-merchant*, whereby, not only the body of the debtor may be imprisoned and his goods seized in satisfaction of the debt, but also his lands delivered to the creditor till the debt is satisfied. (2 *Black. Comm.* c. 10.) It is, therefore, no judgment, but a mere acknowledgment of a debt. So also in 2 *Bac. Abr.* 190. it is said, " If a fine is levied without an original, or of more than is contained in the original, it is not void, but only voidable by writ of error." It is well known, that the fine generally used contains no judgment, but only a final agreement between the parties ; and that it is, in essence, a solemn mode of conveyance, through the medium of a court of record. Our statutes respecting fines (1 *Rev. Laws*, 74.) provides, that no fine shall be reversed on a writ of error, unless brought in five years. Other cases of error, where there is no judgment, may be indicated ; but it has been sufficiently shown, that *Coke's* remarks must be taken with qualifications and limitations. If the decision on a *habeas corpus* is to be contemplated as a judgment, or an award in the nature of a judgment, it is embraced by the rule. If it is to be considered as neither an award nor a judgment, it may fall within the exceptions, and, on either hypothesis, a writ of error will lie.

Although there is no adjudication to be found on this subject, yet, in 1704, in the reign of Queen *Anne*, the memorable prosecution of *Paty and others* took place, which will throw a flood of light on this case. It is reported in 2 *Ld. Raym.* 1115. and 2 *Salk.* 504. under

the title of *Regina* v. *Paty et al.* It appears, that *Paty* and four others were committed by the speaker of the house of commons, by virtue of an order of that house, and upon a *habeas corpus* to bring them before the court of B. R., the warrant was returned in the following words: " *Martis 5 die decembris* 1704. By virtue of an order of the house of commons of *England*, in parliament assembled, this day made, these are to require you forthwith, upon sight hereof, to receive into your custody the body of *John Paty*, who, as it appears to the house of commons, is guilty of commencing and prosecuting an action at common law against the late. constables of *Aylsbury*, for not allowing his vote in the election of members, to serve in parliament, contrary to the declaration, in high contempt of the jurisdiction, and in breach of the known privileges of this house, and him in safe custody to keep, during the pleasure of the said house of commons," &c.

This warrant contained a specification of the supposed contempt; and as it was clearly not a breach of privilege, but the birthright of every *Englishman*, to prosecute in a court, for a redress of injuries, Lord Chief Justice *Holt* was of opinion, that the prisoner ought to be discharged. He was, however, overruled by the three other judges, who proceeded upon the ground of the undefined and omnipotent privileges of parliament. A record of the case was made up, under the direction of the court, with a view, that a writ of error might be brought to the house of lords An interesting account of the proceedings, on this case, in parliament, is contained in the 8th volume of the *State Trials.* As there is, however, a faithful and concise narrative, exhibiting a connected view of the subject, in *Smollett's Continuation of Hume's History of England,* (vol. 1. p. 413.) I shall quote that author, in preference. " The remaining part of the session was consumed in disputes and altercations

*IN ERROR.*

ALBANY,
Feb. & March,
1810.

YATES
v.
THE PEOPLE.

IN ERROR.
.....
ALBANY,
Feb. & March,
1810.

YATES
v.
THE PEOPLE.

between the two houses, on the subject of the *Aylsbury* constables, who were sued by five other inhabitants, for having denied them the right of voting at the election. These five persons were committed to *Newgate*, by order of the house of commons. They moved for a *habeas corpus*, in the king's bench, but the court would take no cognisance of the affair. Two of the prisoners petitioned the queen, that their case might be brought before her majesty in parliament. The commons, in an address, besought the queen to refuse granting a writ of error in this case, which would tend to the overthrowing the undoubted rights and privileges of the commons of *England.* She assured them, she would not do any thing to give them just cause of complaint, but this matter, relating to the course of judicial pleadings, being of the highest importance, she thought it necessary to weigh and consider very carefully, what might be proper for her to do, in a thing of so great concern. They voted all the lawyers who had pleaded, on the return of the *habeas corpus*, in behalf of the prisoner, guilty of a breach of privilege, and ordered them to be taken into custody. They likewise ordered the prisoners to be removed from *Newgate* into the custody of their serjeant at arms, lest they should have been discharged, by the queen's granting them writs of error. The prisoners, finding themselves at the mercy of the exasperated commons, petitioned the lords for relief. The upper house passed six different resolutions against the conduct of the commons, as being an obstruction to justice, and contrary to *magna charta.* The lower house demanded a conference, in which they insisted upon the sole right of determining elections. They affirmed, that they could judge who had a right of voting; and that they were judges of their own privileges, in which the lords could not intermeddle. The upper house demanded a

IN ERROR.
.....
ALBANY,
Feb. & March,
1810.

YATES
v.
THE PEOPLE.

free conference, which proved ineffectual. New resolutions were taken, by the commons, diametrically opposite to those of the peers, who, on the other hand, attended the queen, with a long representation of all the particulars relating to this affair. They affirmed, that the proceedings of the house of commons, against the *Aylsbury* men, were wholly new and unprecedented. That it was the birth right of every *Englishman*, who apprehended himself injured, to seek for redress in her majesty's courts of justice. That if any power could control this right, and prescribe when he should, and when he should not, be allowed the benefit of the laws, he ceased to be a freeman, and his liberty and property were precarious. They requested, therefore, that no consideration whatever should prevail with her majesty, to suffer an obstruction to the known course of justice; and that she would be pleased to give effectual orders for the immediate issuing of the writ of error. The queen assured them, that she should have complied with their request, but finding an absolute necessity for putting an immediate end to this session, she knew there could be no further proceeding on that matter. On that very day she prorogued the parliament, and before the period of prorogation arrived, she dissolved them." This, of course, discharged the prisoners, and thus the controversy terminated.

From this statement, it is manifest, that, although, in consequence of the prorogation of parliament, the question was not decided, judicially, by the lords, yet that they, in fact, gave an explicit opinion in the case, by stating to the queen, that writs of error ought to be issued, and that the prisoners were unjustly and illegally treated.

I know of nothing which has been urged against this doctrine, except some remote analogies, some distant allusions to the merits of the controversy, and some ob-

scure doubts respecting the constitutionality and efficacy of our interference.

And, first, this case has been compared to the cases of a *procedendo*, prohibition, and *mandamus*, in which error, it is said, will not lie.

A *procedendo* is a writ commanding an inferior court to proceed to judgment. It gives no decision, (3 *Black.* c. 7.) but directs one. The reason, then, that a writ of error will not lie, is obvious. A prohibition is the opposite of a *procedendo*. It prohibits courts from exceeding their jurisdiction, and meddling with causes that do not belong to them. For the same reason that error will not lie on a *procedendo*, it will not on a prohibition.

A *mandamus* lies in a variety of cases; (*Esp. Dig.* 661.) and is a prerogative writ, to enforce obedience to acts of parliament, and to prevent a failure of justice or police. It is used to restore a person deprived of some corporate or other right or franchise, or to admit a person legally entitled to the same rights. It directs persons having authority therein to do all legal acts connected with their duties and offices; and it orders corporations to proceed to elections, justices to execute statutes, and courts to render judgments.

The case of *The Dean and Chapter of Dublin*, in B. R. (1 *Stra.* 536. 8 *Mod.* 27.) was a case of error from B. R. in *Ireland*, on a peremptory *mandamus*, grounded on a return to a *pluries mandamus* to the dean and chapter to admit one *Robert Dowgate* to his seat and voice in the chapter.

On this case two questions arose : 1. Whether a writ of error will lie on the award of a peremptory *mandamus*; 2. On the merits of the return.

After two arguments, it was determined, that a writ of error will not lie, and it was quashed.

A motion was also made in chancery to order the B. R. in *Ireland* to make a return to the writ of error,

IN ERROR.
.....
ALBANY,
Feb. & March,
1810.
YATES
v.
THE PEOPLE.

IN ERROR.
.....
ALBANY,
Feb. & March,
1810.

YATES
v.
THE PEOPLE.

and in the mean time to stay all proceedings on the *man-.* *damus*. After argument, the chancellor gave time to make a return, understanding that the court intended so to do, and also intended to stay all proceedings on the *mandamus*. (1 *P. Wms.* 349.) He had, on this important occasion, called to his assistance the two chief justices and chief baron; and Chief Justice *Parker* was of opinion, that a writ of error would lie on proceedings under the statute on a *mandamus*, for they are in the nature of an action; but that it is no *supersedeas* to a peremptory *mandamus*, for such a construction would prevent officers chosen annually from having any fruit of the *mandamus*.

The dean and chapter, afterwards, brought a writ of error, in the house of lords, from the judgment of B. R. quashing the writ of error, which judgment was affirmed. (2 *Bro. P. C.* 554.)

Upon sifting the reasons assigned for this decision, in the four different reports respecting it, it will be found that they resolve themselves into three heads.

1. The form of the judgment; "*ideo consideratum*" being omitted. *Fortescue*, Justice, very gravely insists upon this; although *Powys*, Justice, rather thought that "*per quod consideratum fuit*" was used in awards of a peremptory *mandamus*, and that such awards were judgments, on which error will lie. On the second argument, *Eyre*, Justice, takes his stand upon the want of an *ideo consideratum est*, and *Powys*, Justice, finding that he was mistaken in the entries, gives in. I trust that it is not necessary to treat this point with serious refutation. The award is substantially a judgment.

2. It was insisted, that a writ of error, operating as a *supersedeas*, would produce great inconveniences from delay, and from entangling the public acts of officers chosen annually in corporations.

To this the answer is easy. A writ of error on a *man-*

*lamus*, according to Chief Justice *Parker*, is not a *supersedeas*.

3. The remaining objection was, that an award of a peremptory *mandamus* gives no right, not even a right of possession. So that, if the judgment should be reversed, still the same right would subsist in the claimant, which makes the reversal signify nothing; and that a writ of error is intended to restore a party to something that is lost.

IN ERROR.
.....
ALBANY,
Feb. & March,
1810.
YATES
v.
THE PEOPLE.

But does not a *mandamus* give the party possession, and is not this something gained to one, as well as lost to the other? Waiving, however, this consideration, it is admitted, that error will lie on an issue in law as well as fact, on the proceedings on a *mandamus*, under the statute. After the return to the *mandamus* to show cause comes in, and the party waives a traverse of the return, admits the facts, and appeals to the court on the sufficiency of the return, whether it is sufficient in law to shut him out of his office, is not this virtually, and in essence, a demurrer? And what essential difference is there between the informal issue in law, submitted to the court in this shape, and the formal demurrer after a traverse? Why, then, should a writ of error lie on a peremptory *mandamus* under the statute, and not on a peremptory *mandamus* at common law? Is it because the statute gives costs and damages? But they do not compose the substance of the demand, which is the enjoyment of the office or franchise. Admitting, however, in its fullest extent, that a writ of error will not lie on a peremptory *mandamus*, at common law; and admitting, also, the sufficiency of the reason assigned, that it decides no right, how does this apply? How is it to be likened to the case of a writ of error on a *habeas corpus*? Can it be pretended that a decision on it decides nothing? Let us bring this doctrine to the touchstone of investigation.

3 O

IN ERROR.

ALBANY,
Feb. & March,
1810.

YATES
v.
THE PEOPLE.

A court of errors ought to give the same judgment upon reversal which the court below ought to have given. (2 *Bac. Abr. Gwil.* ed. 503.) If judgment be given against the defendant, and a writ of error is brought by him, judgment shall be only *quod judicium reversetur*, for it is brought only to be eased and discharged from that judgment; but if against the plaintiff, and he brings a writ of error, the judgment shall not only be reversed, but the court shall also give such judgment as the court below should have given; for the writ of error is to revive the first cause of action, and to revive what he ought to have recovered by the first suit, wherein erroneous judgment was given.

The questions in the supreme court were: Is the prisoner legally confined, or not? Ought he to be restored to his liberty, or not?

The judgment of the supreme court was, that he was legally confined, and that he ought to be remitted to prison.

If the supreme court mistook the law, as the prisoner alleges, then this court is bound to give the same judgment which the supreme court ought to have given, that is, that the imprisonment is illegal, and that he be discharged; or, in other words, a reversal of the judgment of the supreme court, and a remission of the record to that tribunal, with directions to act in the case, as it ought to have acted in the first instance, that is, to have discharged the prisoner, instead of having remitted him. If the supreme court did not mistake the law, then the judgment of this court will be an affirmance of their judgment, and the prisoner will remain in custody.

A determination of this court, being the judgment of a court of the last resort, becomes the law of the land, until altered by the legislature. All our decisions, which apply to general principles, are general law. All that apply to individuals, become the law of the respective cases. A judgment in favour of the prisoner would

IN ERROR.
.....
ALBANY,
Feb. & March,
1810.

YATES
v.
THE PEOPLE.

then become the law of the case; and all inferior tribunals, all judicial officers, will be bound to respect and obey it accordingly. A judge might release him immediately, in vacation. The supreme court would unquestionably be bound to do it, in term; the chancellor would be equally obligated to discharge him; and I have no doubt but that this court could do it by virtue of its controlling authority.

This court is established by the constitution, for the review and correction of all errors in the courts of probate and chancery, and in the supreme court. Unless it is contended, that the court of chancery cannot commit an error in proceedings on a contempt; or that the supreme court cannot commit an error in proceedings on a *habeas corpus*, I cannot conceive how it can be pretended that this tribunal is without jurisdiction in those cases. The court of errors, on writs of error, is composed of the president, the senators, and chancellor; on appeals, of the president, the senators, and judges of the supreme court. If the chancellor is absent or disqualified, by interest or prejudgment in the one case, or the judges of the supreme court in the other, it cannot affect the legality or constitutionality of the proceedings of the court. A majority of the members constitute the court; and although the *gravamen* complained of in this case originated in chancery; yet the chancellor is a constitutional judge, and may, if he sees fit, give his reasons and vote. It is conceded, that an appeal would lie from the commitment by the chancellor; why then not a writ of error from the judgment of the supreme court, which is in the nature of a commitment by that tribunal, the prisoner having been, at the time of the judgment, out of the custody of the chancery, and under their control.

The cases which have been stated, as cases of inconvenience that might occur, are irrelevant to the inquiry; but, admitting their application, they are entitled to no weight.

YATES
v.
THE PEOPLE.

1. If a judge does not discharge a prisoner in vacation, he will not be remediless in the way of a writ of error; he may renew his *habeas corpus* in term.

2. The inconvenience arising from interfering with convictions of contempts by courts, is imaginary and idle. It is essential to the administration of justice, that tribunals of justice should be armed with this authority; but it is not necessary that it should be unlimited, uncontrolled, indefinite, arbitrary, and omnipotent. It is to be remembered, that summary convictions are against the genius and spirit of our constitution, and in derogation of civil liberty. The judge is without check, and the accused without the usual guards of freedom. There is no grand jury to accuse; no petit jury to try; but his property and liberty depend upon the *fiat* of the court. Is there not the strongest necessity for a review of such convictions? Is not the necessity of the check at least equal to the necessity of the delegation of the power? Suppose the court of chancery should commit a man for high treason; that the supreme court should commit a jury for giving a verdict against law, and against the direction of the court; that the house of assembly should commit a citizen for bringing a suit against an inspector for refusing his vote; that the senate should, under pretence of a contempt, commit the governor of the state, for sending a written communication, instead of making a speech, at the opening of the session, will any man have the hardihood to say, that the persons so improperly and illegally proceeded against, ought to be continued in prison? Although there is no reason to believe that such outrages will take place in these times, yet it must be remembered, that the freedom of the citizen ought not to depend on the moderation and virtue of the ruler, but upon the barriers which the law erects against the inroads of oppression. Two of the cases I have stated, have actually occurred in *English* history.

That of *Paty* I have already mentioned, on which Lord
Chief Justice *Holt* delivered the following noble senti-
ments : " If," says he, " there be a wrongful imprison-
ment by the house of commons, what court shall deliver
the party? Shall we say there is no redress, and that we
are not able to execute the laws upon which the liberty
of the queen's people subsists ? To conclude, all courts
are so far judges of their own privileges, and intrusted
with a power to vindicate themselves, that they may pu-
nish for contempts, but to make them, or any court, final
judges of them, exclusive of every body else, is to intro-
duce a state of confusion, by making every man judge in
his own cause, and subverting the measures of all juris-
dictions." The other is the case commonly called *Bushell's*
case. (3 *Bac. Abr.* 784. *Vaugh.* 143. 2 *Jon.* 16.) He and
other jurors were fined and committed, because they found
a verdict contrary to evidence, and the direction of the
court. Although the imprisonment was decided to be
illegal; yet the court determined, that no action lay against
the commissioners of *oyer and terminer*, who made the
commitment, because they acted as judges, and could no
more be punished for an erroneous commitment than
for an erroneous judgment; and the court declared, that
the highest remedy a party can have in such case, is a
writ of *habeas corpus*.

3. It is said, that the senate, as a court of errors, may
be called upon to review a commitment, made by them
as a senate. And why not? May not cases occur, in
which questions respecting the constitutionality of sta-
tutes may be tried in the court of errors, where the senate
in their judicial character, determine upon acts adopted
and sanctioned in their legislative capacity? May not
questions arise with respect to the validity of legislative
grants, and the construction of statutes, in which the
judge and the legislator will be blended together ? This
arises from the constitution of the court, and will not
frequently happen. But, let me repeat, that suggestions

*IN ERROR.*

ALBANY,
Feb. & March,
1810.

YATES
v.
THE PEOPLE.

of this kind are irrelevant. The question is not how we shall decide, when merits come before us; but whether they shall be brought before us for decision.

4. It is alleged, that the pardoning power may be extended to the prisoner, which will afford him complete relief.

The mercy of the executive is one thing, and the justice of the court another. A pardon is not a remedy in the course of law. It may, or may not be afforded, at pleasure; and is entirely extrinsic from judicial proceedings. The sum of the reasoning is this; that a citizen may be deprived of his liberty, without the accusation of a grand, or the interposition of a petit jury, and upon the mere *fiat* of a single judge; that this judge shall be without control, and the citizen without appeal; that he must continue imprisoned for life, unless the judge shall relent, or unless the executive shall pardon. This doctrine may suit the meridian of *Constantinople;* but it is utterly repugnant to the genius of a free government.

If the governor cannot, or will not, pardon; and if the legislature cannot, or will not, relieve, then a citizen may, at any time, upon the grounds contended for, be incarcerated for life, by a court composed of a single judge, and without the benefit of a trial by his peers, and the judge cannot be called to an account for his conduct. For, if I rightly understand the positions which are maintained throughout, they are these; a court may commit for contempt, whether perpetrated in court or not. This commitment, whether legal or illegal, cannot be examined or overhaled by any other tribunal; but it is to be considered as final and conclusive, and it may continue during the pleasure of the court. If the prisoner is brought up on a *habeas corpus*, the court is to remand him, the moment it is perceived to be for a contempt, and no writ of error will lie on this decision; and, although this may be wicked and oppressive, and may operate as an imprisonment for life; yet the court so acting is not liable to pu-

4

nishment: for a commitment is a judicial act, and it is
contended, that no judge can be questioned for his acts
as such. Here then is a case (excluding the favourable
interposition of the executive or legislature) where an un-
just and tyrannical judge may, at pleasure, imprison an in-
nocent man for life, and yet place punishment at defiance.
A doctrine pregnant with such monstrous absurdities,
and teeming with such horrible results, can never be in
unison with the letter or the spirit of a free and enlighten-
ed system of jurisprudence. And, although I trust we
have nothing to apprehend from such practices, in the
times in which we live, yet we ought to keep our eyes
fixed on futurity. The all-pervading force of corruption,
and the all-grasping lust of power, may raise up for the
destruction of unborn generations, men who will devote
themselves to oppression and to blood. Why are we to
expect an exemption from the common lot of nations?
In the true course of events, we must, indeed, travel the
round of human calamity. Pestilence and war, famine
and oppression, will visit us; and we must anticipate
that in some period, the *Tresilians* and the *Jefferies* of
former times will live again in our tribunals, men who
will imprison under the forms of justice, and murder
with all the solemnities of law. And when such monsters
arise, to scourge the human race, let me tell you, that
they will be supported by the arm of power, and will be
attended by their obsequious satellites, and smooth-faced
parasites, who will deride the *magna charta* of your liber-
ties, and laugh at the majesty of the people.

In *Bushell's* case, where the sanctuary of a jury was
invaded, where the lawful dispensers of justice were
fined and imprisoned, and the immunities and rights of
*magna charta* invaded, the court decided, that the judges
were protected, by their robes of office, from the sword
of justice, and that the injured party had no other reme-
dy than a *habeas corpus*. And shall this great bulwark
against oppression be circumscribed and limited to a sin-

IN ERROR.
.....
ALBANY,
Feb. & March,
1810.
YATES
v.
THE PEOPLE.

IN ERROR.
.....
ALBANY,
Feb. & March,
1810.

YATES
v.
THE PEOPLE.

gle *forum?* I put the question to the conscience, and to the unsophisticated understanding of every man who hears me, why should the remedies for violations of personal liberty be more limited and contracted, than those for infractions of the rights of property? If it is of importance, that every citizen should have the right of appeal against unfavourable decisions in the latter case, is it not vastly more important that he should, in a case which reduces him to a state of imprisonment and deprives him of the blessings of liberty?

And what are the objections opposed to this extension of the blessings of the *habeas corpus?* Are they not superficial, technical, pedantic, scholastic, and sophistical? Are they founded on enlarged views of the subject; on reverential feelings for the rights of the citizen; on a liberal construction, and a just view of the judicial functions and powers of this high tribunal? Are they not founded on the letter which killeth, not on the spirit which giveth life? With the most profound veneration, and the most exalted respect, to the great land-marks of our law, which define the rights of the citizen, and the powers of the ruler; for those elementary principles which compose the essence of all justice, and constitute the substance of all right, I entertain a correspondent contempt for that technical jargon, that metaphysical subtilty, and that legal chicanery, which would entangle justice in the nets of form, and sacrifice the essential interests of our country to the *formulas* of special pleading, and the scruples of legal sophistry.

PLATT, Senator, said, that he concurred in the opinion delivered by the *Chief Justice*, and Mr. Justice *Thompson*, that the writ ought to be quashed.

PARIS and WILLIAMS, Senators, were of the same opinion.

A majority of the court(a) being of opinion, that a writ of error would lie, in this case, and that the writ ought not to be quashed, the motion was denied.

*March* 19th, 1810. This day the *Chief Justice* assigned the reasons of the judgment of the supreme court; (see 4 *Johns. Rep.* 317. 354.) and the cause was argued by *Rodman* and *Emmet, ex parte* Mr. *Yates*, on the merits, as they appeared on the record returned by the supreme court; but the reporter did not hear the argument.

YATES
v.
THE PEOPLE.

*Cur. adv. vult.*

*March* 27, 1810. This day being assigned for the final decision of the cause, the following opinions were delivered.

THE CHANCELLOR. In the progress of this case in its several stages, some harsh terms have occasionally occurred; certainly, with all that guarded decorum, which forensic discussions require, in cases circumstanced as this is. They have never been directly or disrespectfully applied; but from their manner and circumstance, those who run might read, that they were not used as mere expletives, or in exemplification of general doctrines, but that they seemed to mean more than was expressed. One of the counsel hazarded the broad assertion, that if the question on the proceedings at large was before the court, he could clearly demonstrate, that the whole were illegal.

The judgment of the court is required on the record before us; and the case adjudged in the court of chancery cannot be fairly tested here, without examining it throughout, which it is not pretended can be done on

(a) There were for the *affirmative* 12, for the *negative* 16.

IN ERROR.
.....
ALBANY,
Feb. & March,
1810.

YATES
v.
THE PEOPLE.

this occasion. But it may be useful merely to state its situation in the court of chancery, which will exhibit its relation to the questions now to be decided, and show, very forcibly, how little adapted the present mode of proceeding is, to bring the merits into a full review.

This case originated in the complaint of *Samuel Bacon*, preferred by him on the 18th day of *April*, 1808, who charged *John V. N. Yates*, then a master, *but not a solicitor*, of the court of chancery, with having exacted from him 18 dollars, under the false pretence of being a solicitor; and subjecting him to great delay, and considerable trouble, in a suit which he had undertaken to prosecute in that court. The matter, after due notice to *John V. N. Yates*, was examined, *ex parte*, and an attachment ordered against him. This order was opened, on his application, by an order to show cause why the former order should not be abrogated. He was permitted to pursue such course as his counsel thought proper. He disclosed his defence. His proofs, taken by affidavits, by examination of a witness in court, and on a commission issued at his instance, were considered, and not determined upon, until the 8th of *August*, more than three months after the complaint preferred. In his defence, it was not denied, that he had received the money which the complainant alleged that he had taken, under pretence of being a solicitor. That he had acted as solicitor, was fully admitted; but the bill having been filed by him, with the name of *Peter W. Yates* subscribed to it, as solicitor, he alleged, that it had been done by the consent of *Peter W. Yates*, which the latter denied; and thus the only doubtful point presented for decision, was not, whether *John V. N. Yates* had been guilty of mal-practice, *for that was fully and unequivocally admitted*, but whether the illegal exaction or imposition was attended with circumstances of more or less aggravation. The rule to show cause was discharged, and he was committed for mal-practice and contempt, on the ground, that

his conduct had been oppressive, contrary to common honesty, and injurious to the fair administration of justice. It was a contempt, by construction of law, which had no reference to the chancellor personally, to whom no other disrespect had been offered, than as the rules which ought to regulate the conduct of the officers in the court of chancery, had been grossly violated.

IN ERROR.
.....
ALBANY,
Feb. & March,
1810.

YATES
v.
THE PEOPLE.

That part of the opinion expressed by the chancellor, on discharging the rule to show cause, which has been quoted in argument, is preceded by a sentence, which is necessary to be connected with it, clearly to understand the doctrine it inculcated.

The part quoted, is found in the 94th page of the report. [Here his honour read from a printed report of the case of *Yates*, containing the proceedings in chancery.]

" Though the commitment, I found, upon consulting precedents, must be absolute, and without any precise limitation, I shall have no doubt, that its duration ought to be contracted, as much as a due attention to public justice will admit, as the first instance of the kind occurring in the state. But an application to terminate it, can only be listened to, after the party injured has been fully remunerated."

The sentence alluded to, which preceded that quoted, and which was not adverted to, is found in p. 87. and is in the following words:

" I am totally averse to turn the party aggrieved, to seek his remedy at law, if he is entitled to such remedy here; as it is compelling him to travel in a circuitous, instead of a direct route. There certainly are cases, in which the court will leave the party to such resort; but this does not appear to be of that description; for though the nature of the jurisdiction to be exercised here, must, of course, stop short of that complete indemnity which the verdict of a jury might give, I think it competent to remunerate him, to the amount of the ascertained damages, for which a measure is disclosed by the case."

*IN ERROR.*
.....
ALBANY,
Feb. & March,
1810.

YATES
v.
THE PEOPLE.

The three points originally presented to the supreme court, and which have received its decision, are

1. That the matter laid to the prisoner's charge *is a crime* prohibited by the statute ; and, therefore, as such, is not cognisable in the court of chancery, which has no criminal jurisdiction; nor is it punishable any where, by an attachment for a contempt.

2. That the conviction is founded upon evidence, which the law does not hold sufficient to warrant a conviction, even for a contempt.

3. That the imprisonment, being in execution and conviction, should be definite, and terminate either by the effluxion of time, or on the doing of some act of the prisoner, and cannot be uncertain and indefinite, as until the further order of the authority inflicting it. ·

These points are again presented for the decision of this court, with the addition of a fourth :

That the commitment was by order, and not by warrant.

· Perfectly satisfied, that the doctrine laid down by the supreme court, on the first three points, is correct; that it does not require to be fortified; and that if it did, I have it not in my power to add to the lucid developement which has been exhibited in the opinion expressed on that occasion ; I shall, as to all those points, adopt it, as conclusive to my mind. I shall only bring them into view, in considering the new attitudes in which they have been placed in argument, which has almost throughout been bottomed on that opinion, and the opinions expressed by the court of chancery, in this case, and in the case of *Philip S. Parker* Esq. recorder of *Hudson*, who, as commissioner, had discharged Mr. *Yates* from his imprisonment on the recommitment made in the court of chancery, after the opinion of the supreme court, on the first three points, had been expressed. This imposes it on me to take a more extensive range, than from the limited view of the proceedings appearing by

IN ERROR.
.....
ALBANY,
Feb. & March,
1810.

YATES
v.
THE PEOPLE.

the record, could possibly have been anticipated. The circumstances which have no immediate connection with the case, and which have been pressed into the argument, will either be totally disregarded, or adverted to with the utmost brevity; and, certainly, for no other purpose, than to state correctly what has been distorted by partial views and mutilated extracts, to prevent them, by the complexity of the subject, from being involuntarily mingled in the mind, as facts capable of influencing judicial opinions.

I shall, in the first place, read the opinions given in the case of *Parker*, and in them will be found the cases cited,* which have been the subject of particular discussion, and the manner in which they were applied to the case, which was, in every respect, as relates to the 4th point, perfectly analogous to it. [Here his honour read the opinions delivered by him, in the case of Mr. *Parker*, from MS.] I have seen no cause to change my opinion on the 4th point, and the distinction taken in *Paty's* case, by *Powys*, J. and which is directed to this point, appears to me a solid one; " that commitments of courts need not be under seal." (2 *Raym.* 1107. 10 *Mod.* 439.) He adds, " we commit people by a rule of two lines, and such commitments are held good;" and so, it will be recollected, is the practice, both in the supreme court, and court of *oyer* and *terminer*, and cannot, either there or at circuit, be otherwise exercised, than by order or rule, as those courts have no seals; and if, as has been supposed, the rule is to be taken from the court of chancery, it appears, from an authority in *Styles*, 129. that this court will not examine it. For in a case adjudged in the upper bench, during the *Protectorate*, it was held, " that if, upon *habeas corpus*, it appears that the admiralty had proceeded to a sentence, against the rules of their own court, that court would not deliver the prisoner, for he ought to have appealed.

* 2 *Saund.* 182.
1 *Mod.* 272. *S.*
*C.* 2 *Keb.* 711.
1 *Hale's P. C.*
681. *Mosely,*
238. 1 *Atk.* 57.

*IN ERROR.*
•••••
ALBANY,
Feb. & March,
1810.
⁓‿⁓‿⁓
YATES
v.
THE PEOPLE.

* 1 *Atk.* 57.

And so it is touching the proceedings in other courts of equity."

The case *ex parte Whitchurch*,* has been met by the suggestion of mistake. It is said, *locus sigilli* has been omitted by the reporter ; for Lord *Hardwicke* calls it a warrant. If that suggestion is correct, the conclusion is also a departure from the ordinary course ; for instead of adding any of the usual words indicative of sealing, it concludes, dated the 16th day of *June,* 1748. But it is a positive proof, drawn from very weighty authority, that the word *warrant* is legally appropriate to a warrant with, or without, seal. And so it would seem, from several authorities, is the general acceptation ; that the word simply describes the genus, but when coupled with the adjuncts, under hand and seal, it is descriptive of a species. (*5 Bac. Abr.* 573.    2 *Roll. Abr.* 528. *pl.* 2.    *Ib.* 574.    *Cro. Eliz.* 829. 2 *Hawk. P. C.* 13. *S.*)

To meet the other cases on this subject, it has been strongly urged, that the words *stand committed,* in some of the other cases, show, that the person committed, was actually and personally present in court at the time. In one of the cases, however, it appears, the person committed was in the *Fleet prison,* and not in court ; and so in precise analogy to the case of an officer of the court, who is in court only by construction of law. But a conclusive argument to this verbal criticism is, that the same term is made use of, both in the *English habeas corpus* act, and in our statute of 1787, (*Jones & Varick's ed. L. N. Y.* 77.) in the second section of the latter of which, it is enacted, " that if any person shall stand committed or detained." This is certainly not supposing the prisoner to stand *in facie curiæ,* but in prison, in the custody of the officer to whom the *habeas corpus* is directed. The other authorities are numerous, uncontradicted, and satisfactorily show the course of the court, which, according to the authority from *Styles,* can only be reviewed on appeal, and not in this collateral mode.

2

The record contains the writ of error to the supreme court, the *habeas corpus*, its return by the sheriff of Albany, and the award of a *remittitur*. The return shows the attachment issued by the court of chancery, two several orders for the discharge of Mr. *Yates*, by Mr. Justice *Spencer*, in vacation, and the order of the court of chancery reclaiming him, as its prisoner, on the attachment.

IN ERROR.
.....
ALBANY,
Feb. & March,
1810.

YATES
v.
THE PEOPLE

As that part of the report (see 4 *Johns. Rep.* 317.) which relates to the successive discharges and recommitments, brings up the case in a complicated shape; and as those proceedings, it has been supposed, must very materially influence the decision of this court, I prefer simplifying the subject, by considering the matters arising out of the return, as relating to those discharges and recommitments, as a preliminary question, distinct from the principal points to which the *ex parte* argument has been directed.

In the supreme court, the chief justice gave the opinion of the court, and Mr. Justice *Spencer*, and Mr. Justice *Yates*, dissented from it. Their opinions have been read from the report, by the counsel, and so much relied on, as to make them the professed basis of argument, on this point.

Mr. Justice *Yates* states the only question to be, whether the power had been constitutionally exercised by the court of chancery? That the constitution afforded any *test*, has not been pretended in argument. He divided the subject into an inquiry, whether a commitment for a contempt could be for an indictable offence, and whether a recommitment was warranted by law; and he limits the right of recommitment, to the court in which the prisoner may be subsequently indicted, or charged with a criminal offence, and pronounces the proceedings of the court of chancery, *coram non judice*, and that they constitute a summary conviction.

Mr. Justice *Spencer* examined the subject on two grounds; 1. Whether the commitment of Mr. *Yates*,

*IN ERROR.*

ALBANY,

Feb. & March, 1810.

YATES

v.

THE PEOPLE.

after he had been discharged upon *habeas corpus*, was a legal act? 2. Whether he was originally committed for matter, whereof the court of chancery had cognisance, and if so, whether the commitment was legal?

On that part of the reasoning, contained in those opinions, relating to the want of jurisdiction, I have already mentioned that it is not my intention to enlarge.

The loftier the edifice, the more stable ought to be its foundation; and, if instead of pursuing the reasoning contained in those opinions, and the argument, in all their details, it can be made to appear that their basis is unsound, they cannot be admitted to influence our opinions.

The *English habeas corpus* act is precise in its terms, as to the exclusion of all other than criminal cases. The distinctions which have been taken, to induce the court to give our statute a more enlarged construction, showed that this was not contested ground. It has received that construction in *England;* and is so well established as to be laid down as settled law, by one of their best and most correct elementary writers; (3 *Black. Comm.* 137.) and the doctrine is not there even doubted.

The *English* statute (31 *Car.* II. c. 2. See vol. 2. stat. at large, 208.) has the following preamble:

" Whereas, great delays have been used by sheriffs, gaolers, and other officers, to whose custody any *of the king's subjects*(a) have been committed, for criminal or supposed criminal matters, in making return of writs of habeas corpus to them directed, *by standing out an alias* and *pluries habeas corpus, and sometimes more,* and by other shifts, to avoid their yielding obedience to such writs, contrary to their duty and the known laws of the land, whereby many *of the king's subjects* have been, and hereafter may be long detained in prison, in such cases, where, by law, they are bailable, to their great charge

(a) The words *king's subjects* are omitted, in our statute of 1787, and the word *persons,* inserted in their stead; and the other words in *italics* are also omitted.

IN ERROR.
.....
ALBANY,
Feb. & March,
1810.

YATES
v.
THE PEOPLE.

and vexation; for the prevention whereof, and the more speedy relief of all persons imprisoned, for any such criminal, or supposed criminal matters."

The preamble of the statute of this state, of 1787, (2 *Laws of N. Y.* 76. *Jones and Varick's* ed.) was, in every respect, correspondent to that of the *English* statute, excepting in the descriptions, in which it was necessary to depart from the latter, by substituting the word *persons*, for the words *of the king's subjects*, and the details of delay, "*by* standing out an *alias* and *pluries habeas corpus.*"

The first section of the *English* statute had not been precisely adapted, in its phraseology, to its preamble; and hence a more perfect adaptation was devised in the first section of the revised statute of 1787, by repeating the words *sheriffs, gaolers*, adding the word *minister*, instead of *other officer*, and instead of *person, person or persons whatsoever.*

In some other instances, while the original sense is studiously and carefully preserved, the mode of expression has been changed; in none, however, which have any relation to the points now under consideration. But the third section of the *English* statute enacts, that if any person shall be, or stand committed, or detained, as aforesaid, for any crime, unless for treason or felony, plainly expressed in the warrant of commitment, *in the vacation time*, it shall be lawful for such person, so committed, or detained, (other than persons convicted, or in execution by legal process,) or any one on their behalf, to complain to the lord chancellor, &c.

The third section of our statute enacts, that it shall and may be lawful for every such person (other than persons convict, or in execution, by legal process, or committed for treason or felony, plainly and specially expressed in the warrant of commitment) to apply to the chancellor, or any judge of the supreme court, for a *habeas corpus.*

In the second revision of our laws, by the *Chief Justice*, and Judge *Radcliff*, it will be found, that the

*IN ERROR.*

*ALBANY,*
*Feb. & March,*
*1810.*

*YATES*
*v.*
*THE PEOPLE.*

preambles have been omitted; probably on the ground, that many of them contained matter inconsistent with the state of things, at the time of their re-enactment, or that the construction of the *English* statutes having become settled by usage or adjudication, the preambles were useless.

Instead, therefore, of seeking the history of the *habeas corpus* act in the proceedings of the *English* house of commons, we find it, in a less questionable shape, in those of our own legislature, and so satisfactorily traced, as to leave no doubt on the mind of any man of common sense, who will take the trouble of examining it with attention. And in doing so, it will be discovered, that this point, which has been so earnestly urged as indubitable, has no foundation but that of fancied affinities, which do not exist.

If this doctrine is correct; if the *English* statute relates only to criminal cases; if the statute of 1787 was conformable to it; if that of 1801 is in no other respect different than in the omission of the preamble; and if, in the construction of the statute, the preamble ought to be considered as still existing, how is it possible that a case, treated here as not in the least partaking of criminal matter, in which the judge whose acts in vacation are thus brought up, repelled the calling in of the attorney-general, by notice, on the ground that it was not a criminal proceeding, and which was approved and acted upon by this court, can be considered as affected by it? It appears to me, that thus considered, the same construction must be inevitably attached to our *habeas corpus* act, as that which has obtained in *England;* it exclusively relates to criminal matters, or commitments to answer in courts of criminal jurisdiction.

But there is another branch of this subject, which relates to the power to be exercised by a judge in vacation. The only difference supposed to be material in the present case is, that the *English* statute, as to the power of the judge in vacation, extends to any person who shall stand committed, or detained, as aforesaid, for any crime :

our statute extends it to any person imprisoned as afore-
said. The word *aforesaid* carries it, by relation, to the
description which precedes it, as fully, and with as much
certainty, as if the more ample phraseology had been
retained; for it relates to the antecedent subject, which
is criminal matter, if taken in connection with the pre-
amble as if that still existed; and so, I am convinced, it
ought to be construed, or the revised statutes must, in
many cases, receive constructions totally different from
the originals, which would introduce infinite mischief.

From the exceptions mentioned in the statute, it ap-
pears, that every person who is committed may apply
for a *habeas corpus*, excepting such as,

1. Have been committed for treason or felony;
2. Persons convicted;
3. Those in execution by legal process.

The last of these exceptions has been satisfactorily
examined and decided upon, by the supreme court, and
the first requires no particular attention.

Mr. *Yates*, it has not been doubted, has been convict-
ed of a contempt by the court of chancery. Whether
that conviction was on competent or incompetent evi-
dence; whether the party convicted was interrogated,
or confessed the matter charged as a contempt, are not
questions, which, in the purview of the *habeas corpus*
act, were to be submitted or determined in vacation.

The restraining language of the statute, comprised in
the exception, is as imperative, as if it had positively
and expressly forbid the application for a *habeas corpus*.
It is, *it shall be lawful for such person, so committed, to
apply for a habeas corpus, in vacation*, unless convict,
or in execution by legal process; *in either of which
cases, it shall not even be lawful to make application*.
Here the party is met, *in limine*, by the exception. If it
is a case within the exception, how can a judge, in vaca-
tion, surmount it? If the party convicted cannot even
apply, how can he be relieved?

*IN ERROR.*

ALBANY.
Feb & March,
18⒑

YATES
v.
THE PEOPLE.

It is not pretended, that the case did not arise on *con-viction.* The unanimous voice of the supreme court has pronounced it so; for, however much they may have differed on other points, in this they unite. Mr. Justice *Yates,* in his opinion, calls it a *summary conviction.* Mr. Justice *Spencer* says, he judicially pronounced the *conviction* illegal; and throughout his whole opinion, which has been read in argument, he repeatedly calls it *a conviction.* The chief justice, in giving the opinion of the court, took it for a ground of its decision. The counsel for Mr. *Yates* have treated it as such, and in their second point, in the supreme court, as well as here, it has been expressly recognised as a conviction. By what rule of construction, then, can the statute be made to embrace a case, in the most express and pointed terms excepted and excluded from it? And what possible distinction can the ingenuity of man devise, under the terms of the statute, to include the cases of persons *convict,* and exclude convictions for treason and felony? There is not the least pretence that the latter are embraced in its provisions. My opinion has uniformly been, that a justice of the supreme court, in vacation, had no jurisdiction in the present case; and it excited some surprise, that the proceedings of the court of chancery could have been considered, as having been conducted in *a summary manner,* by the justice who made the discharges in question; when it can be ascertained, from the report, that the complaint was exhibited on the 18th of *April;* that after various examinations and proceedings, the ultimate opinion was not pronounced till the 8th of *August,* nor the attachment issued till the 17th day of *August;* that the writ of *habeas corpus* was returned before Mr. Justice *Spencer,* at the house of *Joshua B. Aldridge,* in the town of *Milton,* in the county of *Saratoga,* and the discharge given on the 19th of the same month. On this summary proceeding, in my opinion, (appearing from the report,) expressed on the 5th

of *September*, I merely remarked, that it appeared, little
time was afforded for deliberation; that the opinion
given on the discharge, had not so much weight with
me, as it would have had if it had been formed upon
mature reflection, and with a ready access to authorities,
and not under circumstances less favourable to either,
than *at a circuit*. Such, however, was the first summa-
ry process to annul a conviction clothed with the forms
of law, and legally intactable by a judge in vacation.

Of the case of *Puller*, which it has been supposed I
decided, I know nothing. I am satisfied, that if I
ever decided a case of that kind, in vacation, it could
not have been on the principle stated; and if it had
been in term, I should have a note of it; which I have
not. The chief justice, of whom I inquired on the
subject, recollects no decision of the nature alleged to
have been made by him.

One of the counsel has argued, with great zeal, to
establish the position, that every chancellor, every judge
of the supreme court, and every commissioner, possess
an appellate jurisdiction, under all circumstances which
can affect personal liberty, which he may exert, in vaca-
tion, on all and every conviction of every court of this
state; that if a prisoner can prevail upon any of those
officers to discharge him, that discharge would be abso-
lute and irreversible. If they have this power, it has
some resemblance to the *veto* of the *Roman* tribunes; but
its exertion is, in every instance, to be preceded by trial,
or confession and conviction; and in doing so, it has
been said, that the discharging officer would be ancillary
to the law.

Let me, instead of reasoning on the subject, exem-
plify this singular doctrine, by briefly tracing its ef-
fects.

The supreme court, collectively, try, convict and ad-
judge. One of the judges, at the time of giving the

*IN ERROR.*

ALBANY,
Feb. & March,
1810.

YATES
v.
THE PEOPLE.

IN ERROR.
.....
ALBANY,
Feb. & March,
1810.

YATES
v.
THE PEOPLE.

judgment, or at some period subsequent to it, is dissatisfied with it, and discharges the convict. All the judges of the supreme court are perfectly satisfied, and render a judgment; a commissioner, who was originally merely ancillary to that court, makes a like discharge, and all these discharges, not only give liberty to the prisoner, but put him completely and irrevocably beyond the reach of the court which has convicted him.

The chancellor may, in cases of capital convictions, stay execution, by allowing a writ of error, which operates as a *supersedeas;* the governor may, in that case, respite till the next meeting of the legislature, who may pardon, or give effect to the judgment; but if either the chancellor, a judge of the supreme court, or commissioner can be found, who will say the conviction is illegal, the prisoner may be discharged, and irreversibly adjudged to be exempted from punishment.

If the discharge did not secure legal immunity, the bosom of the convict must be animated by the spirit and virtue of a *Socrates,* to resist the temptation of placing an insurmountable obstacle to a revision which could possibly affect him, by escaping to some place to which the justice of this state could not be extended.

What possible reason can exist for applying to the chancellor, for the writ of error, to the governor for a respite, to the legislature for a pardon, if either a chancellor, a judge or a commissioner can, without having the record of conviction before him, without any assignment of errors; without notice to the attorney-general, and in the most summary way, at home, or abroad, with consideration or without, say, " let him go," and thus do away all the legal consequences of an indictment, trial, verdict, and judgment?

As to the second point. In ordinary contempts, by openly insulting and resisting the powers of the court, no moral turpitude is involved; for they may have been the effect of irritation, of passion, or of insubordination

Upon proof, by affidavit, either an attachment is issued, or a rule to show cause, why it should not be issued, is granted. At common law, if the contemner is put to his interrogatories and he purges his contempt by oath, he must be discharged, as the proceeding is contrary to its genius, and no evidence is admitted to contradict him. But it is not so in the court of chancery; witnesses may be examined in court, by a master, by an examiner, or on commission; and examinations have been had in this case, at the instance of Mr. Yates, in three of those modes; and if the court are satisfied, that the contempt has been committed, it is not bound to discharge. In some cases of gross contempts, it will not even permit an examination of the first affidavits; but merely commit, until submission, on the ground, that as the officers of the court are frequently alone in executing its process, the affidavits are in the nature of a return, which cannot be traversed, and that it is necessary to afford them effectual protection, to prevent them from being exposed to the most violent outrages.

The attachment contains a recital, " that it appears from certain affidavits, that *John V. N. Yates* has been guilty of mal-practice and contempt." To this it has been objected, that it does not appear that interrogatories have been exhibited, or, to state it in stronger terms, it appears that no interrogatories have been exhibited.

This point was not considered of such importance by the supreme court, as to attract much of its attention; but the imposing manner in which it has again been brought up requires that it should be particularly considered.

It has not been denied, that Mr. *Yates* had full notice of the complaint; that he was fully apprized of its being under examination; and it appears from the report, that he disregarded the notice. The first order was in the nature of a rule to show cause, the precise course which, in the argument, was indicated as the proper one. He had

IN ERROR.
.....
ALBANY,
Feb. & March,
1810.

YATES
v.
THE PEOPLE.

therefore an opportunity of being heard, and it would be a singular objection, which has, however, been glanced at, to say, that because he had a monition, or summons served on him, instead of an attachment to bring him up, *nolens volens*, so as to compel him to make his defence, he had been injured.

None of the cases adverted to, show that interrogatories have ever been exhibited in any case of contempt, arising from mal-practice. The rule laid down by *Harrison*, *Wyatt*, and in other books of practice, both ancient and modern, is undoubtedly the general rule, as applied to cases arising in the regular prosecution of a cause; but I much doubt its applicability to cases involving moral turpitude.

The examination of the question, whether the interposition of interrogatories is the right of the court, or of the party, may throw some light on the subject. If it is in the court, it would seem that it must rest in its discretion, for I shall show that it is not the practice to exhibit them in all cases of contempt, and under all circumstances. If in the party, he must offer himself; for if the matter he seeks to be permitted to swear to, grows out of his defence, he is bound to show the point to which it is to be directed, and if he does not appear to make his defence, the court is certainly not bound to devise one for him.

The form of interrogatories show that they are merely directed to establish facts, not to explain motives; and as all evidence must be presented to the mind through the medium of the senses, wherever a contempt is committed, in the view of the court, it is and has been the constant and uniform practice of every court, to commit on its own view, on the same principles on which they determine in cases of infancy and mayhem. Not a case has been cited, and I believe none exists, that in a case so circumstanced, interrogatories were ever filed. So if the party is brought up on a rule to show cause, and he confesses the contempt, why should he be less credited, than a traitor or a felon, whose confession has always been considered as a ground for adjudging him to death.

*IN ERROR.*

*ALBANY,*
Feb. & March,
1810.

YATES
v.
THE PEOPLE.

Would the court permit a contemner to devise interrogatories, so as to enable him, by explaining his motives, to soften the features of the transaction? It would, according to Chief Justice *M'Kean,* in *Oswald's* case, (1 *Dallas,* 329.) only give him an opportunity of swearing whether the conduct was owing to ignorance or wickedness; and can this case possibly be so stated as to present this absurd alternative for the decision of the court?

Suppose the contemner had been brought up, in consequence of the affidavits alluded to, and he had confessed their truth, does not the recital precisely comport with that state of things? Suppose the interrogatories exhibited and answered, and the court to be of opinion that the answers admitted the truth of the affidavits, would not the same result have been produced? Would either one or the other have imposed a change of phraseology to make it comport with truth? In either case, the affidavits would have remained the basis of the conviction, and there is nothing inconsistent with either in the attachment. If we go beyond the record, as has been repeatedly done, in the course of the argument, for other purposes, we find the order taken by default; that the contemner was afterwards admitted to his defence; that every material circumstance, the filing the bill by him included, was uncontroverted, and that he only denied that it had been done without the consent of *Peter W. Yates.*

But there is another point, which has been treated by the counsel, as settled by the decision on the last question in this case, whether the writ of error ought to be quashed, which I consider of more interest to the community than any which has been discussed by them; and that is, whether the writ of error has brought the record to this court at all? If it has not, then vain are all decisions on the questions which have been so elaborately argued.

*IN ERROR.*

ALBANY,
Feb & March,
1810.

YATES
v.
THE PEOPLE.

The judicial officers of the superior courts of this state, who give the rule to the inferior courts, are bound to receive it from this. But this court, and all others, are imperiously required to respect the constitution, and to preserve it from violation; and whenever there is a manifest and indubitable departure from it, this court cannot legally coerce the other courts of the state, or prevent them from exercising their independent judgment, which they must, however, do at their peril.

When the judgments of this court are rendered, in its general course, few of the members give the reasons on which their opinions are founded. If they unite in principle, the reasons expressed are supposed to be those which governed the decision. But if the members who declare themselves in favour of such decision, adopt different principles, the effective reasons cannot be distinguished; and if none of those assigned are such as can possibly apply to any other case, the decision must necessarily be narrowed down to the rule of the particular point decided.

The last adjudication of the court, in the case now again before us, might, and ought, under certain circumstances, to influence my judicial opinion in this. If I do not yield to its authority, a decent respect to the deciding tribunal requires that I should explain the reason why I deny it to be so. I shall, therefore, examine it as an adjudged case.

When I am required to submit to an authority, the reason on which it was established, the circumstances attending it, and the manner it was pronounced, are within the legitimate range of examination.

Sound law is tested by the rules of sound logic. If the predicates are false, truth cannot be deduced from them.

In treating this as an adjudged case, in the manner proposed, I may be permitted to observe, that two of

IN ERROR.
.....
ALBANY,
Feb. & March,
1810.

YATES
v.
THE PEOPLE.

the members of the court have founded their opinions on the ground, that there was no adjudged case to give the rule of decision; and another, a senator, learned in the law, disgusted with the strict formal rules, devised by conquering *Normans* and illiterate feudists, rends the whole *web of form*, wove by their art or folly, and boldly darting through, with strong terms of opprobrium, takes a stand beyond the constitution and laws.

If, therefore, that decision is to be admitted as authority, it must be on one of two grounds.

1. That there is no adjudged case, to govern the point decided in it; or,

2. That if there are any, they are not to be regarded.

As to the first. The mind cannot be devested of the conviction, that the opinions expressed must be formed on some misapprehension, if it is possible to lay the finger on the very point, decided two centuries ago, in a book of high authority, compiled by one of the most distinguished sages of the law, whose common law learning was profound, whose accuracy is unquestioned, and whose knowledge was derived from his own observation. If it is found that its correctness has been recognised, in every shape in which it has been judicially brought into view, in a long series of cases, which have been fully presented to the court, and which it cannot be necessary again to particularize, and its solidity attested by the acquiescence of ages, it cannot possibly yield to the assertion, that there is no adjudged case on the subject. If it is not possible to assent to it, and so, I should have supposed, must have been the belief of every lawyer, till I found it thus doubted, it cannot constitute an authority to bind my judgment; the fact, in my opinion, being indubitably assumed, in the teeth of the most conclusive reporting evidence. If so, all deductions from a position so unsound, must be rejected, as untenable.

*IN ERROR.*
.....
ALBANY,
Feb. & March,
1810.

YATES
v.
THE PEOPLE.

Connected with these opinions, an auxiliary consider-
ation was introduced; that the *habeas corpus* act was
passed subsequent to the case from 8 *Coke*. That statute
was passed in the 31st year of the reign of *Charles* II.
It gave facility to the operation of the writ of *habeas
corpus;* but it still left a case, according to *Coke*, in which
no issue could be joined, and no demurrer or rejoinder
thereto taken, and on which no writ of error would lie;
and the current of authorities, which originated in *Coke*,
has flowed without interruption, leaving the circum-
stance of the passing the statute as an insular speck, inca-
pable of discomposing the surface of the copious stream,
and merely serving as a land-mark of the point at which
it acquired a greater profundity, and a calm, temperate,
but irresistible impulse.

To follow the second of these opinions, it is indispen-
sably necessary to possess the same ardour and intrepidity
which dictated it; and I confess, in sober sadness, I can-
not possibly aspire to either. My mind is shackled by
the trammels of the constitution, my oath and the laws;
and I have still to learn that any object, however desira-
ble, can justify a total disregard of the sacred obliga-
tions imposed by those, to me, insurmountable re-
straints.

The constitution has perpetuated, by express provi-
sion, such parts of the common law of *England*, as
formed the law of the colony, on the 19th day of *August*,
1775, subject to be altered by the legislature *only*.

The common law, before the art of printing was in-
vented, must have been, in a great measure, traditionary;
and some learned men have supposed, that many of its
principles were originally introduced, or sanctioned, by
statutes since forgotten; but *Blackstone*, in his *Commen-
taries*, (53, 54.) says, that, at present, the monuments
and evidences of our legal customs, are contained in the

records of the several courts of justice, in books of re-
ports, in judicial decisions and treatises of learned sages
of the profession, preserved and handed down from the
time of the highest antiquity.

If the opinion, now under examination, is to govern, all those invaluable monuments of the wisdom of antiquity, the volumes that contain them, and the maxims preserved in them, transmitted to us as an inheritance above all price, shielded by the provident care of the framers of our constitution, among whom were men as distinguished by their legal discernment, as capable of estimating the true value of the common law, as well acquainted with its tenets, as jealous of the liberties of the citizen, and well disposed to guard and perpetuate them, as any lawyers of the present day, are to be consigned to indiscriminate, interminable destruction; and this solely by the uncontrollable power of this court. If this court can thus prostrate the common law, protected by what it is bound to deem the inviolable provisions of the constitution, it may, with as much ease, extend its irresistible arm, and by one tremendous blow, demolish the statute law with it.

It might, perhaps, be said, that the intent is not to destroy the common law, but only that the reporters should be rejected; but this is like wresting from a man his title deeds to a contested estate, and leaving him to a search for witnesses, who might, peradventure, be able to prove their former existence, purport and loss.

Bound to distribute justice according to the constitution and laws of the state, though this court might discover traits of excellence in other systems, dictated by the benevolent views of a despot, or by the sublimated theories of real or pretended patriots, who sometimes succeed in a free republic in identifying their opinion

*IN ERROR.*
•••••
ALBANY,
Feb. & March,
1810.
‿‿‿
YATES
v.
THE PEOPLE.

with that of the government of the country, it cannot adopt them in the cases on which it is required to decide. Decisions on the principles of abstract justice destroy the safety and liberty of the citizen, and strike at the most essential rights of property. They destroy all rule. They vary with the conceptions of every judge; and if, as has been impressively pronounced in a former stage of this case, *discretion is the law of tyrants*, can it be less alarming, if so detestable a law is expanded to the dimensions to which this doctrine is calculated to extend it? It would be much less exceptionable in principle, much more salutary in practice, to adopt the *Roman* custom, which imposed it on the *prætor*, upon commencing his administration, to promulgate the principles by which he intended to regulate his judicial conduct. But, in this court, every member would conceal the law in his own bosom, and every tribunal of the state must pronounce the law, before it can possibly know the principles by which its decisions are to be tested; or whether the rule is to be deduced from the settled judicial opinions of the country, or from the effusions of angry passions, once unrestrainedly indulged, which the authors have ceased to think of, or strive to forget, dragged into light under the shield of judicial inviolability, to pollute the ear, or distort the judgment, and excite the astonishment and regret of every friend to a fair, dispassionate, and impartial administration of justice.

I well know, that there have been occasions, when courts of supreme jurisdiction, under the influence of indignant feelings, in order to curb the proud oppressor, who, perhaps, with cool deliberation, had calculated the precise limit to which he might carry his extortions, and remain beyond the reach of the law; to wrest from the polluted hands of the man, who had been intrusted with the administration of justice, the fruits of venality and corruption, and to vindicate the purity of the principles

which ought to have been respected, have, by violating those principles which it was thus admonishing others to revere, dragged him to their tribunal, and subjected him to punishment, regardless of the forms under which he had attempted to shelter himself. Examples of this kind are always dangerous, even in extreme cases, though their efforts may sometimes be salutary. Many victims are carried in the train of such decisions; and in such extraordinary cases, the history of mankind shows, that extraordinary principles will ever be resorted to. But is this a case of that kind? It is the case of a citizen, unjustly deprived, by an officer of the court of chancery, of his money, his time, his hopes in the justice of his country, pursuing the man who has defrauded, deceived, and disappointed him, who, it would seem, from what dropped from one of the justices of the supreme court, held important and honourable offices under the government; and who, if any of those offices had conferred criminal jurisdiction, might have been required to give his judgment in cases, perhaps divided, if divided at all, from the present, by as thin a partition as the imagination can form, and to consign the offender *to a twelvemonth's imprisonment, at hard labour,* to which the court will recollect the punishment for taking money, under false pretences, may extend. And is it possible, that the dispensation of the justice of the state can be so unequal, that while the ignorant, want-worn wretch, who has, perhaps, devised a false pretence to obtain bread, to rescue a starving family from famishing, shall be subjected to such a punishment which the legislature deems the offence to merit; a sympathy should be attempted to be excited, avowedly calculated to mislead the judgment, and to induce the court to go out of the record, to pronounce that a man distinguished by the favour of government, holding important offices under it, intrusted to distribute a portion of its justice, who, stoop-

IN ERROR.
....

ALBANY,
Feb. & March,
1810.

YATES
v.
THE PEOPLE.

*IN ERROR.*
.....
ALBANY,
Feb. & March,
1810.

YATES
v.
THE PEOPLE.

ing from the elevation in which he was placed, stopped a suitor at the threshold of a court, to impose himself on him for what he was not, to take from him his money, under such false pretence, to sport with his anxiety and suspense for more than a year, had been arbitrarily imprisoned, as not for a definite period, though until he had repaid the money he had acquired by fraud and imposition?

Could it be expected, that the pointed allusions to the tribunal which had directed the commitment, and the unqualified declaration, that a disproportionate punishment had been inflicted, calculated to degrade by imposing a submission and payment, in a case in which those allegations could not be examined, and to which they had no application, could be tacitly acknowledged as well directed; or that they would not thus be repelled, and the correctness of the commitment, on a ground on which it ought not to have been questioned in this case, as now before the court, vindicated?

I shall only add, that the opinion delivered by me, on the motion for quashing the writ of error, I consider as fully meeting the case, as now presented ; that the court has no record here on which it can pronounce a judgment of reversal ; that I hold the award of the *remittitur* a valid one, and that to conform to the shape to which this proceeding has been moulded, I am for an affirmance.

CLINTON, Senator. We are now to give a final decision upon the merits of this interesting case. In forming our opinion, we cannot travel for facts beyond the record. Any statement of the proceedings which does not appear in the return of the supreme court, is not to enter into view ; any moral or legal depravity attributed to the prisoner, beyond what appears in the case, or any justification, that may be offered in his behalf, or any allegations for, or against the court, ordering the commitment,

which are extrinsic the record, must be rejected. We
may indeed refer to the decision, and opinions of the chancellor, in this as in other cases, in the same manner as we refer to the reasons of the chief justice, or any other justice of the supreme court; but further than this
we cannot go with propriety. A case involving the rights of personal liberty, and implicating the functions and conduct of our highest courts, will always command attention, and must ever be considered with delicacy and interest. These considerations are enhanced, and our difficulties are heightened, when we perceive the chancellor, and three of the judges of the supreme court opposed in opinion to two other of the judges.

In giving an opinion on a case, in which such collision exists, I shall proceed with all that respectful deference, so justly due to the high judicial authorities of the state, and to the able and learned men who occupy them.

It appears that the prisoner was committed for a contempt of the court of chancery; that he was discharged by a judge on a *habeas corpus*, recommitted by an order, and again discharged; and that the case finally came before the supreme court, on a *habeas corpus*, who decided, " that the cause of commitment of the prisoner is good and sufficient in law to detain him in custody; and that, therefore, he be remitted to custody," &c. The question before us is, whether this judgment of the supreme court is erroneous or not. In order to determine it with accuracy, it is necessary to consider the following points:

1. Whether the original commitment of the court of chancery was legal?

2. Whether a judge, in vacation, had jurisdiction in the case?

3. Whether a person, discharged on a *habeas corpus*, can be reimprisoned for the same offence?

4. Whether the commitment by order of the court, and not by attachment, is legal?

*IN ERROR.*
.....
ALBANY,
Feb. & March,
1810.

YATES
v.
THE PEOPLE.

5. Whether the judgment of the supreme court, on a view of the first point only, admitting the legality of a commitment, by order, the. want of jurisdiction in the judge, and the right of reimprisonment, ought not to have been favourable to the prisoner; and whether he ought not, on some of the other grounds singly taken, to have been discharged?

As to the legality of the original commitment, it is objected; 1. That the prisoner was committed for a crime; 2. Without being examined on interrogatories; and, 3. Without a definite, or terminable period, prescribed in the conviction.

The attachment recites the order of commitment, which states, that it appeared from several affidavits, that the prisoner had, while a master in chancery, filed a bill and subscribed the name of a solicitor, without his knowledge or consent, and had acted as solicitor, in the said cause, in the name of such solicitor, " contrary to the statute in such case made and provided, in wilful violation of his duty, as a master, and in contempt of the authority of this court;" and it was thereupon ordered, " that he be committed for his said mal-practice and contempt, to the common gaol of the city and county of *Albany*, there to remain until the further order of the court."

The ninth section of the act concerning counsellors, attorneys, and solicitors, directs, " that no clerk, deputy-clerk, register, or deputy-register of any court, nor any examiner, or master of chancery, shall act as counsellor, attorney or solicitor, in any action or matter in the same court." A violation of this provision is undoubtedly a misdemeanor, and as such indictable. The chancellor supposed, that the prisoner had violated the statute. The whole order is founded on his filing a bill in the-name of another solicitor, without his consent, and acting as, a solicitor in such cause. This act is stated to be against the statute, in violation of his duty, as master, and in contempt of the authority of the court; the fact

IN ERROR.
.....
ALBANY,
Feb. & March,
1810.

YATES
v.
THE PEOPLE.

is one and entire, *a master acting as solicitor* is the simple allegation; and this is represented in the attachment to be; 1. Against the statute; 2. Against his duties as master; and, 3. In contempt of the honour of the court. When a statute prescribes certain acts to be done or omitted by a public officer, the doing or omitting of those acts becomes a portion of his official duties and a violation of his official duties, and a violation of the law are the same offence. The superadded charge of, *in contempt of the authority of the court*, must be considered as an inference from the official misconduct before imputed; as a declaration, that an officer of the court violating a statute in his official conduct, acted contemptuously to the court; or it may be considered as superinduced, in the way of aggravation. The chancellor proceeded, on the ground of a crime, and the deductions of a violation of duty, of mal-practice, and of contempt, resulted, in his mind, from a breach of the statute. And whether this statute was actually violated or not, is, in my mind, not a decisive consideration. The chancellor is of opinion, that the statute was violated; the chief justice intimates that it was not. Whether the offence was perpetrated, is not the only question; but whether he was proceeded against, as having committed it, is the most material point. If the statute was not violated, then he was innocent, and ought not to have been punished on that ground. If it was broken, then the chancellor had not cognisance of the cause, because chancery is not a court of criminal jurisdiction; and from both horns of the dilemma it is impossible to escape.

The prohibition against certain officers of the court from practising in it, was to maintain purity and impartiality, by preventing them from interfering, ministerially, or judicially, in cases, in which they were employed by one of the parties. A master in chancery would be, indeed, an improper officer to report on a reference made in a cause, in which he felt the bias of a solicitor or counsellor. Whether he practises in his own name,

*IN ERROR.*

ALBANY,
Feb. & March,
1810.

YATES
*v.*
THE PEOPLE

or uses the name of a friend, the evil will be the same; and I consider both modes of conduct as falling within the spirit and reason of the prohibition. The adoption of the name of another, may produce more pernicious effects than a palpable open violation, because, the secrecy of the agency may prevent those measures which might defeat the mischief; and indeed the officer might act in cases wherein he had prejudged the question, and was so biassed and interested, as to be incapable of acting properly and justly. The practising as solicitor, in another name is, if an offence, a more aggravated one, than practising in the master's own name. " The master is interdicted from acting as a solicitor in any matter or action in the court." May he not act as a solicitor in the name of another, as well as in his own name? And the doubts suggested by the chief justice do not appear to be solid. " Strictly speaking," says he, " the prisoner did not act as solicitor, but he acted as agent for, and in the name of another solicitor."

Now the very statement of the case precludes all idea of agency. It was done without the consent or knowledge of *Peter W. Yates.* The prisoner did not, indeed, act, directly, as solicitor in his own name, but he acted indirectly, as solicitor, in the name of another; and this comes with more force within the mischiefs contemplated by the statute, than a direct and open assumption. " The act (continues the chief justice) intended to render that practice unlawful, which was lawful before. Practising in the name of another solicitor was always mal-practice, and punished as such by the courts. It is a fraud practised both upon the solicitor and the court, and there is no need of a statute prohibition. If such conduct was within one of the mischiefs that the statute had in view, the power of the courts was adequate to meet and redress it. If the statute does in fact reach this case, it is so far a declaratory provision, and per-

fectly useless." I must confess that I have, for the first time, now learned, that rules of practice adopted by courts are to be considered as having the same sanction, efficacy, and force, as law; and that an act of the legislature, prohibiting what is previously prohibited by a rule of court, is to be considered as a declaratory act, and as such, useless. This doctrine is certainly novel, and I know of no ground upon which courts of justice, even within the sphere of their acknowledged jurisdiction, can lay claim to legislative powers. A court has power to prescribe rules of practice, and rules for the conduct of its officers; and the chancery was as fully authorized to prohibit a master or clerk from acting as solicitor in his own name, as from so acting in the name of another. The existence of the rule would depend, in the one case as well as the other, on the volition of the court, and might vary at pleasure; and surely, if the rule of conduct prescribed by the court was a salutary one, it was proper in the legislature, and beneficial to the community, that it should receive the weight of a law, which would give it permanency and stability, and that it should be enforced by punishment. The opinion of the chancellor, who appears to have given great attention and consideration to this subject, is directly contrary, and seems to be founded on firmer ground. He considers the conduct of the prisoner as an offence against the statute. " I do not think," says he, " that the distinction taken, that the word *as* is to be construed to identify the restraint with a person who would have been competent to act as solicitor, if his capacity as such had not been legally suspended, is well taken; for, in my opinion, the acting in that capacity simply, while master, is sufficient to bring it within the purview of the statute. If so, it is not an offence deduced from principle only, as was contended, but in contravention of a positive law. Devest this case of the circumstance that the person acting as solicitor, being a master of the

361

IN ERROR.
.....
ALBANY,
Feb. & March,
1810.

YATES
v.
THE PEOPLE.

IN ERROR.

ALBANY,
Feb. & March,
1810.

YATES
v.
THE PEOPLE.

court; and it is clearly within the case from *Burrow's Reports.* (1 *Burr.* 20.) I still retain my opinion, (continues the chancellor,) that the master filed the bill in question contrary to the provision of the statute." That the chancellor proceeded on this ground, is to be collected not only from his explicit opinion, but from these considerations: He imputed no misfeasance or nonfeasance to the prisoner, as master merely; the offence was, acting as a solicitor, while master. Now, as this could not have been a contempt, or an offence of any kind, if the statute had not been passed; the act of the prisoner was, if any offence, a statutable offence. But we will suppose, that the chancellor is mistaken in imputing a violation of the statute to the prisoner, it follows, that the case is stronger in his favour. He has been convicted of a violation of a statute, when no violation existed; he has been declared guilty, when he is not guilty; and this supposed misdemeanor, supposing it connected with a contempt, has entered into the estimate of his crime, the quantity of his punishment, and the extent of his aggravation, when it ought never to have been taken into the account.

The proceedings in chancery are, according to the course of the civil law, without grand or petit juries, and therefore the chancellor cannot take cognisance of crimes. If he proceeded against the prisoner for a statutable offence, and he declares that he did, he transcended his jurisdiction, and the conviction is unquestionably illegal. Our constitution declares, " that trial by jury, in all cases in which it hath heretofore been used in the colony of *New-York,* shall be established and remain inviolate for ever." The trial by jury existed in the colony, in all criminal cases; and if the chancellor was permitted to punish for this violation of a statute, the prisoner would be rendered liable to two punishments for the same offence; for in a prosecution in a

court of law, he could not interpose, in bar, a plea *IN ERROR.*

*ALBANY.*
Feb. & March,
1810.

YATES
v.
THE PEOPLE. of *auterfoits convict*. And I take it that this considera- tion is conclusive to exclude the cognisance of chancery. The affair charged to the prisoner is one act, " acting as solicitor while master." If this is a statutable offence, the chancellor cannot, as such, notice it; but must take cognisance of it under some other denomination or cha- racter; and this must be an interposition upon sustaina- ble and substantial grounds, not upon nominal preten- sions. To give a new name to a mode of conduct, does not change the nature of the act, or give it a new com- plexion. If the chancellor chooses to consider a crime and a contempt as synonymous, this will not give him jurisdiction of the offence. The conduct of the prisoner was a statutable offence; and if the chancellor punishes this as a contempt, when, in fact and judgment of law, it is a crime, he acts under a usurped jurisdiction. The same act may be punished twice, although under dif- ferent names; in chancery as a contempt, in a court of law as a misdemeanor. That the chancellor intended to punish the prisoner for violating the statute is obvious, from his having recited the statute in his order of com- mitment; and that the contempt charged was considered by him, not as a distinct substantive offence, but as a result, is obvious from the second opinion delivered by him in chancery. " It is," says he, " the legal inference of a contempt, deduced from a departure from the ob- vious rules of justice and common honesty; and the doctrine of contempts can only be applied as the source of the remedy or correction." Although, in the judg- ment of the chancellor, not a contempt itself; yet being a violation of moral rectitude, it was proper and right to exert the power which the court has over contempts, and to apply that power, as a rod of chastisement, to this depravity. This doctrine, however well intended, can never be considered as legitimate; for then the juris- dictional functions of all courts might, under the pre-

IN ERROR.
.....
ALBANY,
Feb. & March,
1810.

YATES
v.
THE PEOPLE.

tence of constructive contempts, or some other plausible assumption, be exercised to an unlimited extent, and be commensurate and coextensive with all departures from justice and common honesty.

Considering this conviction, however, as composed of different ingredients, as of a mixed amphibious character, as comprising a contempt and a statutable offence, mal-practice, and a violation of official obligation, it is evident that the chancellor has undertaken to try a contempt which he can try, and a statutable offence which he cannot try; to mingle legitimate and illegitimate subjects together, and to apply one indivisible punishment to the whole. The case of *The King* v. *Collyer and Capon*, (*Sayer's Reports*, 44.) is a case in point. The defendants were sentenced by a court of quarter sessions to be imprisoned one month, to ask pardon on their knees, and to publish an account of the sentence in the newspapers. On a *habeas corpus*, they were discharged by the court of K. B. because the conviction was illegal, in prescribing two of three punishments not authorized by law. The present case is a stronger one; for if a conviction is illegal in prescribing a punishment not authorized, it must, *à fortiori*, be illegal, if a court not empowered to take cognisance of the crime, should, nevertheless, assume it, and punish accordingly. In the latter case, the proceeding was unwarrantable from its inception; in the former only in its termination.

I, therefore, conceive this branch of the subject, free from the least *scintilla* of doubt, and from the least shade of obscurity. I consider it as the strongest and firmest ground on which the prisoner stands. And so considering it, I might here rest the investigation of the remainder of this, and the three subsequent points, and proceed immediately to the last point. But considering the magnitude and importance of the question, I shall treat it in the manner I originally proposed.

The second objection taken to the legality of the con-

viction is, that he was not admitted to the benefit of in-
terrogatories. It has been stated by the chief justice
that it does not appear on the return that he was not
examined on interrogatories. True it is, that it does
not expressly appear; but it expressly appears, that he
was convicted on the affidavits of certain persons; and
it is not stated, that he was admitted to purge himself
upon oath. *Quod non apparet, non est.* The silence of
the order, is conclusive as to the fact. If it was essen-
tial and indispensable to a conviction, that a purgation
on oath should be admitted, the omission of this mate-
rial link in the chain, or in the inducing reasons for the
commitment, is a fatal oversight. Although the denial,
under oath, of a contempt in chancery, is not conclusive
as it is in a court of law, yet, as the proceedings in
such cases are summary, without the compulsory at-
tendance of witnesses and trial by jury, against the
rules of common law, and contrary to the genius of a
free government, the party charged, ought, at least, to
have the benefit of a purgation on oath. For if it does
not destroy the charge of criminality, it may lessen its
shades; and if it does not prevent punishment, it may
diminish its severities. And I cannot think, that the
reason assigned by the chancellor, for not admitting the
prisoner to exculpate himself on oath, is satisfactory.
" It is on that ground, (says the chancellor, to wit, the
application of the corrective or remedial doctrine of con-
tempts, to the punishment of a departure from justice
and common honesty,) that the master has not been
called on to answer on interrogatories, and that his
affidavit was rejected, as inadmissible." That is, "he has
not been admitted to his interrogatories, because he is
guilty of injustice and dishonesty. If he had been
charged with a disturbance in court, or for not obeying
the process of the court, or any other actual contempt,
I should admit him to an exculpation; but, inasmuch
as he is said to have behaved dishonestly and unjustly,

IN ERROR.
.....
ALBANY,
Feb. & March,
1810.

YATES
v.
THE PEOPLE.

I shall not indulge him. The same protection and justification which are allowed him in slight offences, shall be withheld from him in flagrant cases. And taking it for granted, that the charges of his accusers are true, I shall proceed to convict him, without admitting that mode of extenuation, if not justification, marked out by the invariable course of such proceedings." To show the injustice of this proceeding, let us suppose, that *Peter W. Yates* was the only witness against the prisoner, to prove that he acted without his authority; that the oath of the complainant *Bacon*, should establish beyond doubt, that he paid *Peter W. Yates* a sum of money to change the solicitor, and that the prisoner, on being admitted to his oath, should state, that he had an express authority from him to make use of his name. Would not this purgation, fortified and upheld in an essential point, by the oath of the complainant himself, completely rebut and prostrate the testimony of *Peter W. Yates*, so far as it relates to this aggravated feature of the charge; and, of course, in extenuating his offence, have extenuated his punishment?

The remaining objection to the legality of the commitment is, that it is not definite and terminable, either by the effluxion of time, or on the doing of some act by the prisoner.

In the case of summary convictions, the offender ought not to be put in a worse situation, as to the duration of the punishment, than if he had enjoyed the benefit of a trial by jury; and a conviction in the latter case, unlimited as to the period of confinement, would be relieved against by *habeas corpus*, or reversed on a writ of error. This power in the *English* courts of committing during pleasure, seems to have been borrowed from the indefinite and omnipotent privileges claimed by the lords and commons; but even in commitments by either house of parliament, as well as by our senate and assembly, the imprisonment ceases

with their adjournment, and is, therefore, terminable on the happening of that event. And it is no argument to say, " that if the time should be definite in the sentence, the court could not alter it, even upon the submission of the party, and it would operate rigorously upon him ;" because the conviction may be made limited in point of time, and yet provide, that within the defined period, the prisoner may be discharged, if the court shall direct. And where an imprisonment is made to terminate on the doing of a certain act, on the part of the prisoner, every legitimate object will be answered, and his course of future conduct expressly marked out. He will not depend for his liberation upon the varying volition or the fluctuating caprice of the judge ; and it is not satisfactory to say, " that it is the established course in the courts of law and equity to receive the submission of the party whenever he is ready to offer it, and on reasonable satisfaction made, to discharge him." The offence being completed, the whole punishment and extent of the submission can as well be prescribed at the time of the conviction as at any subsequent period. An indefinite commitment as to time, with an implied understanding that the prisoner shall be released on submission, is, in fact, an imprisonment during the pleasure of the judge, which pleasure may continue until the subject of punishment is released by death ; for what will be deemed a sufficient submission, or atonement, is still preserved as a mysterious deposit in the bosom of the judge ; and when the prisoner offers his atonement, the judge may reject it as inadequate, or impose one impossible to be fulfilled, or declare, that the end of punishment has not been sufficiently realized. And there can be no reason of necessity, no consideration involved with the maintenance of judicial authority, that requires arbitrary imprisonment, where the proceedings are summary, and in derogation of the principles of free government. Every court in the state, from the court of the last resort

IN ERROR.
.....
ALBANY,
Feb. & March,
1810.

YATES
v.
THE PEOPLE.

IN ERROR.
•••••
ALBANY,
Feb. & March,
1810.

YATES
v.
THE PEOPLE.

to the lowest tribunal, may commit for contempts, and. I presume that this high-toned doctrine of contempts will be applied to them all. Every part of the state will then exhibit its magistrates armed with the power of indefinite imprisonment for contempts. Giving the line to this doctrine, and allowing practical operation to the dogmas of judicial discretion, of imprisonment during pleasure, and of exclusive cognisance of contempts, no man will be safe from the coercion of tyranny. If "man, proud man, dress'd in a little brief authority," does not then "play such fantastic tricks, before high heaven, as make the angels weep," he may still make your citizens groan in prisons, deprived of the blessings of freedom, of the comforts of domestic life, and of the rights and liberties which were procured for us, by the soldiers and statesmen of the revolution. Upon the doctrine contended for, a throne of judicial tyranny may be erected in every part of the country, unless the legislature shall interpose, and define the nature of contempts, the period of imprisonment, the extent of fines, and shall say to our courts, "thus far shalt thou go, and no farther." A bill formed with this view passed the senate at their last session, but was not acted upon in the assembly.

2, 3. The second and third points suggested for inquiry, are, whether a judge, under the *habeas corpus* act, had cognisance of this case; and whether a reimprisonment under the *habeas corpus* act was justifiable? As these two points are intimately blended together, I shall consider them conjunctly.

It is contended, that the judge usurped a jurisdiction not given him by the statute; and that, therefore, his decision was null and inoperative, being *coram non judice*.

Our statute differs from the *English*, not only in phraseology, but in this important respect, that a judge may take cognisance of the case of any *person imprisoned*, whereas in *England*, he is confined to persons *committed*

IN ERROR.

ALBANY,
Feb. & March,
1810.

YATES
v.
THE PEOPLE.

or *detained for crimes.* In *England,* in the year 1757, (6 *Bac. Abr.* 603.) a gentleman was impressed, and on application to a judge for a *habeas corpus,* in vacation, a difficulty arose about granting it. He was, however, relieved by the admiralty. This produced a discussion in parliament, and the opinions of the twelve judges were taken on the extent of the remedy furnished by the *habeas corpus* act. It is easy to perceive that apprehensions existed whether a salutary interference, by parliament, might not clash with the practice of impressment, and the service of the navy, and nothing was done. Our statute, in enlarging the powers of the judge, evidently gave him cognisance of all cases of imprisonment other than persons convict, or in execution by legal process, or committed for treason, or felony, plainly and specially expressed in the warrant of commitment. A judge in vacation, has then exactly the same powers under the *habeas corpus* act, that the supreme court has at common law, except in treason and felony; for I take it, that the same limitation applies to the powers of the supreme court, at common law, in the case of persons convict, or in execution, by legal process, that are applied to the judge by the statute; the legality of the commitment being in both forums a subject of judicial investigation and determination. The supreme court have no more right to discharge a person committed legally for a crime, or imprisoned in a civil action, than a judge has under the statute. There is this further difference between the statutes: the *English* judge is bound to take the recognisance of the prisoner, to appear in the *king's bench,* or in such other court, where the offence is properly cognisable, as the case shall require. Our statute does not mention any court by name, but directs a recognisance of the prisoner, for his appearance *at the next court, where the offence is properly cognisable, as the case shall require.* This difference, although verbal, may illustrate a difficulty which has been presented. In

*IN ERROR.*

ALBANY,
Feb. & March,
1810.

YATES
v.
THE PEOPLE.

both statutes, nearly the same provision exists, to the following effect: in the *English* the recognisance . is to be taken, "unless it shall appear, that the party so committed is detained upon a legal process, order or warrant, out of some court that hath jurisdiction of criminal matters, or by some warrant, signed and sealed, with the hand and seal of any of the said justices or barons, or some justice or justices of the peace, for such matters or offences, for the which, by law, the prisoner is not bailable." And our statute says, "unless it shall appear unto the said chancellor, or judge, that such prisoner is detained upon a legal process, out of some court having jurisdiction of criminal matter, or by some warrant, under the hand and seal of a judge or justice, for some matter or offence, for which, by law, the prisoner is not bailable." The obvious construction of this power of bailing, and of the limitations of the power is, that the judge shall, in all instances, bail, except the prisoner is committed for matters not bailable by a court of criminal jurisdiction, or by a judge or justice, acting in a criminal case; evidently referring back to the exceptions of felony and treason, in the antecedent part of the section; and the words, *for some matter or offence for which, by law, the prisoner is not bailable,* relate as well to commitments by criminal courts, as to commitments by a judge or justice. The recognising to appear in the king's bench, in *England*, the supreme criminal court of the kingdom, shows the application to crimes, to persons committed for offences; and that, as the power only embraced crimes, the limitation of the power cannot go beyond the power itself, nor can the exception be made broader than the rule. Commitments by chancery cannot certainly come into view in this part of the section, which treats only of crimes; for chancery is not a court having jurisdiction of criminal matters; and who ever heard of a man's being recognised to appear in that court to answer for an offence?

6

IN ERROR.
.....
ALBANY,
Feb. & March,
1810.

YATES
v.
THE PEOPLE.

A judge is certainly constituted a tribunal to pronounce upon the legality of a commitment. He is not to intermeddle, when the prisoner is convict or in execution by legal process; when he is detained upon a legal process out of criminal courts, for some matter or offence not bailable; or, by warrant under the hand and seal of a judge or justice, for such matter or offence not bailable. If a prisoner is brought before a judge, on a *habeas corpus*, who is to determine on the legality of the commitment? Is he to take it for granted that every commitment of every court is in execution by legal process, and legal, and that every commitment of every court and magistrate for offences not bailable is legal, and to remand the prisoner accordingly? Will not this render the *habeas corpus* act of little value, and circumscribe its operation in a most pernicious manner? The judge has jurisdiction, and if he has jurisdiction, his judgment may be erroneous, but it cannot be void. If he decides that the process is illegal, he may err, and so may all courts; but erroneous judgments are not void, but voidable. Several cases have been indicated by the counsel, where discharges have been made by our judges, under the *habeas corpus* act, of persons committed by courts. To these let me add a decision by Judge *Hobart*, in the case of a commitment, for a contempt, *in facie curiæ*, in a justice's court, in *New-York*. The prisoner was discharged by him, on a *habeas corpus*; and although the subject was much discussed at that time, yet I never heard a doubt expressed of his jurisdiction. The truth then is, that a judge, in vacation, has the same powers as the supreme court, except in treason and felony; and the power under the *habeas corpus* act, is enlarged and made commensurate and coequal, because the nature of our government requires that unjust imprisonment should meet with a remedy, prompt, efficacious, and extensive.

If, then, the judge had jurisdiction in the cause, whether he decided erroneously or not is now immaterial,

*IN ERROR.*
·····
ALBANY,
Feb. & March,
1810.

YATES
v.
THE PEOPLE.

his discharge being in favour of personal liberty, is final and conclusive. He is, in that respect, a court of dernier resort; and the 5th section of the act declares that " no person, who shall be set at large, upon any *habeas corpus*, shall be again imprisoned for the same offence, unless by the legal order or process of the court wherein he is bound, by recognisance, to appear, or other court having jurisdiction of the cause ;" and imposes a penalty of 1,250 dollars, for such recommitment, "any colourable pretence or variation in the warrant of commitment to the contrary notwithstanding." This provision appears to set this branch of the inquiry at rest. It is the same as in the *English* statute, and it evidently refers, when speaking of the court where the prisoner is bound to appear, or a court having jurisdiction of the cause, to the case of persons, bound to appear and answer for crimes, in criminal courts. In *England*, the king's bench, or court where the offence is properly cognisable, is mentioned. In the 3d section of our statute, any court where the offence is properly cognisable, is specified. If, therefore, the prisoner is recognised to appear at the general sessions, and is convicted there; or, if after being recognised to appear there, his cause is tried in the oyer and terminer, he may be imprisoned as the justice of the case may demand; but by no other tribunal or magistrate, under any pretence whatsoever. If the right of reimprisonment is sustained in other cases, the benefits of the writ of *habeas corpus* may be greatly evaded, if not completely nullified. I consider it, therefore, of great importance to personal liberty to resist this extraordinary doctrine. Abuses may, indeed, occur in the exercise of the powers of a judge, under the *habeas corpus* act; but if he errs in favour of personal liberty, he errs on the safe side, and his decision ought not to be called in question.

4. Whether the recommitment by the court of chancery, by order, and not by attachment, is legal.

That any recommitment is illegal in this case, I think, cannot be doubted; but, supposing otherwise, the question is, whether it can be done in the shape of an *order*. An order, in the first instance, would not have been warranted by law, and the attachment was spent, and must be considered as *functus officio*. I should conceive that the same authority is necessary to operate a recaption as a caption. Wherever a man is deprived of his personal liberty, our law seems to require the solemnity of a writ or warrant. It was as easy to have issued a new attachment under the seal of the court, reciting the first attachment, and the proceedings under it, as it was to issue the order. And, although I think this to be the most unessential point in the inquiry, yet the case of *Furlong* v. *Bray*, (2 *Saund.* 182.) is very strong and pointed. It appears that an action of false imprisonment was brought against the warden of the fleet; a plea of justification was put in, that the plaintiff was committed by an order of the court of chancery; and it was determined, by the court, that a person cannot be imprisoned by an order of the court of chancery, without a writ. And here, let me remark, that the counsel for the prisoner has contended, that if the person is in court, he may be committed by an order, and that the order will refer to his presence, by stating, *that he stand committed*; but that, if he be out of court, a writ must issue. The order, in the case of *Furlong*, was a case of this nature, *that he should stand committed*; and yet, although it comes within the express admission of the counsel, it was adjudged insufficient. Perhaps the court may regularly commit on an order, in the first instance, if the party is in court, for the sake of securing his person; but is not this to be considered as the mere groundwork of a writ, and ought it not, in all cases, to follow the order? The case of *Furlong* v. *Bray* is also reported, 1 *Mod.* 272. and the court said, that the plea of justification was vitious, in not setting forth an attachment.

*IN ERROR.*

ALBANY,
Feb. & March,
1810.

YATES
v.
THE PEOPLE

IN ERROR.
.....
ALBANY,
Feb. & March,
1810.

YATES
v.
THE PEOPLE.

5. The fifth and last point is, whether the judgment of the supreme court, on a view of the first point only, admitting the legality of a commitment by order, the want of jurisdiction in the judge, and power of reimprisonment, ought not to have been in favour of the prisoner; and whether he ought not to have been discharged on some or all of the other grounds?

If the original commitment was illegal, the supreme court ought to have discharged the prisoner; or if a reimprisonment was contrary to law, or if a commitment by an order, instead of an attachment, is unwarrantable; in either of these cases, there can be no doubt but that they ought to have interposed in his favour, unless it can be shown, that legal impediments exist; and it is pretended that courts will not interfere with commitments of tribunals of coördinate or superior jurisdiction, particularly with convictions for contempts, and by the remedy of a *habeas corpus*.

The chancellor has, in effect, and to a certain extent, given up this ground. He says,* " That a *habeas corpus* is a proper remedy, in all cases of unlawful imprisonment; that the judicial officers, to whom is confided the important trust of determining on the legality of imprisonments, are not to be restrained by the consideration, that such imprisonments are imposed by officers of coördinate or superior grade, I am not disposed to deny; but the most liberal construction of their authority will circumscribe it, by some limits which it is not legally competent to them to overleap."

It was originally held, that a court could not relieve, in any case, by *habeas corpus*, until the conviction was quashed, or reversed, by a writ of error. Before the *habeas corpus* act, the celebrated case of *Bushell* occurred; he was fined, as a juror, for giving a verdict contrary to law, contrary to full and manifest evidence, and contrary to the direction of the court, in matter of law, by the commissioners of *oyer* and *terminer*; and was commit-

* See the printed case of *Yates*, p. 96, 97.

IN ERROR.
·····
ALBANY,
Feb. & March,
1810.
YATES
v.
THE PEOPLE.

ted to prison for not paying his fine. On a *habeas corpus*, returned into the court of common pleas, he was discharged, and the court held, that " quashing the order of commitment, upon a *certiorari*, which the king's bench may do, but not the common pleas, is not material in this case.

" 1. The prisoner is to be discharged, or remanded, barely upon the return, and nothing else, whether in the king's bench, or common pleas.

" 2. Should the king's bench have the order of commitment certified and quashed, before the return of the *habeas corpus*, or after, what will it avail the prisoners? they cannot plead *nul tiel record* in the one case or the other.

" 3. In all the precedents shown in the common pleas, or in any that can be shown in the king's bench, upon discharging the prisoner, by *habeas corpus*, nothing can be shown of quashing the orders, or decrees of that court that made the wrong commitment.

" 4. It is manifest, where B. R. hath, upon *habeas corpus*, discharged a prisoner committed by the chancery, the person hath again been recommitted, for the same cause, by the chancery, and redelivered by B. R. but no quashing of the chancery order ever heard of.

" 5. In such cases of recommitment, the party hath other and proper remedy besides a new *habeas corpus*, of which I shall not speak now.

" 6. It is known, that if a man recover in *assise*, and after in a redisseisin, if the first judgment be reversed in the assise, the judgment in the redisseisin is also reversed. So if a man recover in waste, and damages given, for which debt is brought, (especially if the first judgment be reversed before execution,) it destroys the process for the damages in debt, though by several originals. But it may be said, that in a writ of error of this kind, the foundation is destroyed, and no such record is left. But as to that in *Drury's* case, (8 *Co.*

IN ERROR.
ALBANY,
Feb. & March,
1810.

YATES
v.
THE PEOPLE.

*Rep.*) an outlawry issued, and process of *capias* upon the outlawry, the sheriff returned *non est inventus ;* and the same day the party came into court and demanded *oyer* of the *exigent*, which was the warrant of the outlawry ; and showed the *exigent* to be altogether uncertain and insufficient, and consequently the outlawry depending upon it to be null. And the court gave judgment accordingly, although the record of outlawry were never reversed by error ; which differs not from this case, where the order of commitment is judicially declared illegal ; though not quashed or reversed by error, and, consequently, whatever depends upon it, as the fine and commitment do ; and the outlawry in the former case was more the king's interest, than the fine in this.' (*Vaugh. Rep.* 157, 158.)

This opinion of the court settled the law on the question, whether the court would relieve, by *habeas corpus*, the conviction not being first quashed or reversed : and it is deserving of attention, not only for its importance, but for the great learning and talents it displays. It took place before the *habeas corpus* act, when the *habeas corpus* was not considered a writ of right, and in the common pleas, which has no jurisdiction over crimes, and which could not, of course, quash the conviction. The prisoner was discharged, leaving the judgment unreversed. The great stress which has been laid upon relieving against the execution by *habeas corpus*, and still leaving the conviction or judgment untouched, must now be for ever put at rest ; and all the chimerical speculation built upon it, must vanish into thin air. The courts in *England* have followed this parent case, and I think, that they have generally adopted the following rule : Where the conviction is substantially wrong, they relieve in a summary way by *habeas corpus;* where formally or technically wrong, they put the party to his *certiorari*, or writ of error.

Accordingly, in *Bethell's* case, (1 *Salk.* 348. 5 *Mod. Rep.* 19.) who was fined, by the *oyer* and *terminer*, 150*l.* for buying and selling old money, and committed until paid, he brought a *habeas corpus*, in B. R. and took two formal exceptions to the conviction: 1. That he was sentenced to the custody of the gaoler, not of the sheriff; 2. That the word *committitur* was not used, but only *remaneat.*

The court put the party to his writ of error, saying that where a commitment was without cause, a prisoner may be delivered by *habeas corpus;* but where there appears to be good cause, and a defect only in the form of commitment, as in this case, he ought not to be discharged. And the court said, that before *Bushell's* case, no man was ever delivered by *habeas corpus*, without writ of error, from a commitment of a court of *oyer* and *terminer.*

In the case of *Rex* v. *Chandler*, (1 Ld. *Raym.* 545.) on a *habeas corpus*, brought to discharge a prisoner from custody, on an illegal commitment by two justices of the peace, upon a conviction, under the act against deer-stealing, he was discharged. An objection was started by counsel, that the *conviction ought to be quashed*, before the prisoner could be discharged, for the execution is good until the judgment be reversed. This was overruled. *Holt*, Chief Justice, referred to *Bushell's* case, where the jury were fined, and were committed in execution for it in court; that this was a judgment, and yet he was discharged on *habeas corpus*, in C. B.

In *Crawley's* case, (*Cro. Car.* 567.) in B. R. it appeared that he was committed to gaol by two justices, until he should obey an order of taking the office of constable on him. The court held that he was unjustly committed, and discharged him on *habeas corpus.*

The court of B. R. in *England*, is the only one of the four great courts which has criminal jurisdiction, and it does not appear, that the case ever came up where there

*IN ERROR.*

*ALBANY,*
*Feb. & March,*
*1810.*

*YATES*
*v.*
*THE PEOPLE.*

was a *habeas corpus* brought, to be redressed against any of its determinations. The cases that I have pointed out show, conclusively, that prisoners have been discharged on *habeas corpus*, on commitments by the courts of *oyer* and *terminer*, and other tribunals of inferior juris= diction. The relief to be granted against unjust imprison= ment, has no relation to the court committing, but to the cause for which the commitment was made. As the three great courts of *Westminster Hall*, the chancery, common pleas, and exchequer, cannot convict for crimes, but only for contempts, the only probable case, in which the exer= cise of their committing power could come into question, is in the latter case. It has been held incidentally, and as an *obiter dictum*, that the courts of the *Hall* will not med= dle with each other's convictions of contempt. And the doctrine has been reiterated by the chief justice ; and it is most strenuously contended, that in the single case of contempts only, a review of the decision cannot take place ; a case of all others that requires most a con= trolling power.

Although the courts of *Westminster Hall* have not been called upon to review each other's commitments for contempts, persons imprisoned by the peers and commons have endeavoured to obtain the benefit of the writ of *ha= beas corpus.* The case of *The Earl of Shaftsbury*, (2 *State Trials*, 615. 1 *Modern*, 144.) who was committed by the house of lords for high contempts against it, and during his majesty's pleasure, and the pleasure of the house ; and the case of *The Queen* v. *Paty and others*, (2 *Salk.* 894. 2 *Ld. Raym.* 1005.) show that the B. R. would not relieve in this way against either house of parlia= ment, as does also the case of *Crosby*. (3 *Wils.* 188. 2 *Bl. Rep.* 754.) The true reason was the undefined and omnipotent privileges of parliament ; and the judges did not probably dare in those times of turbulence to encounter the vengeance of that body. In the case of *Paty and others*, Chief Justice *Holt* protested against

making any court final judges of contempts, and declared "that it would introduce a state of confusion by making every man a judge in his own cause, and subverting the measures of all jurisdictions." This doctrine of the conclusive commitments of parliament, derived from the causes I have mentioned, has been extended, it is supposed, by the courts of the *Hall* to each other; so at least the judges said, when deciding on *Crosby's* case, although that question was not before them; dreading, probably, a recurrence of the conflicts which took place between the chancery and B. R. in the time of Sir *Edward Coke*, and undoubtedly stating the confusion it would introduce, and the superior competency of each tribunal to determine on contempts against itself. Taking it for granted that the courts of *Westminster Hall* have, from motives of policy and comity, refrained from overhaling each other's commitments for contempts, it does not follow that this forbearance is to be a law for our tribunals. Every principle worthy of respect, every consideration of personal liberty, forbid an imitation of their conduct. We have but two supreme coördinate tribunals of original jurisdiction; one is supreme in law, the other in equity. Any collisions between them can be healed by this supreme court of appellate jurisdiction. If contempts against inferior courts can be overholed by *habeas corpus*, there can be no conceivable reason, except that of courtesy, why those against superior tribunals should be exempt; and comity ought not to ride triumphant over liberty.

As the question now stands before this court, the objection that the discharge was made by a judge in vacation, vanishes. The question is, whether the supreme court, which is admitted to be a competent tribunal, ought not to have discharged him in term; and the only objection now must be, that in all other cases, except those of contempts, relief will be granted against unjust imprison-

IN ERROR.
.....
ALBANY,
Feb. & March,
1810.

YATES
v.
THE PEOPLE.

IN ERROR.
.....
ALBANY,
Feb. & March,
1810.

YATES
v.
THE PEOPLE.

ment; as if there was something sacred in commitments of that description; something that forbade the hand of justice from extending relief, and something that invested the higher courts with unlimited, uncontrolled powers over personal liberty, whenever they thought fit to impute contempt. But admitting the whole ground, (and I only admit it for the sake of argument;) it covers only contempts. Whenever courts go beyond them, they are liable to have their decisions reviewed and re-examined and nullified. In the case of *Crosby*, Lord Chief Justice *De Grey* said, " as for the case of the chancery committing for crimes, that is a different thing, because the chancery has no criminal jurisdiction; but if that court commits for contempts, the persons committed will not be discharged by any other court. (3 *Wilson*, 203.)

The present case is one of that description. The prisoner was committed for a statutable offence ; it so appeared on the return of the attachment. The supreme court refused to grant relief against the plain intimation of Chief Justice *De Grey*, who would undoubtedly have done it in a similar case.

Upon a view of the whole of this important and complicated question, I am fully of opinion that the supreme court decided erroneously, and that their judgment ought to be reversed.(a)

A majority of the SENATORS being of the same opinion, it was thereupon ordered and adjudged, that the judgment of the supreme court be reversed.

(a) As no other members of the court assigned their reasons, but answered simply in the affirmative or negative; I have considered the majority, who were of opinion that the judgment of the supreme court ought to be reversed, as concurring on all the grounds expressed in the opinion above delivered; and have, accordingly, so stated the points as decided in the cause, in the marginal note, pp. 337, 338.

The following is a copy of the record, judgment, and
*remittitur*, sent to the supreme court:

IN ERROR.
......
ALBANY,
Feb. & March,
1810.

" Pleas," &c.

A...ES
v.
THE PEOPLE.

" Be it remembered, that, on the fifteenth day of *March*,
in the year of our Lord one thousand eight hundred and
ten, the transcript of the within record and process be-
tween the parties aforesaid, of the plea aforesaid, within
mentioned, with all things touching the same, by virtue
of a certain writ of error prosecuted in the premises
within mentioned by the said *John V. N. Yates*, were
transmitted from the supreme court of judicature of the
state, before the court here for the correction of errors;
and the aforesaid *John V. N. Yates* appearing by his
counsel in the same court here for the correction of er-
rors, on the fifteenth day of *March*, in the year afore-
said, did assign certain matters for errors in the within
record and process aforesaid, for reversing and annul-
ling the judgment aforesaid of the said supreme court
of judicature, in the words following, to wit:

Afterwards, that is to say, on the fifteenth day of
*March*, in the year of our Lord one thousand eight hun-
dred and ten, before the court for the trial of all im-
peachments and correction of errors, comes the said
*John V. N. Yates*, by *Daniel Rodman*, his attorney, and
says, that in the record and proceedings aforesaid, and
also in the giving of judgment aforesaid, there is mani-
fest error in this, to wit, that by the law of the land, the
said *John V. N. Yates* ought to have been discharged
from the *order* of the court of chancery on which he
was arrested and is now imprisoned, and ought not to
have been remitted. In this, therefore, there is mani-
fest error. There is also error in this, that judgment in
that behalf was given against the said *John V. N. Yates*,

IN ERROR.
.....
ALBANY,
Feb. & March,
1810.

YATES
v.
THE PEOPLE.

that he should be remitted, when, by the law of the land, judgment in that behalf ought to have been given to discharge the said *John V. N. Yates*. In this, therefore, there is manifest error. And the said *John V. N. Yates* prays, that the judgment aforesaid, for the errors aforesaid, and other errors in the record and proceedings aforesaid, may be reversed, annulled, and altogether held for nothing, and that he may be restored to all things he hath lost by occasion of the premises, &c.

Whereupon the said court for the correction of errors, after hearing the reasons assigned by the justices of the supreme court for their judgment, and the counsel for the said *John V. N. Yates*, did assign the twenty-seventh day of *March*, in the year aforesaid, for the judgment of the said court, now here; and then and there did, after mature consideration of the errors assigned, order and adjudge, and the said court now here doth order and adjudge, that the judgment of the supreme court, adjudging the cause of the commitment of the said *John V. N. Yates* to the custody of the sheriff of the city and county of *Albany*, in the return of the said sheriff specified to be good and sufficient in law to detain the said *John V. N. Yates* in the custody aforesaid, be, and the same is reversed. And it is further ordered and adjudged, that the cause of the commitment of the said *John V. N. Yates* to the custody of the sheriff of the city and county of *Albany*, in the return of the said sheriff specified, is insufficient in law to detain the said *John V. N. Yates* in the custody aforesaid. And it is further ordered, that the transcript of the record herein, with the judgment aforesaid thereon given, and all things touching the same be remitted into the supreme court, where such farther proceedings shall be thereupon had, for the deliverance of the said *John V. N. Yates* from the custody aforesaid, as may be agreeable to law and justice.

And hereupon the record and proceedings aforesaid, as also the judgment of the said court, are remitted to the supreme court, to be proceeded upon according to law."

Judgment of reversal.

IN ERROR.
.....
ALBANY,
Feb. & March,
1810.